## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

**NGC DEVELOPMENT, LLC**,
a Florida Limited Liability Company,

Plaintiff,

v.

**KIM J. SETER,** a Colorado citizen, and
**SETER & VANDER WALL, P.C.,**
a Colorado Professional Corporation.

Defendants.

---

## COMPLAINT

---

Plaintiff NGC Development, LLC ("NGC"), for its complaint against Defendants Kim Seter ("Seter") and Seter Vanderwall, P.C. ("SVW"), alleges as follows:

### INTRODUCTION AND SUMMARY OF THE CASE

1.      SVW is a law firm. Seter is an attorney, shareholder, and principal of SVW. Between 2010 and 2019, Seter and SVW were NGC's legal counsel in Colorado. SVW also was NGC's registered agent in Colorado.

2.      NGC is suing Seter and SVW for the following: (1) negligence; (2) breach of fiduciary duty, and (3) aiding and abetting breach of fiduciary duty.

3.      Seter's and SVW's acts, errors, and omissions proximately caused NGC to lose title to real property located in Adams County, Colorado with an appraised value of $7 million as of the date of loss. Seter and SVW also proximately caused NGC to incur hundreds of thousands of dollars in legal fees and costs in litigation with third parties.

1

4.     At the center of this case is a conflict of interests on the part of Seter and SVW, which NGC never waived and, indeed, was non-waivable. At the same time Seter and SVW were NGC's trusted legal counsel in Colorado, they had an attorney-client relationship with Russell Mills ("Mills") not to mention other fiduciary relationships and business entanglements with Mills. This was a conflict of interests for Seter and SVW because Mills was the manager of JUSA Management, LLC ("JUSA-M"), which in turn managed NGC. As detailed in this complaint, Seter and SVW turned a blind eye toward Mills's breaches of his duties to NGC, actively assisted Mills in breaching his duties to NGC, and sought to conceal from NGC Mills's breaches of his duties to NGC. Time after time, Seter and SVW served Mills's interests at the expense of NGC's interests. Seter's and SVW's relationship with Mills compromised their ability to provide independent, objective, candid advice to NGC.

5.     Seter and SVW knew that the majority member of NGC was Avid Hunter, Ltd., an entity owned and controlled by Klaus Gondert, a German citizen who speaks limited English. Seter met with Klaus Gondert on more than one occasion. Seter knew that Mills reported to Klaus Gondert and was required to obtain Mr. Gondert's approval for certain major decisions. Seter and SVW knew how to contact Klaus Gondert as well as his daughter Steffi Gondert, who acted as Mr. Gondert's translator and assistant.

6.     Unbeknownst to Klaus Gondert, Mills had a self-dealing agenda—which Mills shared with Seter and SVW. Mills's agenda included acquiring a 15-Acre Parcel that NGC owned in Adams County for himself. Whether an integral part of his self-dealing agenda or a consequence thereof, Mills allowed real property taxes that NGC owed on the 15-Acre Parcel to remain unpaid for years. This led to third parties acquiring tax lien certificates on the 15-Acre Parcel.

7.      Seter and SVW did considerable work for NGC related to the unpaid taxes on the 15-Acre Parcel. That work included protesting Adams County's tax assessment of the 15-Acre Parcel, advising NGC with respect to the process for redemption of certain tax liens against the property and the corresponding procedure by which the holder of a tax lien certificate could apply for a treasurer's deed, and monitoring the 15-Acre Parcel so that NGC would be aware of any such application for a treasurer's deed. Seter and SVW were acutely aware of the risk to NGC if the tax lien certificates were not redeemed.

8.      In 2017 and 2018, Seter and SVW worked with Mills on increasingly far-fetched plans to redeem the tax lien certificates and avoid loss of the 15-Acre Parcel. Mills's plans included using affiliated entities to acquire title to the 15-Acre Parcel from NGC and obtaining funds from unverified and untrustworthy foreign sources allegedly in the Middle East and Africa to carry out his plans.

9.      In the second half of 2018, the unredeemed tax lien certificates on the 15-Acre Parcel became a crisis. Adams County notified SVW that it would issue a treasurer's deed on the 15-Acre Parcel on November 29, 2018, unless NGC paid the taxes.

10.      Mills told Seter and SVW that his latest plan to redeem the tax lien certificates involved having an unnamed "investor" wire transfer an absurd but vaguely defined amount—$80,000,000 or $100,000,000—to SVW's COLTAF account. Mills then sent Seter an email to confirm his feverish plan, explaining that Seter and SVW were to use part of the money to pay the taxes while using the balance for an array of projects, from real estate acquisitions to charitable endeavors in Kenya. Seter recognized that Mills was delusional and told others at SVW that Mills's plan was "BS."

3

11.     Even though Mills's plan was objectively unbelievable, and even though it entailed conflicted-interest transactions on its face, and even though if Seter himself called that plan "BS," neither Seter nor anyone else at SVW made any effort to inform Klaus Gondert or Steffi Gondert about Mills's plan or the imminent risk of loss of the 15-Acre Parcel.

12.     As Seter expected, the $80,000,000 or $100,000,000 wire transfer never materialized. Seter and SVW still did nothing to alert Klaus Gondert or Steffi Gondert that NGC was at imminent risk of losing title to the 15-Acre Parcel.

13.     On November 29, 2018—the day Adams County stated that it would issue the treasurer's deed—SVW helped Mills with a last-ditch effort involving negotiations with a hard-money lender on terms that started as extortive and only got worse. Seter and SVW kept their loyalties to Mills and did not alert Klaus Gondert or Steffi Gondert to the peril that NGC faced. Mere hours before Adams County was to issue the treasurer's deed, the hard-money lender demanded terms that required NGC deed the property to his company. Mills had no authority to do so but signed the deed anyway under duress, and NGC lost title to the 15-Acre Parcel.

14.     Had Seter or anyone else at SVW simply emailed or otherwise contacted Klaus Gondert or Steffi Gondert at any time prior to November 29, 2018, and informed them of the need to redeem the tax lien certificates on the 15-Acre Parcel, Klaus Gondert immediately would have addressed the problem by paying or causing NGC to pay the taxes, and NGC would not have lost title to its valuable property. Klaus Gondert had the financial means to have paid the taxes at any time. But for Seter and SVW helping Mills carry out plans that conflicted with NGC's interests and covering up Mills's wrongdoing, NGC would have kept title to the 15-Acre Parcel.

## PARTIES

15.     NGC is a limited liability company organized under the laws of the State of Florida with its principal place of business located at 1990 Main Street, Suite 801, Sarasota, Florida 34236. The current manager of NGC is Avid Hunter Management, Ltd. The current members of NGC Development, LLC are as follows:

a.     Avid Hunter, Ltd., a limited partnership organized under the laws of the State of Florida, with its principal place of business located at 1990 Main Street, Suite 801, Sarasota, Florida 34236. The general partner of Avid Hunter, Ltd. is Avid Hunter Management, Inc., a corporation incorporated under the laws of the State of Florida with its principal place of business located at 1990 Main Street, Suite 801, Sarasota, Florida 34236. The sole owner and limited partner of Avid Hunter, Ltd. is Klaus Gondert, who is a citizen of the Federal Republic of Germany and resident of Trier, Germany. Avid Hunter, Ltd. is the majority member of NGC Development, LLC.

b.     JUSA Development, LLC, a limited liability company organized under the laws of the State of Florida with its principal place of business located at 1990 Main Street, Suite 801, Sarasota, Florida 34236. The current manager of JUSA Development, LLC is Avid Hunter Ltd. The member of JUSA Development, LLC is Russell Mills.

16.     Defendant Kim J. Seter is an attorney who was admitted to practice law in the State of Colorado on October 30, 1984, and whose Colorado attorney registration number is 14294. At all times relevant to this case, Seter has practiced law at the law firm Seter & Wander Wall, P.C. Seter is a citizen of the State of Colorado, being permanently domiciled in the State of Colorado. On information and belief, Seter's residential address is 6384 S Grape Ct, Centennial, CO 80121.

17.     Defendant Seter & Vander Wall, P.C. is a professional corporation incorporated under the laws of the State of Colorado with its principal place of business located at 7400 East Orchard Road, Suite 3300, Greenwood Village, CO 80111. Kim Seter is the registered agent of Seter & Vander Wall, P.C.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and the case is between citizens of different states or, insofar as Klaus Gondert's German citizenship may be imputed to NGC, citizens of a State and citizens or subjects of a foreign state. For purposes of analyzing jurisdiction under 28 U.S.C. § 1332, Klaus Gondert is *not* lawfully admitted for permanent residence in the United States nor domiciled in Colorado.

19.     This Court has personal jurisdiction over Seter and SVW because both are physically present in and domiciled in the State of Colorado. Also, this case arises from their transaction of business in Colorado and commission of tortious acts within Colorado.

20.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because Seter and SVW are residents of Colorado and also because a substantial part of the events and omissions giving rise to NGC's claims occurred in Colorado.

## GENERAL ALLEGATIONS

*A.      The formation of SVW's attorney-client relationship with NGC and Seter and SVW's meetings with Klaus Gondert.*

21.     On or about August 19, 2010, SVW entered an attorney-client relationship with NGC, memorialized by an engagement letter that Seter addressed to Mills. At the time, Mills was the manager of JUSA-M, which in turn was the manager of NGC.

6

22.     SVW agreed to provide legal services to NGC "in connection with the Northgate and Pinnacle Farms projects and various other corporate matters." The "Northgate" project includes the 15-Acre Parcel.

23.     Between 2010 and 2019, Seter and SVW provided legal services to NGC.

24.     From emails and other communications between Seter and Mills as well as NGC's operating agreement, Seter knew of Avid Hunter's membership interest in NGC, knew that Klaus Gondert was the principal of Avid Hunter, knew that Mills reported to Klaus Gondert, and knew that Mills needed Klaus Gondert's approval to take certain actions for NGC.

25.     Seter also personally knew Klaus Gondert and Steffi Gondert, having met both of them. According to deposition testimony by Seter on February 25, 2019, Seter met Klaus Gondert and Steffi Gondert "early on." Seter recalled meeting Steffi Gondert twice. More particularly, Seter recalled enjoying a "nice dinner" with Klaus Gondert, Steffi Gondert, Mills, and Mills's business associate Dan Robison ("Robison") at the Buckhorn Exchange. On a different occasion, Klaus Gondert visited Seter at SVW's offices with Robison, and they talked about NGC's properties. Seter also recalled visiting NGC's properties with Klaus Gondert, Mills, and Robison. Seter knew that Klaus Gondert's "English is not strong" and that Steffi Gondert acted as his interpreter and assistant with respect to matters pertaining to NGC.

26.     Through SVW's representation of NGC, Seter and his associate attorney Russell Newton ("Newton") obtained email addresses for Klaus Gondert and Steffi Gondert. Although Seter's and SVW's direct communications with Klaus Gondert and Steffi Gondert were infrequent as compared to their communications with Mills and Robison, Seter and SVW did communicate with them by email and had their email addresses. For example, on December 7, 2015, Seter sent an email to Mills, copying Klaus Gondert, Steffi Gondert, Newton, Robison, and SVW associate

attorney Elizabeth Dauer. As another example, on January 6, 2016, Newton sent an email to Mills, copying Klaus Gondert, Steffi Gondert, and Seter. Mills occasionally would email Seter or Newton and copy Klaus Gondert and Steffi Gondert; or, Mills would forward emails received from Klaus Gondert and Steffi Gondert to Seter or Newton. Similarly, Mills sometimes sent emails to Klaus Gondert and Steffi Gondert and copied Seter. For instance, Mills emailed Klaus Gondert and Steffi Gondert on November 27, 2017, copying Seter and Robison. In summary, Seter, Newton, and SVW knew how to contact Klaus Gondert and Steffi Gondert by email (if not by other means as well) and had the ability to communicate directly with them by convenient and instantaneous means at any time.

**B.** **Seter's and SVW's representation of NGC specifically with respect to property tax matters concerning the 15 Acre Parcel.**

27.     A significant part of Seter's and SVW's representation of NGC concerned the property taxes assessed by Adams County on the 15-Acre Parcel. Seter and SVW appealed Adams County's tax assessment on behalf of NGC. Seter and SVW advised NGC on issues stemming from the nonpayment of those taxes at least to and including November 27, 2018. The scope of Seter and SVW's representation of NGC included, among other matters, advising and representing NGC with respect to unpaid taxes on the 15-Acre Parcel.

28.     Beginning on or about June 1, 2011, Seter and SVW represented NGC with respect to an appeal of an error in Adams County's valuation of the 15-Acre Parcel. Seter summarized the error as follows: "The 2011 Real Property Notice of Valuation . . . states a combined value of $1,494,092 for the land and a building. The Commercial Property Profile from the Assessor's website divides the valuation between $108,707.00 for a building and $1,385,385 for 21.2027 acres of vacant land. . . . However, the Parcel consists of only 15.185 Acres."

29.     SVW's representation of NGC in appealing Adams County's valuation of the 15-Acre Parcel continued in 2013, with SVW protesting Adams County's 2012 valuation of the parcel and asserting various errors in the valuation.

30.     While SVW appealed and protested Adams County's valuations on behalf of NGC, Mills caused NGC not to pay the taxes assessed by Adams County on the 15-Acre Parcel.

31.     NGC requires discovery into Mills's actual reasons and motivations for causing the taxes on the 15-Acre Parcel to remain unpaid. One plausible explanation is that Mills surmised or was led by Seter and SVW to understand that it would disadvantage NGC to pay the taxes that Adams County had assessed on the 15-Acre Parcel while appealing that assessment. Another plausible explanation is that, as a consequence of Mills's diversion of money to other conflicted-interest transactions with Seter and SVW's assistance, NGC's taxes remained unpaid.

32.     Because the taxes on the 15-Acre Parcel remained unpaid, on November 1, 2013, Adams County held a tax lien sale on the assessed taxes and issued a tax lien sale certificate on the 15-Acre Parcel to a third party.

33.     As a consequence of the tax lien sale, Mills, Robison, Seter, and Newton discussed concerns that the holder of the tax lien certificate on the 15-Acre Parcel might apply for a treasurer's deed, resulting in NGC's loss of the 15-Acre Parcel.

34.     In or about December 2015 or January 2016, Mills first discussed with Klaus Gontert and Steffi Gondert the possibility of selling shares of stock that NGC owned in the Colorado-Big Thompson water project ("C-BT Shares") to generate money to pay the unpaid taxes on the 15 Acre Parcel.

35.     In January 2016, at Mills's request, Seter, Newton, and SVW commenced legal work for NGC in connection with the sale of its C-BT Shares.

36.     On August 22, 2016, Mills again spoke with Klaus Gondert about selling the C-BT Shares to generate proceeds to pay the taxes owed on the 15 Acre Parcel.

37.     In tandem with representing NGC in the sale of its C-BT Shares, SVW analyzed and advised Mills and Robison about Adams County's process for issuing treasurer's deeds and the earliest date Adams County theoretically might issue a treasurer's deed on the 15-Acre Parcel. In other words, Seter, SVW, Mills, and Robison were concerned whether Adams County might issue a treasurer's deed before they could sell the C-BT Shares.

38.     On or about September 15, 2016, at Seter's request, SVW associate attorney Cameron Richards ("Richards") prepared a memorandum analyzing "the process by which the holder of a Tax Lien Sale Certificate could obtain a treasurer's deed to property, the timeline on which such action might occur, and what the land owner's right to redeem the tax lien is under Colorado law. The analysis is applied to two parcels of land in Adams County, No 0182505100039 [the 15 Acre Parcel] and No. 018205100031 [ a different parcel not owned by NGC but owned by a different company that was affiliated with Mills and a client of SVW], upon which tax liens for unpaid property taxes have been placed and subsequently sold at auction." Richards advised, "The first date on which the holder of the lien can apply for a treasurer's deed on the [15 Acre Parcel] is November 1, 2016." Richards noted that the 15 Acre Parcel was at risk of issuance of a treasurer's deed in the event the holder of the tax lien certificate were to apply to such a deed. Seter provided the memorandum to Seter and Newton. Seter gave the memorandum to Mills and Robison, and SVW billed NGC for the memorandum.

39.     Mills, Robison, Seter, and Newton discussed using proceeds from the sale of C-BT Shares to pay the taxes by November 2016 to avoid the risk of losing the 15 Acre Parcel to a treasurer's deed.

40.     In an email dated October 17, 2016, Mills communicated with Newton, Robison, and Seter about pursuing a sale of the C-BT Shares to either of two purchasers, stating, "If only one comes thru we still have the funds to pay the taxes. . . . Deducting the taxes of approximately $450,000 and closing cost of around 10% that leaves me with about $2,200,000. . . . Bottom line a sale of all 110 shares will allow me to accomplish everything I want to do."

41.     In or about October 2016, Mills recommended to Klaus Gondert that proceeds from the sale of the C-BT Shares would be used to pay property taxes that NGC owed. Klaus Gondert, on behalf of Avid Hunter, approved the plan to sell the C-BT Shares with the understanding that the proceeds would be used to pay the taxes.

42.     Newton did most of the work in connection with NGC's sale of the C-BT Shares. Seter was responsible for supervising Newton's work.

43.     In anticipation of NGC's sale of C-BT Shares, Newton prepared a Statement of Authority for NGC. Newton committed several negligent errors and omissions in connection with drafting and later recording the Statement of Authority, the details and consequences of which will be described later in this complaint.

44.     In addition to serving as legal counsel for NGC in connection with the sale of the C-BT Shares, SVW also acted as escrow agent for the transaction.

45.     Although it was implicit and understood that the C-BT Shares were being sold to generate money to pay the taxes on the 15-Acre Parcel, Mills also expressly discussed with Seter and Newton that SVW was to pay the taxes owed on the 15-Acre Parcel from proceeds of the sale. This instruction by Mills was referenced by Newton in an email dated October 28, 2018.

46.     However, upon sale of the C-BT Shares and deposit of proceeds in SVW's trust account, SVW did *not* pay the taxes on the 15-Acre Parcel. Instead, SVW released the net proceeds to the control of Mills.

47.     Mills did *not* cause NGC to pay the taxes on the 15-Acre Parcel. Instead, Mills improperly transferred money from NGC's account to other entities that he controlled, including but not limited to Westhaven Development. Mills then used part of the proceeds from the sale of the C-BT Shares for his own purposes, including to purchase an expensive, luxury Porsche automobile.

48.     Seter, Newton, and SVW were fully aware that the taxes on the 15-Acre Parcel remained unpaid despite the sale of the C-BT Shares.

49.     By email dated January 17, 2017, Mills gave Klaus Gondert and Steffi Gondert false assurances that taxes owed on the 15-Acre Parcel were being paid from the proceeds of NGC's sale of the C-BT Shares.

50.     Seter and SVW continued to monitor the status of unredeemed tax liens on the 15-Acre Parcel in 2017. For example, on May 26, 2017, Newton informed Mills and Robison, "No treasurer's deed applications have been filed on the 27.5 acres as of 3.16.17. . . . The NGC parcel's tax lien is still owned by Woods Cove IV, LLC."

**C.      *Seter and SVW's conflict of interest***

51.     Concurrently with their representation of NGC, Seter and SVW represented Mills and several affiliates of Mills.

52.     Although NGC requires discovery to determine details such as the dates of Seter and SVW's concurrent representation of Mills and his affiliates as well as the specific nature and scope of the concurrent representation, facts adduced to date establish that Seter and SVW had an

attorney-client relationship with Mills and one or more affiliates at least between 2015 and 2018. In addition, Seter appears to have had other fiduciary relationships with Mills and his affiliates, including that of trustee for Mills and his wife and potentially a business partnership with Mills and his wife.

      a.      Westhaven Colorado Development, LLC is a Florida limited liability company that Mills caused to be organized with the Florida Secretary of State on March 27, 2015. On April 2, 2015, Seter caused a Statement of Foreign Entity Authority to be filed with the Colorado Secretary of State for Westhaven Colorado Development. Seter identified himself as the Colorado registered agent for Westhaven Colorado Development and listed SVW's business as its registered agent street address. On June 25, 2018, Seter changed both the principal office mailing address and registered agent street address for Westhaven Colorado Development to his own home address, 6384 S. Grape Court, Centennial, CO 80121. Based on the foregoing, while representing NGC Seter and SVW had a concurrent attorney-client relationship with Westhaven Colorado Development, which was an affiliate of Mills. Based on his registration of Westhaven Colorado Development at his home address, Seter also may have had an ownership interest in Westhaven Colorado Development.

      b.      On April 4, 2018, Seter caused articles of organization to be filed with the Colorado Secretary of State for Friesland Charitable Foundation, listing the principal street address as Mills's office address, 2404 North Rio Grande Avenue, Orlando, Florida 32804. Seter identified himself as the Colorado registered agent for Friesland Charitable Foundation. Seter identified the purpose of Friesland Charitable Foundation as "providing relief of the poor and distressed by providing financial assistance . . . to displaced persons

13

in Kenya and refugees from South Sudan . . . ." Based on the foregoing, while representing NGC, Seter and SVW had a concurrent attorney-client relationship with Friesland Charitable Foundation, which was an affiliate of Mills.

c.    Friesland Capital, LLC is a Florida limited liability company that Mills caused to be organized with the Florida Secretary of State on April 17, 2018. At the time of its organization, the organizational documents identified the managers of Friesland Capital as Mills, his wife Debra Mills, and Seter. Based on the foregoing, while representing NGC, Seter had a concurrent attorney-client relationship with and an ownership interest in Friesland Capital, which was an affiliate of Mills and Debra Mills.

d.    As indicated by an email exchange dated November 21, 2018, between Mills and Seter, Seter was the trustee of one or more trusts affiliated with Mills, referred to as the "Charitable Trust" and the "Friesland Trust." In a deposition taken on February 25, 2021, Seter admitted that he was "involved with Friesland Trust" but refused to answer any questions concerning his "involvement with Friesland Trusts" citing that he could not answer questions without waiving an attorney-client privilege. Implicit in Seter's invocation of the attorney-client privilege to avoid answering questions about the "Friesland Trust" is the existence of attorney-client relationship between Seter, SVW, and the "Friesland Trust."

e.    In the same deposition, in response to the question, "[D]id you actually represent Russell and Debra Mills in 2018, Seter replied, "Yes." Seter refused to answer questions identifying any particular legal matter in which he represented Mills or Debra Mills, again citing the attorney-client privilege. Based on this, Seter and SVW had an

attorney-client relationship with other entities affiliated with Mills or Debra Mills. NGC will require discovery to determine the details of that relationship.

53.     As part of the attorney-client and trustee-beneficiary relationship that Mills had with Seter and SVW, Mills and Seter communicated about objectives and plans that were adverse to NGC's interests and that presented a conflict of interest for Seter and SVW in their representation of NGC.

54.     NGC will require discovery to determine the full scope and details of objectives and plans that Mills and Seter discussed that implicated NGC's interests; however, the following are known.

   a.     At various times, including in March 2018 and November 2018, Mills and Seter discussed Mills's plans to acquire the 15-Acre Parcel owned by NGC through entities to be owned and controlled by Mills.

   b.     In or about March 2018, Seter drafted a Purchase and Sale Agreement between NGC and "Friesland Investments Northgate, LLC a Florida Limited Liability Company." Although NGC has not yet located any record of that entity's existence, "Friesland Investments" is one of Mills's affiliated entities, which Mills described as being "basically, my family." Mills improperly and without authorization signed the Purchase and Sale Agreement for NGC, then delivered the signed copy to Seter with instructions to "sit on [it] until further notice." Seter and SVW did as Mills instructed.

   c.     Mills and Seter discussed Mills's intent to acquire a shopping center that NGC owned adjacent to the 15 Acre Parcel, again through a new entity to be owned and controlled by Mills.

15

55.     On one or more occasions, Seter and/or other attorneys at SVW gave Mills legal advice that was directly adverse to NGC interests. As an example, on June 25, 2018, Mills sent an email to SVW associate attorney Russell Newton ("Newton") and Seter stating as follows:

> I am attaching a Consent Document that was prepared by my Orlando Attorney. He asked that this be signed to protect me as an individual but also the Trust. As with this entity, I am Manager of NGC Development. His opinion in the future after the closing Avid Hunter Ltd could claim, stock market lingo, insider trading and I had a conflict because it is my family that is putting the money as an investor and I am the Manager. I sold the property to line my and the Trust's pockets to the detriment of Avid Hunter Ltd.

Newton replied, "Kim hasn't reviewed this yet, but I think you'll want a similar waiver for the NGC parcel."

56.     Throughout their representation of NGC, Seter and SVW regarded NGC as a mere extension of Mills, notwithstanding their knowledge that NGC had members distinct from Mills and that the authority of JUSA-M (and therefore of Mills) was limited pursuant to NGC's operating agreement. In deposition testimony given on February 25, 2021, Seter testified in part, "I counted on the representations of Mr. Mills who told me what he had authority to do and not do." Although Seter and SVW had a copy of NGC's operating agreement, they did not consider that agreement when performing legal work. Instead, they did the work Mills asked them to do without regard to whether it was authorized or unauthorized, in NGC's interests or contrary to NGC's interests, consistent with NGC's operating agreement or in violation of it.

57.     NGC has reason to believe that Seter and SVW helped Mills divert NGC assets, proceeds from the sale of NGC's C-BT shares, and/or proceeds from sales of other NGC assets to pay debts incurred by other Mills-affiliated entities that also were clients of Seter and SVW. For example, on or about May 22, 2017, Seter and SVW prepared a "Seller's Settlement Statement" reflecting the planned disbursement of proceeds from the sale of C-BT Shares. The "Seller's

Settlement Statement" indicated that some proceeds from the sale of the C-BT Shares would be applied to the payment of non-NGC debts and liabilities, including but not necessarily limited to payment of an $850,000 liability described as "Kessinger / Williams Promissory Note" believed by NGC to have been owed by Mills-affiliated entity Northgate Federal LP as well as payment of $429,653 to Mills-affiliated entity Westhaven Development, LLC. Similarly, on January 26, 2017, Seter instructed Glover in his office to apply proceeds from the sale of NGC assets to pay SVW's account receivable of $85,812.50 then owed by Northgate Federal. NGC requires further discovery to confirm that Seter and Mills improperly misdirected NGC's assets to pay non-NGC debts and, if so, to quantify NGC's damages.

### D.   NGC's Loss of the 15-Acre Parcel

58.     In 2017 and 2018, Seter and SVW assisted Mills with a variety of plans to redeem the tax lien certificates on the 15-Acre Parcel, some of which on their face involved direct adversity between NGC and other entities affiliated with Mills, some of which also were facially improbable, and none of which ever came to fruition. For example, On August 14, 2017, Mills emailed Seter and Newton,

> As of yesterday, all legal hurdles and documents are behind us relating to the funding of Northgate and other purchases. In the next few days your trust account should receive $3.5 million. $2.6 million of these funds directly relate to the Northgate 27.5 acres purchase. $400,000 of the $2.6 million should be allocated to NGC Development and the remaining $2.2 million goes toward purchase of Northgate Federal. The priority funding of the $2.2 million is to pay off the $850,000+ loan, real estate taxes, your fees and any outstanding payables which I will have my office update for you. . . . .
>
> As it relates to the remaining $900,000, that is for Friesland Trust and purchase of SC property.
>
> All of these funds will be coming from the Dubai Islamic Bank. . . .

The promised transfer of funds never occurred.

59.     As another example, on or about March 2, 2018, Mills (purportedly on behalf of NGC) and Robinson (on behalf of "Friesland Investments Northgate, LLC") executed a "Vacant Land Purchase and Sale Contract," which Seter had prepared. That agreement provided for the sale of the 15-Acre Parcel by NGC to Friesland Investments Northgate. Seter was aware that Friesland Investments Northgate was an affiliate of Mills when he prepared the contract. Robinson delivered the signed contract to Seter with instructions to "sit on [it] until further notice." Seter did as Robinson and Mills asked. Although the Vacant Land Purchase and Sale Contract was a contract between two of Seter's clients—NGC and Mills / Friesland Trust—Seter and SVW neither sought nor obtained a conflict waiver from NGC in relation to the conflicted-interest transaction.

60.     Following Mills's repeated failures to make good on his plans to redeem the tax lien certificates on the 15-Acre Parcel, Seter became skeptical of Mills's plans, just as any reasonable attorney would be under the circumstances. However, despite his skepticism and owing at least in part to his conflicted loyalties to Mills, Seter did not contact Klaus Gondert or Steffi Gondert to inform them that NGC was in a perilous position by virtue of the unredeemed tax lien certificates and that it was at risk of losing the 15-Acre Parcel completely.

61.     On or about August 23, 2018, Adams County issued a "Final Notice" that a treasurer's deed would issue as to the 15-Acre Parcel if the taxes were not paid by November 29, 2018. SVW received or otherwise was made aware of the Final Notice on or shortly after August 23, 2018.

62.     After receiving the "Final Notice," Seter and SVW had more than three months during which they could have contacted Klaus Gondert and Steffi Gondert to advise them of the deadline imposed by Adams County. Seter and SVW made no effort to do so.

63.     On or about November 21, 2018—eight days before the deadline to pay the taxes—Mills informed Seter of a facially outlandish plan by which $80,000,000 to $100,000,000 was to be wire transferred to SVW's law firm trust account from an unnamed source in Kenya, to be applied to a variety of Mills-affiliated projects. A portion of the funds were to be used to pay the taxes on the 15-Acre Parcel. Mills and Seter also discussed Mills's plans to use the funds to acquire NGC assets including the 15-Acre Parcel.

64.     On November 21, 2018, Mills emailed Seter, copying Debbie Mills, to confirm his outlandish plan as follows:

Kim

As I told you and Kathy, you need to let me know when the wire hits the US Bank. It probably will be tomorrow or Friday. As soon as it hits pay the taxes on the 15 acres.

Deb and I plan on making a quick trip to Denver to sit down with you, since you [sic] our Trustee, to discuss the use of the funds. We also believe we should pay you over and above your legal fees as the Trustee. Whether we pay you directly or the firm is your decision.

I have made a deal to buy the Dacono property for $10,400,000. The real estate commission will be 3.00% with the Buyer paying half and Seller paying half. Closing should be on or before the 14th of December.

I would also like to buy the 15 acres and the Shopping Center in Westminster. If the Contract falls through on the 12.5 acres my intent would be to buy that also. Deb, as with you, likes the name Whiskey Springs. Therefore, any properties we buy in Colorado will be under Whiskey Springs Investments, LLC. Each property will have a Roman numeral after it for each purchase. I do not know whether it should be a Colorado entity or Florida.

Any purchases in Florida will be under Friesland Capital LLC followed by a Roman numeral.

I have a follow up Doctors Appointment next Tuesday and shortly thereafter Deb and I will be leaving for Nairobi. The purpose of that trip is twofold. One is [sic] get the 100 [million dollars] released to your account and the other is to discuss the Charitable Trust with Kenyan Officials. I may need you as the Trustee to go to Nairobi. It would not be this initial trip. Apparently, we may need to have the

Charitable Trust registered in Kenya. Any cost for this trip will be paid by the Friesland Trust not the Charitable Trust. We can discuss further when we meet.

Also we have asked both the Realtor and Mura Browne whether we can close prior to the Holidays. I [sic] intent is we call fly to Ireland to close on my nickel.

I will also tell you, when we meet, the story of the delays in getting the 80 [million dollars] released.

Russ

65.     Just as any reasonable attorney would, Seter recognized and understood that the plan outlined in Mills's email of November 21, 2018, was a complete fantasy—or, Seter's own words, "BS." Seter shared his opinion with others at SVW, as confirmed by a November 27, 2018, email from Seter to Newton and Kathy Glover in which Seter expressed, "I still think this is bs . . . ."

66.     Seter's reply to Mills's self-evident "BS" email of November 21, 2018, was "Sounds good Russ. There is no sign of anything yet."

67.     Still owing in part to their conflicted loyalty to Mills, Seter and SVW took no action to alert Klaus Gondert or Steffi Gondert to the imminent danger that NGC would lose the 15-Acre Parcel if the taxes were not paid by November 29, 2018.

68.     The wire transfer of $100,000,000 or $80,000,000 to Seter's account never materialized.

69.     On the morning of November 29, 2018, Seter and SVW assisted Mills in an effort by Mills to negotiate a loan from a hard-money lender named "Marbella Ventures." Although the terms of the loan never were agreed upon, Seter followed Mills's request to prepare a Loan Agreement and Promissory Note pursuant to which NGC would pay an extortive 100% return on the amount loaned to pay the taxes, with payment due by December 7, 2018 (approximately one week later).

70.     Even as they participated in what amounted to an act of gross extortion and financial duress at Mills's request, neither Seter nor anyone else at NGC contacted Klaus Gondert or Steffi Gondert to alert them to the situation.

71.     With mere hours left before the deadline imposed by Adams County, Marbella Ventures demanded that Mills cause NGC to convey title to the 15-Acre Parcel to Marbella Ventures with an option to repurchase the property. Although Mills lacked any authority to convey title to the 15-Acre Parcel, he signed the papers presented to him by Marbella Ventures, which over a period of time involved a Quitclaim Deed as well as a second, corrective Quitclaim Deed, which eventually caused NGC to lose record title to the 15-Acre Parcel.

### E.     Seter and SVW attempt to conceal Mills's and their own wrongdoing.

72.     During and following NGC's disastrous loss of its 15-Acre Parcel, Seter and SVW protected their client Mills and maintained his confidences at the further expense of NGC by remaining silent. Neither Seter nor anyone else at NGC informed Klaus Gondert or Steffi Gondert of what had transpired.

73.     On August 20, 2019, the law firm Paul Hastings LLP contacted Seter, informed him that Mills had no authority to take action on behalf of NGC, and requested that Seter and SVW provide information about NGC's interests in Colorado. Seter disregarded the request. Paul Hastings followed up with emails to Seter on September 5, September 8, and September 11, 2019, asking that Seter provide the requested information. Seter ignored the emails.

74.     On September 16, 2019, a court in Florida entered an order removing JUSA-M as the manager of NGC and appointing Avid Hunter as NGC's manager. NGC engaged the law firm Faegre Drinker, which emailed and left a voice message for Seter on September 17, 2019, to demand NGC's files. Seter did not respond to Faegre Drinker's communications.

75.     Seter finally responded to Paul Hastings's demands on October 4, 2019, by providing a memo describing work that he and SVW had performed for NGC. In his memo, Seter and SVW continued to protect their client Mills, while harming their client NGC, by offering incomplete and inaccurate information without providing NGC files that Paul Hastings and Faegre Drinker requested.

76.     On October 9, 2019, Faegre Drinker sent Seter and SVW a letter again demanding NGC's files. Seter and SVW ignored the letter and did not respond. Faegre Drinker sent yet another letter on November 1, 2019, which Seter and SVW again ignored.

77.     On November 15, 2019, Faegre Drinker attorney Brandee Caswell and Klaus Gondert physically appeared at SVW's offices to demand the files. They told Seter that they would not leave SVW's offices without NGC's files. Seter gave Caswell some physical files as well as a flash drive of some electronic files. On review, Caswell concluded that Seter and SVW had not provided all of NGC's files.

78.     Faegre Drinker made additional requests to Seter and SVW for NGC's complete files on December 11 and December 23, 2019. Seter and SVW ignored those requests. Faegre Drinker sent yet another request to Seter and SVW on March 27, 2020, which Seter and SVW also ignored.

79.     On June 11, 2020, Keating Wagner Polidori Free P.C. on behalf of NGC sent Seter a letter demanding NGC's files. Seter ignored that letter.

80.     On July 6, 2020, Keating Wagner Polidori Free sent a letter to all shareholders of SVW noting that, in view of Seter's defiance of his ethical obligations to NGC and pursuant to Rule 5.1 of the Colorado Rules of Professional Conduct, *all shareholders* of NGC had a responsibility to ensure that SVW met its professional obligations.

81.     Following the July 6, 2020, letter, SVW engaged outside counsel to represent it in providing the files that NGC had requested.

82.     On September 23, 2020-- more than 13 months after NGC initially had requested its files—outside for SVW provided counsel for NGC approximately 36,000 pages of documents. Those documents revealed Seter and SVW's negligence, conflicts of interest and other breaches of fiduciary duties, and aiding and abetting Mills to breach his and JUSA-M's fiduciary duties.

F.     *NGC's efforts to regain title to the 15-Acre Parcel and additional problems caused by SVW*

83.     Notwithstanding the substantial difficulties that NGC faced due to Seter's and SVW's refusal to provide NGC with its files, on January 3, 2020, NGC commenced an action to quiet title to the 15-Acre Parcel in the District Court for Adams County, Colorado, Case No. 2020-cv-30010 ("Quiet Title Lawsuit") against Marbella Ventures, LLC, an affiliate MarQuest LLC, and other named defendants.

84.     In the Quiet Title Lawsuit, NGC seeks a declaration restoring its title to the 15-Acre Parcel. Among other grounds, NGC alleges that Mills lacked authority to cause NGC to convey title to the 15-Acre Parcel.

85.     For their defense, the defendants in the Quiet Title Lawsuit rely principally on the above-referenced Statement of Authority, which Newton prepared under Seter's supervision in September 2016. The defendants in the Quiet Title Lawsuit claim the Statement of Authority as evidence of Mills's authority to cause NGC to deed the 15-Acre Parcel to Marbella Ventures, and they claim to have relied upon that Statement of Authority in acquiring title to the 15-Acre Parcel.

86.     A statement of authority is a legal instrument that is commonly prepared by attorneys in connection with the sale of property by an entity client.

87.     Attorneys also commonly review the operating agreements for legal entities to determine the scope of a manager's authority.

88.     In September 2016, attorneys at SVW had experience analyzing entity operating agreements or other governing instruments to determine the scope of the manager's authority and, indeed, had analyzed such operating agreements to determine the scope of Mills's managerial authority. For example, on March 5, 2013, Seter directed SVW attorney Elizabeth Dauer to review the operating agreements of Westhaven Development, LLC and Northgate Federal, LP to analyze signing authority and meeting requirements for those Mills-affiliated entities.

89.     Newton drafted the Statement of Authority.

90.     At the time of drafting the Statement of Authority, Newton was an associate attorney at SVW.

91.     At the time of drafting the Statement of Authority, Seter was Newton's supervisor and supervised Newton's work in relation to the Statement of Authority.

92.     In drafting the Statement of Authority, Newton either (a) failed to exercise reasonable and ordinary care, or (b) deliberately drafted the Statement of Authority so as to give Mills the appearance of more authority than he actually had.

93.     The Statement of Authority contained multiple errors.

94.     The Statement of Authority stated: "The name or position of the persons authorized to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of the Entity is: Russell L. Mills, as the Manager of NGC Development, LLC."

95.     The preceding statement was erroneous because (a) the manager of NGC Development, LLC was JUSA-M, not Mills; and (b) neither JUSA-M nor Mills was "authorized

to execute instruments conveying, encumbering, or otherwise affecting title to real property" on behalf of NGC under the terms of the NGC operating agreement.

96.     The Statement of Authority stated: "The limitations (pursuant to C.R.S.§ 7-30-105) upon the authority of the person named above or holding the position described above to bind the Entity are as follows: Authority is not limited."

97.     The statement in the preceding paragraph was erroneous because (a) Mills had no authority to act as the manager of NGC, because NGC's manager was JUSA-M and not Mills; and (b) pursuant to the operating agreement of NGC, the authority of JUSA-M to cause NGC to sell or otherwise convey title to any asset was strictly limited and required prior approval by the members of NGC.

98.     NGC Development, LLC's operating agreement provides in relevant part as follows:

### Article 7
### Management and Operations of Business

**Section 7.1 Management Powers of the Manager**

. . .

[T]he Company may undertake the following actions (each, a "Unanimous Decision") only with the Unanimous Consent of the Members:

. . .

(5) sell, lease, encumber or otherwise dispose of any Company properties or assets except in accordance with any approved Plan and Budget.

99.     The Statement of Authority stated: "Other matters concerning the manner in which the Entity deals with any interest in real property are: N/A."

100.    The statement in the preceding paragraph was erroneous because, pursuant to NGC's operating agreement, JUSA-M required unanimous consent from the members of NGC to

sell, encumber, or otherwise dispose of NGC's properties or other assets except in accordance with an already-approved plan or budget.

101.    Seter and Newton knew that the sole purpose of the Statement of Authority was the prospective sale of the C-BT Shares.

102.    At the time Newton drafted the Statement of Authority, SVW had a copy of NGC's operating agreement.

103.    At the time Newton drafted the Statement of Authority, Seter and Newton knew or should have known that JUSA-M was the manager of NGC and that the authority of JUSA-M to sell, encumber or otherwise dispose of properties or other assets was restricted by the terms of that operating agreement.

104.    Avid Hunter—and to the best of Klaus Gondert's knowledge, the other members of NGC—*did* authorize JUSA-M to sell the C-BT Shares; however, they *only* authorized the sale of the C-BT Shares. At no time did Avid Hunter give JUSA-M general authority to sell NGC's real property or other assets.

105.    The Statement of Authority contained the following signature line: "Manager: Russell L. Mills, Manager, NGC Development, LLC."

106.    The signature line described in the preceding paragraph was erroneous because the manager of NGC was JUSA-M, not Mills.

107.    After drafting the Statement of Authority, Newton and/or Seter obtained Mills's signature on it.

108.    All of the foregoing errors in the Statement of Authority were avoidable had Seter and Newton exercised reasonable care, including reviewing NGC's operating agreement.

109.    All of the foregoing errors in the Statement of Authority also were avoidable had Seter exercised reasonable supervision over Newton's work, including directing Newton to review NGC's operating agreement in connection with the preparation of the Statement of Authority and reviewing Newton's draft to verify that it conformed with NGC's operating agreement.

110.    The following allegations are alleged in the alternative:

a.    Newton did not review NGC's operating agreement in connection with the Statement of Authority.

b.    Newton did review NGC's operating agreement in connection with the Statement of Authority but, in drafting the Statement of Authority, negligently or recklessly disregarded (a) the fact that the manager of NGC was JUSA-M and not Mills; (b) the fact that JUSA-M's authority to sell, encumber or otherwise dispose of properties or other assets was limited by the operating agreement.

111.    The following allegations are alleged in the alternative:

a.    Seter did not review Newton's draft of the Statement of Authority.

b.    Seter did review Newton's draft of the Statement of Authority but negligently or recklessly disregarded (a) the fact that the manager of NGC was JUSA-M and not Mills; (b) the fact that JUSA-M's authority to sell, encumber or otherwise dispose of properties or other assets was limited by the operating agreement.

112.    Upon information and belief, Newton and Seter did not explain to Mills the legal significance of a statement of authority pursuant to C.R.S. .§ 7-30-105 prior to obtaining Mills's signature on the Statement of Authority.

113.    Upon information and belief, Newton and Seter did not explain to Mills that the Statement of Authority contained errors and failed to conform to NGC's operating agreement.

114.    Upon information and belief, Newton or Seter procured Mills's signature on the Statement of Authority in violation of Colorado law, insofar as Mills was in Florida at the time he signed the document, yet his signature was notarized by SVW paralegal Catherine Bright with an attestation that Mills had acknowledged it before her in Arapahoe County, Colorado.

115.    On September 20, 2016, SVW caused the Statement of Authority to be recorded with the Clerk and Recorder for Adams County, Colorado.

116.    Because the purpose of obtaining a statement of authority from NGC in September 2016 was to facilitate the sale of the C-BT Shares, the proper place for recording any statement of authority in connection with that sale was Weld County, Colorado—not Adams County.

117.    Recording the Statement of Authority with the Clerk and Recorder for Adams County, Colorado was yet another error by SVW.

118.    Following the sale of the C-BT Shares, Seter, Newton, and SVW negligently took no action to correct the errors they made concerning the Statement of Authority.

119.    Trial of the Adams County Lawsuit currently is set for November 15-19, 2021. Accordingly, the outcome of the Adams County Lawsuit is not yet known.

120.    Seter and SVW's conduct in failing to notify Klaus Gondert and Steffi Gondert of the facts and circumstances surrounding NGC's nonpayment of taxes on the 15-Acre Parcel caused NGC to incur substantial legal fees and costs in connection with the Adams County Lawsuit. Those legal fees and costs were further aggravated and multiplied by the acts, errors, and omissions of Seter, Newton, and SVW in relation to the Statement of Authority, which compounded the complexity of the Adams County Lawsuit and caused NGC to incur attorneys' fees and costs that otherwise should have been avoidable.

121.    At this point, the Adams County Lawsuit foreseeably may lead to a range of outcomes. At one end of the range, NGC prevails on its quiet title claims, in which event it will have mitigated its damages substantially by limiting its damages largely if not entirely to the many hundreds of thousands of dollars in legal fees and costs it already has incurred and continues to incur in the Adams County Lawsuit. The other end of the range, NGC loses the quiet title claims, in which case its damages are much more substantial and will include, in addition to the aforementioned legal fees and costs, the loss of the 15-Acre Parcel worth an appraised $7,000,000.

122.    At all times relevant to this case, Klaus Gondert and Avid Hunter had the financial ability to pay the taxes on the 15-Acre Parcel and redeem the tax lien certificates. Had Seter, Newton, or anyone else at SVW notified Klaus Gondert or Steffi Gondert at any time after January 2017 that the taxes on the 15-Acre Parcel remained unpaid, Klaus Gondert and Avid Hunter would have taken immediate action to pay the taxes and redeem the tax lien certificates.

## FIRST CLAIM FOR RELIEF – NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

123.    NGC incorporates the preceding allegations as if fully set forth herein.

124.    Newton's acts, errors, and omissions in connection with the Statement of Authority were below the standard of care for lawyers practicing law in Colorado and were negligent. Newton failed to employ that degree of skill, knowledge, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client, NGC.

125.    Seter's acts, errors, and omissions in connection with assisting Newton with the Statement of Authority and/or supervising Newton were below the standard of care for lawyers practicing law in Colorado and were negligent. Seter failed to employ that degree of skill, knowledge, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client, NGC.

126.     Newton's and Seter's negligent acts, errors, and omissions included, but were not necessarily limited to, failing to contact Klaus Gondert and Steffi Gondert to alert them to the circumstances surrounding NGC's nonpayment of taxes on the 15-Acre Parcel and the risk that NGC would lose title to the 15-Acre Parcel. Newton and Seter had the ability to contact Klaus Gondert and Steffi Gondert, and they had a duty to do so both under applicable Colorado Rules of Professional Conduct and case law. A reasonable lawyer faced with the same or similar circumstances would have contacted Klaus Gondert and Steffi Gondert. Their failure to contact Klaus Gondert and Steffi Gondert was negligent.

127.     The negligence of Newton and Seter or both proximately caused NGC to suffer damages, harms, and losses, including loss of title to the 15-Acre Parcel and attorneys' fees, costs of litigation, and other costs related to the Adams County Lawsuit.

128.     The aforementioned acts, errors, and omissions of Newton that caused NGC to incur damages, harms, and losses were done in the course and scope of his employment by SVW, such that SVW is vicariously liable.

129.     At least some if not all of the acts, errors, and omissions of Seter that caused NGC to incur damages, harms, and losses were in the course and scope of his employment and ownership of SVW, such that SVW is vicariously liable.

**SECOND CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTY**
**(AGAINST ALL DEFENDANTS)**

130.     NGC incorporates the preceding allegations as if fully set forth herein.

131.     In addition to and in the alternative to the foregoing claim for negligence as well as the following claim for aiding and abetting breach of fiduciary duty, NGC alleges this claim for breach of fiduciary duty.

132.     As attorneys for NGC, Seter and Newton owed NGC fiduciary duties including the duty to give NGC their undivided loyalty and the duty to be truthful and candid with NGC and disclose to NGC all facts material to their representation of NGC of which they were aware.

133.     Seter and Newton violated their duty of undivided loyalty to NGC by concurrently representing Mills as a client and even advising and otherwise assisting Mills with schemes that directly conflicted with NGC's interests. Seter's and Newton's concurrent representation of both NGC and Mills (as well as entities affiliated with Mills) presented an irreconcilable problem, in that they were unable to discharge their duties of loyalty and candor to NGC while at the same time discharging their similar duties of loyalty, candor, and confidentiality to Mills. Put differently, in the process of being loyal and candid with NGC, Seter and Newton would have revealed gross negligence, breaches of contract, breaches of fiduciary duties, and breaches of statutory duties by Mills and JUSA-M.

134.     Seter and Newton further violated their duty of undivided loyalty to NGC when they failed to alert Klaus Gondert and Steffi Gondert to conduct and omissions by Mills that posed a foreseeable risk of catastrophic damage, harm, and loss to NGC. Seter himself characterized Mills's plan to have $80,000,000 or $100,000,000 wire transferred from Kenya to SVW's trust account as "BS," yet Seter remained loyal to Mills by not informing Klaus Gondert and Steffi Gondert that NGC was on the verge of losing title to the 15-Acre Parcel.

135.     Seter and Newton violated their duty to be truthful and candid with NGC. Despite knowing that Mills was engaged in conflicted interest transactions, and despite knowing that Mills had contrived facially absurd plans to pay the taxes owed on the 15-Acre Parcel, they took no steps to bring these facts and circumstances to the attention of NGC's members.

136.     To the extent Seter and Newton believed their conflict of interest in representing Mills and NGC was waivable, they took no steps to obtain a conflict waiver.

137.     Because Seter and Newton did not obtain a conflict waiver from NGC, and because the conflict of interest was not waivable in any event, Seter and Newton owed NGC a fiduciary obligation to withdraw from representing NGC and to advise NGC to obtain new legal counsel separate from and independent of Mills. Their failure to advise NGC to obtain new legal counsel separate and independent of Mills was a further breach of their fiduciary duties.

138.     Seter and Newton's violations of their fiduciary duties to NGC proximately caused NGC to incur damages, harms, and losses, including loss title to the 15-Acre Parcel and legal fees and costs incurred in the Adams County Lawsuit.

139.     All of Newton's violations of his fiduciary duties to NGC occurred in the course and scope of his employment by SVW, such that SVW is vicariously liable.

140.     At least some of Seter's violations of his fiduciary duties to NGC occurred in the course and scope of his employment by and ownership of SVW, such that SVW is vicariously liable.

**THIRD CLAIM FOR RELIEF—AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (AGAINST ALL DEFENDANTS)**

141.     NGC incorporates the preceding allegations as if fully set forth herein.

142.     In addition to and in the alternative to the foregoing claims for negligence and breach of fiduciary duty, NGC alleges this claim for aiding and abetting breach of fiduciary duty.

143.     Because NGC reposed special confidence and trust in Mills and JUSA-M, and because Mills managed JUSA-M, and because JUSA-M was NGC's manager, both Mills and JUSA-M owed NGC fiduciary duties. Such duties exist under common law as well as by statute.

144.     Seter and Newton had actual knowledge of the fiduciary relationship between Mills and JUSA-M on the one hand and NGC on the other.

145.     Seter and Newton had actual knowledge of various plans, schemes, and designs by Mills that conflicted with NGC's interests.

146.     Seter and Newton had actual knowledge that Mills and JUSA-M recklessly disregarded payment of taxes that NGC owed on the 15-Acre Parcel in pursuit of Mills's own separate interests and exposed NGC to catastrophic losses.

147.     Seter and Newton knowingly participated in Mills's and JUSA-M's breaches of their fiduciary duties to NGC, including without limitation advising and assisting Mills in plans and schemes that conflicted with NGC's interests, drafting contracts between NGC and entities affiliated with Mills, and counseling Mills on how to avoid legal claims by NGC.

148.     Mills's and JUSA-M's breaches of fiduciary duties to NGC, aided and abetted by Seter and Newton, caused NGC damages, harms, and losses, including loss of title to the 15-Acre Parcel and legal fees and costs incurred in the Adams County Lawsuit.

149.     All of Newton's participation in Mills's and JUSA-M's breaches of their fiduciary duties to NGC occurred in the course and scope of his employment by SVW, such that SVW is vicariously liable.

150.     At least some of Seter's participation in Mills's and JUSA-M's breaches of their fiduciary duties to NGC occurred in the course and scope of his employment by and ownership of SVW, such that SVW is vicariously liable.

## PRAYER FOR RELIEF

Plaintiff NGC Development, LLC prays that the Court or jury as applicable find in its favor and against Defendants Kim Seter and Seter Vander Wall, P.C. on all claims, and requests that the

Court enter judgment for such amount of damages as are established by the evidence and authorized by the law, together with all taxable costs and allowable attorneys' fees, and that the Court order such other and further relief as justice requires.

DATED: June 25, 2021

> _/s/ Ross W. Pulkrabek_
> Ross W. Pulkrabek
> 1290 Broadway, Suite 600
> Denver, CO 80203
> Phone: (303) 534-0401
> Email: rpulkrabek@keatingwagner.com
>
> _Counsel for Plaintiff_