# EXHIBIT C

to

Defendants' Designation of Non-Parties

*NGC Development, LLC v. Seter & Vander Wall, P.C., et al.*
*Case No.: 1:21-cv-01746-RM-STV*

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br>720-865-8301 | DATE FILED: March 19, 2021 9:46 AM<br>FILING ID: CB5141CADE71F<br>CASE NUMBER: 2021CV30915 |
| NGC DEVELOPMENT, LLC, a Florida limited liability company, and AVID HUNTER, LTD, a Florida limited partnership<br><br>Plaintiffs,<br><br>v.<br><br>DRAKE ASSET MANAGEMENT, LLC, a Colorado limited liability company, PERRY RADIC, an individual, and JON HAUSER, an individual<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiffs:**<br>Brandee L. Caswell, #30706<br>Carla R. Martin, #46433<br>FAEGRE DRINKER BIDDLE & REATH LLP<br>1144 15th Street, Suite 3400<br>Denver, Colorado 80202<br>Phone Number:  303-607-3500<br>Fax Number:  303-607-3600<br>E-mail:  brandee.caswell@faegredrinker.com<br>             carla.martin@faegredrinker.com | Case No.<br><br>Division |

## COMPLAINT AND JURY DEMAND

Plaintiffs, NGC Development, LLC ("NGC"), and Avid Hunter, Ltd ("Avid Hunter") through their undersigned counsel, bring this Complaint against Defendants Drake Asset Management, LLC ("Drake"), Perry Radic ("Radic"), and Jon Hauser ("Hauser").

### INTRODUCTION

This Complaint arises from Defendants' mismanagement of millions of dollars of NGC's real estate and cash.  Defendants managed NGC's real estate assets and collected millions in

revenue generated by those assets. Because of Defendants' mismanagement, NGC lost over $2 million in cash and title to real property[1] valued at $7 million due to unpaid real property taxes.

## PARTIES, JURISDICTION AND VENUE

1. NGC is a Florida limited liability company with its principal business address located at 1990 Main Street, Suite 801, Sarasota, Florida 34236.

2. Avid Hunter is a Florida limited partnership with its principal business address located at 1990 Main Street, Suite 801, Sarasota, Florida 34236.

3. Drake is a Colorado limited liability company with its principal business at 7800 E. Union Avenue, Suite 410, Denver, CO 80237.

4. Radic is an individual residing in Parker, Colorado.

5. Upon information and belief, Hauser is an individual residing or conducting business in Denver, Colorado.

6. Venue is proper in this Court under 98(c)(1) because Drake is located in or transacts business in the City and County of Denver, Colorado.

7. The Court has personal jurisdiction over all Defendants because they live or conduct business in the State of Colorado, and the transaction and events giving rise to the claims herein occurred in Colorado.

## GENERAL ALLEGATIONS

1. NGC was formed under the laws of the state of Florida on June 11, 2010, for the purpose of holding title to US real estate assets purchased as investments.

2. Reinhard Krafft ("Krafft"), is a prominent European investment advisor. He was Head of Private Banking with Sal. Oppenheim, one of Europe's largest independent banking groups (now part of Deutsche Bank).

3. Krafft founded Jupiter Group, S.A. Luxembourg, specializing in the development and financing of commercial US and German real estate projects. Krafft funneled a number of European investors, including Klaus Gondert, to Jupiter USA companies in Florida. Those

---

[1] NGC disputes the transferees were bona fide purchasers for value and is pursuing an action to quiet title to the property in Adams County District Court.

entities were JUSA Development, LLC ("JUSA-D") and JUSA Management, LLC, ("JUSA-M").

4. The role of JUSA-D was to hold equity stakes in and promote development of the US real estate assets. The role of JUSA-M was to manage the real estate assets for the foreign investors.

5. At relevant times, Russell Mills ("Mills") held an ownership interest in and controlled both JUSA-M and JUSA-D.

6. Klaus Gondert formed Avid Hunter for the purpose of investing in US real estate assets as a result of his communications with Krafft and others associated with the JUSA entities.

7. Since November 18, 2010, NGC's Members and their respective interests in the company have been:

    a. Avid Hunter, Ltd. ("Avid Hunter"), 80%;

    b. JUSA Development, LLC ("JUSA-D"), 10%

    c. RMA Asset Management, Ltd. ("RMA"), 10%

8. Avid Hunter has always been owned and controlled by Mr. Gondert, a German citizen who speaks limited English.

9. On or about November 18, 2010, NGC purchased commercial real property in Adams County known as the Northgate Shopping Center for $8,000,000, paying $6,000,000 up front and the remaining $2,000,000 in scheduled installments, which were all fully paid.

10. The Northgate Shopping Center contains numerous retail stores, including Wal-Mart as the anchor tenant, a restaurant, and approximately 15 acres of adjacent, mostly vacant commercial property.

11. The Shopping Center is comprised of two distinct legal / tax parcels: 7110 Federal Boulevard, which is fully developed with retail buildings ("Parcel 1") and 7120 Federal Boulevard, which is mostly undeveloped except for a restaurant that operates on the property as Nancy's Café ("Parcel 2").

12. Avid Hunter funded 100% of the purchase price for Parcels 1 and 2, received 80% of NGC's equity interest with the remaining 20% equity split evenly between JUSA-D and RMA, an entity controlled by Krafft.

13. Also, on or about November 28, 2010, NGC entered into a property management agreement (the "Contract") with PRA Real Estate Services, LLC, a Colorado limited liability company ("PRA"), to provide property management services for the Shopping Center for a fee of $1,500 per month.

14. Radic executed the Contract on behalf of PRA as "Managing Member" of PRA.

15. JUSA-M executed the Contract as "Manager" on behalf of NGC.

16. Mills, acting as the manager of JUSA-M, executed the Contract on behalf of JUSA-M.

17. PRA officially changed its name with the Colorado Secretary of State on February 28, 2011, to Drake Asset Management, LLC.

18. Radic and Hauser are the owner-members of Drake.

19. Drake shares office space and employees with another entity called Drake Real Estate Services ("DRES"). Hauser is the principal owner of DRES.

20. On November 28, 2010, the same date NGC purchased the Shopping Center, Radic accepted conveyance of title to a 100-square foot parcel of land (the "Director's Parcel") within Parcel 2.

21. Radic later used his ownership of title to the Director's Parcel to nominate himself as a director to the Northgate Water District, in which the Northgate Shopping Center is situated.

22. Similarly, Radic took title to another director's parcel within a separate NGC investment property in Weld County, Colorado known as Pinnacle Farms.

23. Radic also used his ownership of title to the Pinnacle Farms' director's parcel to nominate himself as a director on the Pinnacle Farms Metropolitan District, in which the Pinnacle Farms property is situated.

24. Mills arranged for Radic to hold a seat on the Bella Mesa Metropolitan District board until that property was also lost to foreclosure in 2018. Bella Mesa is another development in Douglas County that was managed by Mills.

25. Defendants and Mills caused NGC's bank account to be moved from Public Service Employee's Credit Union to Front Range Bank, now Fortis Bank. Hauser holds a seat on the Fortis Bank Board of Directors and directly or indirectly owns interests in Fortis Bank.

4

26. Upon information and belief, Hauser, DRES, and Fortis Bank had additional business dealings with and received pecuniary benefits due to their relationship with Mills.

27. Drake's responsibilities under its Contract with NGC included: collecting rents from tenants of the Northgate Shopping Center; maintaining and repairing the property and contracting with third-party service providers for such repair and maintenance to be paid from NGC's funds; paying all bills, including payment of applicable property taxes; and remitting the monthly principal payment to the lender from NGC's funds.

28. Under the Contract, Drake was also required to submit monthly reports to NGC detailing the operation and management of the Northgate Shopping Center along with copies of bank statements and details of monthly cash receipts and disbursements. Drake was also required to remit monthly net receipts to NGC along with its monthly management report.

29. The Contract also required Drake to:

> Ensure such control over accounting and financial transactions as is reasonably required to protect [NGC's] assets from loss or diminution due to error, negligence or willful misconduct on the part of Agent's associates or employees. Losses caused by such error or activity shall be borne by [Drake], to the extent such losses are not covered by the bond required by Subsection 1.2(i) hereof.

Contract, § 2.3.

30. According to the terms of the Contract, the property under Drake's management was to be identified in Exhibit C to the Contract. For unknown reasons, Exhibit C was left blank. Radic recently provided sworn testimony that Drake's management obligations under the Contract covered Parcel 1 but not Parcel 2.

31. Radic testified, however, that he undertook the responsibility to manage and maintain Parcel 2 by hiring contractors to control weeds on Parcel 2, assisting with leasing the restaurant on Parcel 2 and collecting rents due under the lease, and performing other services for the benefit of Parcel 2.

32. Plaintiffs reposed special confidence and trust in Defendants who exercised control over NGC's investment properties and finances.

33. Radic met Mr. Gondert in person on more than one occasion and drove Mr. Gondert to and around NGC's Colorado properties. As a result of these interactions, Defendants

5

US.131400412.02

learned that Mr. Gondert was the principal investor in NGC through Avid Hunter, that he lived in Germany, and that he spoke limited English.

34. Records on file with the Colorado Secretary of State's office demonstrate that both Radic and Hauser have over a decade of experience in forming corporate entities, filing corporate reports, and acting as registered agents for service of legal process.

35. Defendants Radic and Hauser also have knowledge of the roles of managers and members of limited liability companies due to their own experience as managers and members of several limited liability companies in Colorado.

36. Defendants, however, failed to take any steps at any time to ascertain whether and to what extent Mills or JUSA-M had legal authority to act on behalf of NGC.

37. Despite its obligations and responsibilities to NGC, Drake and Radic failed to place controls over the accounting and financial transactions involving NGC's funds to protect NGC's interests.

38. For the decade that Defendants exercised control over NGC's real and personal property, including millions of dollars in NGC's operating account, Defendants never asked for or reviewed the operating agreement of NGC or it's manager, JUSA-M, to ascertain who had authority over NGC and the extent of such authority.

39. Defendants never asked for, received, or reviewed any corporate formation, operation or governing documents for NGC (even those that were publicly available via internet search) at any time before or during the time they managed the Northgate Shopping Center.

40. Defendants knew that Mills personally was not NGC's manager, as the Contract between NGC and Drake showed that JUSA-M was NGC's manager, not Mills.

41. Defendants nonetheless elected to treat Mills as if he had personal authority in all matters to bind and speak for NGC even when Mills requests were contrary to the terms of the Contract and/or NGC's interests.

42. Drake and Radic also knew that NGC's controlling member was Avid Hunter, which they also knew was and is owned and controlled by Mr. Gondert. In fact, Mr. Gondert met Radic on more than one occasion, during which times Mills held Gondert out as the owner of the controlling interest in NGC.

43. Likewise, Hauser knew that Mr. Gondert and/or Avid Hunter had an ownership interest in NGC.

44. Despite all of the foregoing, Defendants failed and refused at any point in time to investigate or provide information to Avid Hunter that would have revealed mismanagement and theft of NGC's assets.

45. Instead, Defendants stood by and allowed Parcel 2 to be saddled with hundreds of thousands of dollars in tax liens resulting in NGC's loss of title to Parcel 2 while at the same time repeatedly disbursing NGC's cash to Mills in response to Mills' facially suspicious and fraudulent "funding requests."

**Unlawful Cash Disbursements from NGC's Operating Account**

46. As part of his management of NGC's assets, Radic obtained full power over NGC's bank account. His disbursement of NGC cash to Mills and others drained NGC's operating account and often left NGC with insufficient funds to meet the operating expenses of the Northgate Shopping Center.

47. Drake and Radic also issued numerous checks written on NGC's account that were returned NSF – insufficient funds.

48. The amount Drake and Radic transferred at Mills' request varied, but sometimes totaled as much as $120,000 in a single month. These transfers did not correspond to any documented expenses of NGC. The transfers were also far in excess of the receipts over expenses for the Northgate Shopping Center that the Contract authorized Drake to distribute to NGC on a monthly basis

49. The numerous, unauthorized transfers of NGC's funds enabled Mills to siphon over $2,000,000 from NGC's Northgate Shopping Center account to bank accounts controlled by Mills and JUSA-M. Mills then promptly transferred the funds to other bank accounts he owned or controlled.

50. In the fall of 2018, Mr. Gondert contacted Defendants on behalf of Avid Hunter numerous times personally and through his daughter acting as a translator, with questions regarding the Northgate Shopping Center and its finances. Defendants delayed and avoided responding to Mr. Gondert's requests.

51. On December 1, 2018, Mr. Gondert requested NGC's financial reports on behalf of Avid Hunter and asked to set up a time to speak on the phone. Defendants ignored Mr. Gondert's requests.

52. On December 20, 2018, Mr. Gondert again urged Radic to contact him because he needed to "check and control the finances of the shopping center" on behalf of Avid Hunter

53. Instead of responding to Mr. Gondert, Radic turned to Mills and asked him what to do. Mills falsely told Radic that NGC's operating agreement precluded Radic from speaking about NGC's business to anyone except Mills. In fact, Mills told Radic that Mr. Gondert "signed two terrible operating agreements."

54. Defendants took no action whatsoever to verify whether Mills' representations were accurate, even after Defendants had actual knowledge that:

   a. Other properties controlled by Mills were foreclosed upon or surrendered for failure to pay debt service, including the Northgate Federal property in Adams County and the Bella Mesa property in Douglas county.

   b. NGC's property taxes had not been paid for several years in either Weld or Adams County.

   c. Defendants were distributing NGC's cash to Mills at Mills' request for purposes such as personal loans Mills wanted to make to third parties. For example, Mills told Radic that one of the requested disbursements of NGC's funds would be used to help "someone in the office that is in need of help immediately." Mills then asked, "Would it break the bank if you sent [$2,500] **to me** today?" (emphasis added).

   d. Defendants also distributed NGC's cash for payment of undocumented debts NGC allegedly owed to Mills, who said "I want to immediately begin to bring my past due fees current" and that "with my upcoming retirement, I am **trying to make sure I collect all that is due me** before that time." (emphasis added).

   e. Mills admitted in writing that he may have taken more of NGC's funds than he was entitled to take, saying "If I have drawn in excess of funds due me as Manager of NGC … then I will be paying back NGC or I can directly pay a portion to your account if you need funds."

   f. Mills claimed he would "fix" problems by buying out NGC's interests in Colorado.

8

55. Despite knowing all the foregoing, Defendants refused to respond to any of Avid Hunter's inquiries into the Northgate Shopping Center's finances and continued to disburse NGC's operating funds to Mills.

56. Instead of taking action to verify whether Mills' requests for disbursements were legitimate, or even reviewing the Contract, which allowed Drake to provide information to any officer of NGC, Defendants instead complied with Mills' requests.

57. Defendants falsely told Mr. Gondert that they could only speak with and take direction from Mills. This was not only false under the terms of NGC's operating agreement (which they never bothered to ask for or review), it also contradicted the terms of the Contract and Defendants' own actions in taking direction and providing information to people other than Mills over the years. By way of example only, Defendants shared NGC's financial information with and disbursed NGC funds at times upon the request of Dan Robison, Brian Dixson, and Donna Weiner, none of whom were officers of NGC or investors in NGC.

58. On January 5, 2019, Hauser put an end to Avid Hunter's inquiries by informing Mr. Gondert in writing that Defendants would not provide any information absent a court order. Upon information and belief, Hauser did so knowing Radic had expressed serious concerns about what was transpiring between NGC, Avid Hunter, and Mills.

59. In April 2019, Mills told Defendants he was getting everything in order and "didn't want to have to ask for anymore [*sic*] funding but looks like **I'm going to need it**," (emphasis added) again requesting Radic send him $15,000 of NGC's money.

60. On May 9, 2019, Mills asked Radic to send another $7,000 of NGC's funds, saying, "I'm still hanging in there, trying to get everything sorted."

61. On May 30, 2019, Mills asked Radic to send another $7,000.

62. Then, less than a week later, Mills asked Radic to FedEx another check for $10,000.

63. Five days later, Radic told Mills "I am extremely low on cash right now. I am paying the 2nd half payment on the property taxes. I will not be able to send you any money for a while. **I see that you did not pay the taxes for the vacant land … It seems that things are not going well for [NGC] or its partners. I don't want to get caught in the middle of a lawsuit.** We need to discuss the possibility of Drake resigning as the management company." (emphasis added).

9

64. In response, Mills asked Radic to send $5,000 of NGC's funds, telling Radic "You have no worries. My intention is to buy out everything NGC owns."

65. Despite Radic's express concerns and the fact that Mills' disbursements were leaving the Northgate Shopping Center account short on cash, Mills continued to request that Drake and Radic send tens of thousands of dollars of NGC's funds and Drake and Radic continued to do so.

66. In September 2019, Avid Hunter obtained a court order in a Florida action formally removing JUSA-M as NGC's manager and appointing Avid Hunter as NGC's manager. At that point, Avid Hunter's attorney contacted Radic and only then did he finally stop sending Mills NGC's money. Mills' last request for NGC's money was on or about September 12, 2019, when he requested Radic send him $20,000 via FedEx.

67. Drake finally provided copies of its management reports to Avid Hunter in early 2020, which revealed the misappropriation of millions of dollars of NGC's funds.

68. In just the ten months Avid Hunter spent seeking information from Defendants before securing a court order, Defendants disbursed $248,000 to Mills from NGC's operating account and NGC lost title to Parcel 2, which was under the management of one or more of the Defendants.

### Mismanagement and Loss of NGC's Title to Parcel 2

69. Non-payment of property taxes for Parcel 2 was a recurring issue during management of Parcel 2 by one or more of the Defendants. Upon information and belief, Defendants were aware of persistent tax liens on Parcel 2 and that eventually, title to properties with tax liens may transfer under a Treasurer's Deed.

70. In November 2018, just before a Treasurer's Deed was issued for Parcel 2, Mills executed a fraudulent document titled "quitclaim deed" to a third party in exchange for the third party paying approximately $600,000 in delinquent taxes.

71. When Mr. Gondert first contacted Defendants about the Northgate Shopping Center in the fall of 2018, Defendants knew there were substantial delinquent taxes on Parcel 2. Upon information and belief, Defendants had received notice not only of the delinquent taxes, but also notice that a tax lien had issued and the deadline to redeem the property.

10

72. Upon information and belief, Radic also had direct personal knowledge of the delinquent taxes on Parcel 2 by way of his role as a director in the Northgate Water District and his knowledge of the District's failure to timely receive its share of taxes on Parcel 2.

73. Despite this knowledge of the tax lien and the knowledge that Mills' disbursement requests left insufficient funds to cover the Northgate Shopping Center's expenses, Defendants took no steps to pay the taxes for Parcel 2 from NGC's operating account or make inquiry, or provide notice to NGC and Avid Hunter of the past-due property taxes.

74. Had Defendants notified NGC or Mr. Gondert of the past due taxes and tax lien when Mr. Gondert was making inquiries about the financial condition of the property under Defendants' management, NGC and/or Mr. Gondert, acting for Avid Hunter, could and would have arranged for payment of the past-due property taxes owed on Parcel 2.

75. Instead, Defendants put their own interests (namely Defendants' desire to keep Mills happy because Mills was the source of significant business referrals, income, and accounts benefitting Defendants) ahead of NGC's interests, causing NGC millions of dollars in damages.

76. Upon information and belief, Mills hired Drake, Radic, Hauser and DRES to perform services for real estate projects in Colorado not owned by NGC, including Bella Mesa in Douglas County, Dacono Gateway in Weld County, and Northgate Federal in Adams County. The extent of Defendants' work for Mills on other Colorado real estate projects is unknown. Defendants, however, consistently directed their loyalty and fidelity to Mills rather than the entities they contracted with.

77. Drake paid itself a monthly fee for property management services from NGC's operating account totaling over $200,000.

78. Defendants also took "commissions" out of NGC's operating account, the nature, purpose and amounts of which have yet to be determined and quantified.

79. The amount of additional compensation Defendants earned, directly or indirectly from other services they performed at the request of Mills is unknown but believed to be substantial.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract Against Drake)**

80. Plaintiffs incorporate by reference the allegations set forth above.

81. The Contract constitutes a binding contract between Drake and NGC.

11

Case No. 1:21-cv-01746-RM-SBP   Document 33-3   filed 02/28/22   USDC Colorado   pg 13 of 16

82. NGC fully performed its obligations under the Contract, and there has never been a notice or claim by Defendants that NGC failed to perform any obligation.

83. Drake breached the Contract in numerous ways, including without limitation, by failing to implement proper financial controls to prevent the loss of NGC's assets as required by Section 2.3 of the Contract; by failing to identify who was authorized to give Drake direction and receive information on behalf of NGC and the extent of such authority; and by failing to follow the Contract's process of remitting the monthly excess of receipts over expenses to NGC, along with a monthly financial report, while always keeping sufficient funds to pay expected expenses.

84. Drake's failures under the Contract caused NGC damages, including the loss of the Northgate Shopping Center funds that were inappropriately disbursed to Mills and the loss of Parcel 2 of the Northgate Shopping Center.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Drake and Radic)

85. Plaintiffs incorporate by reference the allegations set forth above.

86. NGC and Avid Hunter entrusted JUSA-M and Defendants with authority to act on NGC's behalf, to manage the Northgate Shopping Center, provide for the payment of its expenses and manage the receipts generated by the Shopping Center in good faith and with the utmost duty of care as a fiduciary.

87. Drake and/or Radic, individually, undertook the management of Parcel 2 and acted as an agent of NGC with respect to Parcel 2 as evidenced by their actions to oversee weed control on the property, negotiate a lease with the tenant on Parcel 2, collect rent under the lease, and other actions.

88. Drake and Radic knew NGC and Avid Hunter reposed special confidence in them to act on its behalf as NGC and its principals, who lived outside of Colorado and abroad.

89. By undertaking management of NGC's Colorado assets and becoming an agent of NGC, Drake and Radic owed fiduciary duties to NGC as well as its members, namely Avid Hunter.

90. Drake and Radic owed duties:

   a. To act with the utmost faith and loyalty on behalf of and for the benefit of the principal.

12

US.131400412.02

    b. To use reasonable care in the protection of land and chattels entrusted to the agent and to use them only in accordance with the directions of the principal and for the benefit of the principal.

    c. To act only as authorized by NGC.

    d. Not to act or agree to act for persons whose interests conflict with the interests of the principal in matters that are the subject of the agency.

    e. To act upon or to communicate to the principal or to another agent of the principal information received by the agent even if not specifically instructed to do so, upon receiving notice of facts which, in the view of the agent's relations with the principal, he should know may affect the desires of his principal as to his own conduct or the conduct of the principal or of another agent to the principal.

    f. To inquire of the principal concerning the agent's exercise of powers on behalf of the principal upon changes of circumstances concerning the subject of the agency.

91. Drake and Radic breached their fiduciary duties to NGC and Avid Hunter as described in the foregoing paragraphs, including, without limitation, by refusing to provide or communicate information to NGC and Avid Hunter, failing to take any action to determine whether Mills' requests for funding were authorized, agreeing to act for and at the request of Mills, whose interests conflicted with NGC, even when such requests left NGC's Northgate Shopping Center account overdrawn and with knowledge that Mills might have taken more than he was purportedly owed; helping Mills loot NGC's funds; failing to provide the monthly reports to NGC's controlling member, Avid Hunter/Mr. Gondert; failing to inform NGC's controlling member about the past due taxes and resulting tax lien on Parcel 2; failing to take any action whatsoever to ensure Parcel 2's taxes were paid; placing their own interest in covering up their failures and keeping the revenue generated via their relationship with Mills ahead of NGC's interests.

92. As agents of NGC, Drake and Radic should have given consideration to all relevant facts about which they had notice each and every time they acted on behalf of NGC.

93. Drake and Radic's breaches directly resulted in NGC's loss of the funds that were improperly transferred to bank accounts under Mills' control and the loss of Parcel 2, and damaged Avid Hunter by allowing NGC's assets to be misappropriated, stolen, and sold.

US.131400412.02

### THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty Against All Defendants)

94. Plaintiffs incorporate by reference the allegations set forth above.

95. Defendants knew that JUSA-M was the manager of NGC and Mills was JUSA-M's manager because this was apparent from the signature blocks in the Contract. As such, Defendants knew JUSA-M and Mills owed fiduciary duties to NGC as a manager and the manager of the managing entity, respectively.

96. Mills and JUSA-M succeeded in breaching their fiduciary duties to NGC and defrauding NGC in material part due to Defendants' actions and inactions. It was the Defendants who supplied Mills with as much of NGC's cash as he wanted, whenever he wanted it, and for whatever purpose he wanted it, including when Defendants had written notice that Mills was requesting NGC funds for purposes that were undocumented, improper, and/or totally unrelated to NGC's business. Mills would not have been able to continue to breach his fiduciary duties to NGC but-for Defendants' improper acts and omissions which protected Mills to the detriment of NGC and Avid Hunter.

97. JUSA-M, Mills, Drake and Radic breached their fiduciary duties to NGC in numerous ways, including by failing to use reasonable care and diligence, failing to make inquiry, failing to follow the terms of the management Contract, misappropriating NGC's money in the Northgate Shopping Center and failing to ensure the property taxes on Parcel 2 were paid.

98. While Drake and Radic breached their own fiduciary duties to NGC, Defendants also aided and abetted Mills and JUSA-M in their breach of fiduciary duties to NGC, as detailed in the foregoing paragraphs.

99. Defendants knowingly participated in and provided substantial assistance in the breach of Drake's, JUSA-M's and Mills' fiduciary duties, as detailed in the foregoing paragraphs.

100. Defendants' actions and failures to act caused NGC and Avid Hunter substantial damages in the form of loss of personal property, real property, and devaluation of NGC.

### PRAYER FOR RELIEF

Plaintiffs respectfully requests the Court enter judgment in their favor and against Defendants, on all counts and that the Court award the following relief:

A. Plaintiffs' actual damages, in an amount to be proven at trial;

B.  Plaintiffs' reasonable attorneys' fees, as provided in the Contract;

C.  Pre- and post-judgment interest as permitted by law;

D.  Plaintiffs' costs; and

E.  Such further relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

DATED this 19th day of March 2021.

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Brandee L. Caswell*
    Brandee L. Caswell, #30706
    Carla R. Martin, #46433

ATTORNEYS FOR PLAINTIFFS

Plaintiffs' Address:
1990 Main Street, Suite 801
Sarasota, Florida 34236

*In accordance with C.R.C.P. 121 §1-26, a printable copy of this document with electronic signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.*

US.131400412.02