# ATTACHMENT

to

Defendants' Notice of Order of Judgment

*NGC Development, LLC v. Seter & Vander Wall, P.C., et al.*
*Case No.: 1:21-cv-01746-RM-STV*

<table>
<tr><td>

**Adams County District Court**
1100 Judicial Center Drive
Brighton, Colorado  80601

**Plaintiff:  NGC DEVELOPMENT, LLC**, a Florida limited
liability company,

v.

**Defendants:  WESTMINSTER STATION NORTHGATE,
LLC,** a Colorado limited liability company, **et al.**

</td><td>

DATE FILED: September 20, 2022 5:50 PM
CASE NUMBER: 2020CV30010

**COURT USE ONLY**

</td></tr>
<tr><td></td><td>

Case Number:  **20CV30010**

Division:  **A**
Courtroom:  **506**

</td></tr>
<tr><td colspan="2">

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT**

</td></tr>
</table>

A trial to the court was conducted on November 15-19, 2021, and December 3, 2021.

The parties submitted written closing arguments and proposed findings of fact and conclusions

of law on December 31, 2021.  The court heard oral closing arguments on February 4, 2022.[1]

Plaintiff NGC Development, LLC was represented by Laurence W. DeMuth, III (#13196)

and Carla R. Martin ($46433).  Defendant Westminster Station, LLC was represented by Adam

P. O'Brien (#37854) and William D. Healey (#50050).  Defendants Charles Santaularia,

Marbella Ventures, LLC, and Marquest, LLC , (collectively the "Santaularia Defendants") were

represented by R. Livingston Keithley (#35786) and Elliot Fladen (#36784).

---

[1] I sincerely apologizes for the delay in issuing my ruling.  The case had the unfortunate timing of becoming ripe for decision just after I rotated to a criminal division.  The resurgence of Covid in early 2022 further delayed my ability to address this case as I had to work through the backlog of criminal matters that were postponed with the shutdown of jury trials in early 2022 and related speedy trial issues created by the Covid continuances.  None of this is an excuse.  The parties and counsel deserve better.  Again, my apologies for the delay.

The following witnesses testified at trial:

| | |
|---|---|
| Christian Hoffmeister (assisted by German language interpreter) | Witness called by Plaintiff |
| Klaus Gondert (assisted by German language interpreter) | Witness called by Plaintiff |
| Eric Fagerstrom | Witness called by Plaintiff |
| Donna Weiner | Witness called by Plaintiff |
| Stephanie Nieses | Witness called by Plaintiff |
| Robert Noesner | Expert witness for Plaintiff (real estate appraisal) |
| Dan Murphy | Expert witness for Plaintiff (purchase and development of real estate and due diligence) |
| Russell Mills (by video deposition) | Witness called by all parties |
| Kim Seter | Witness called by Defendants (former attorney for Plaintiff) |
| Curt LeRossignol | Witness called by Defendants |
| Hugo Weinberger | Witness called by Defendants |
| Greg Notarianni | Expert witness for Defendants (title examination and real property conveyance) |
| Michael Eisenstein | Witness called by Defendants |
| Michael Martin (by deposition designation) | Expert witness for Defendants |
| Charles Santaularia | Witness called by Defendants |
| Gina Maldonado | Witness called by Defendants (former employee of Adams County Treasurer's Office) |

The parties stipulated to the admission of all exhibits, which are too numerous to list or describe individually in this order.[2]

---

[2] The exhibit numbers are 1-436, 500, 558-59, 565, 567-69, 600-699, and 700-743.

The court having considered the testimony and stipulated facts in the Trial Management Order, reviewed the exhibits presented, and taken judicial notice of the contents of the file pursuant to rule, hereby makes the following findings of fact and conclusions of law, and enters the following order of judgment.

## I.      CASE SUMMARY

This is a quiet title action brought under C.R.C.P. 105.  Plaintiff NGC Development, LLC ("NGC") seeks to quiet title to a 15-acre parcel of real property located at 7120 Federal Boulevard in Adams County, Colorado.  NGC was delinquent in paying its property taxes on the property.  As a result, a tax lien for the property was purchased in 2013.  In 2018, the tax lien purchaser sought the issuance of a treasurer's deed, which, when issued, would have divested NGC's title to the property and vested title in the holder of the tax lien.  The Adams County Treasurer issued a final notice to NGC that if the property taxes were not paid by November 29, 2018, the treasurer's deed would issue.

NGC was unable to (or, if able to, did not) pay the property taxes on its own.  Instead, at the last possible minute on November 29, 2018, Russell Mills, the individual authorized to act as a NGC's manager (through another entity which Mr. Mills was the principal), sold the property to Defendant Marbella Ventures, LLC, ("Marbella") an entity owned by Defendant Charles Santaularia, in exchange for Mr. Santaularia paying the outstanding property taxes.  Mr. Santaularia and Mr. Mills agreed that NGC would have the ability to repurchase the property within ninety days for $1,500,000.  NGC, however, was unable to repurchase the property, and the property was eventually conveyed to Defendant Westminster Station, LLC, ("WSN") for $3,250,000, (with an intermediate conveyance from Marbella to Defendant Marquest, LLC,

another entity owned by Mr. Santaularia).  NGC is the current title holder of record for the property.

Through this action NGC seeks to invalidate the chain of conveyances which started with NGC's conveyance to Marbella and culminated with the conveyance to WSN.  NGC contends that Mr. Mills did not have the authority to convey the property to Marbella.  Absent the requisite authority, NGC maintains that the conveyances to Marbella and WSN cannot stand as the deeds are either void or voidable and neither Marbella nor WSN was a bona fide purchaser for value.  Defendants deny any impropriety in the conveyances.  Defendants assert that Mr. Mills had sufficient authority to act on NGC's behalf to convey the property to Marbella. Defendants further assert that they are bona fide purchasers for value.

In addition to a claim to quiet title, NGC asserts a claim for unjust enrichment against the Santaularia Defendants.  NGC asserts that the Santaularia Defendants were unjustly enriched by obtaining the property for substantially less than its true value.  NGC brings its unjust enrichment in alternative in the event that it does not prevail on its quiet title claim.  The Santaularia Defendants deny that they were unjustly enriched.

## II.      FINDINGS OF FACT

The findings of facts set forth below are based upon a review of the exhibits and the evaluation of the credibility of witness testimony.  To the extent there were conflicts in testimony or other evidence (as opposed to conflicts as to their significance), the findings of fact reflect what was deemed the more credible or otherwise persuasive evidence.  Any credibility determination was based upon observations of the witnesses' means of knowledge, strength of memory, and opportunities for observation; the reasonableness or unreasonableness of their testimony; the consistency or lack of consistency in their testimony; their motives; whether their

testimony was contradicted or supported by other evidence; their biases, prejudices or interests, if any; their manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affected their credibility.  *See generally* CJI-Civil 3:16.

**A.**     **The Parties and the Property**

1.     Plaintiff NGC is a limited liability company organized under the laws of Florida.

2.     Defendants Marbella Ventures, LLC and Marquest, LLC are Colorado limited liability companies.  Defendant Charles Santaularia is the owner of Marbella and Marquest.

3.     Defendant Westminster Station Northgate, LLC is a Colorado limited liability company.  Non-parties Curt LeRossignol, Michael Eisenstein, and Hugo Weinberger are principals of WSN.

4.     The dispute concerns ownership of approximately 15 acres of real property located at 7120 Federal Boulevard, Westminster, Colorado, at 7120, (the "Property").  The legal description for the Property is:

## EXHIBIT A TO DEED

### LEGAL DESCRIPTION

A parcel of land situated in the Northeast 1/4 of Section 5, Township 3 South, Range 68 West of the 6th P.M., Adams County, State of Colorado, said parcel being more particularly described as follows:

Commencing at the North 1/4 corner of said Section 5; Thence N 89°37'42" E, a distance of 1112.80 feet to the Northerly extension of the West line of Park Terrace Filing No. 1 as recorded in the records of said county; thence S 00°29'59" W, a distance of 30.00 feet to the Northwest corner of said subdivision, said point also being the point of beginning;

Thence along said Westerly line S 00°29'59" W a distance of 893.57 feet;
Thence S 89°38'08" W a distance of 1067.44 feet to a point on the Easterly right-of-way of Federal Boulevard, said ROW being 50' Easterly of and parallel with the Westerly line of said Northeast 1/4;
Thence along said right-of-way N 00°47'17" E a distance of 169.55 feet to the right-of-way described in Book 4152 at page 550;
Thence along said right-of-way N 89°37'54" E a distance of 9.86 feet;
Thence N 03°04'53" E a distance of 250.65 feet;
Thence N 05°26'14" E a distance of 136.46 feet;
Thence N 00°47'27" E a distance of 288.32 feet;
Thence N 45°47'27" E a distance of 33.87 feet;
Thence N 87°42'44" E a distance of 464.01 feet;
Thence N 89°24'00" E a distance of 86.50 feet;
Thence N 01°02'06" W a distance of 10.29 feet to a point in a line that is 30 foot South of and parallel with the North line of said Northeast 1/4;
Thence along said parallel line N 89°37'42" E a distance of 458.42 feet to the Point of Beginning,
County of Adams, State of Colorado.

Except therefrom, lots 1 and 2, Northgate Shopping Center Subdivision in the City of Westminster, County of Adams, State of Colorado, per plat recorded January 23, 2009 at Reception No. 2009000004883.

**B.    NGC's Formation, Management and Acquisition of the Property**

5.    NGC was formed in 2010 for the purpose of buying and holding real estate in Colorado.

6.    NGC is a manger-managed LLC.

6

7.      NGC's Members were Avid Hunter, Ltd., JUSA Development, LLC (owned by Russell Mills (43%) and Christian Their (53%)), and RMA Asset Management, Ltd. (owned by Reinhard Krafft).

8.      Klaus Gondert, who lives in Germany and speaks limited English, is the manager of Avid Hunter Limited, which at all relevant times was the majority investor in NGC.

9.      From the time it was formed until September 2019, NGC's manager was JUSA Management, LLC ("JUSA-M").

10.     During the relevant time period, Russell L. Mills was the manager of JUSA-M. JUSA-M was a management company that was managed by Mr. Mills.  Mr. Mills, therefore, was the manager of the manager for NGC and was effectively NGC's manager.

11.     Mr. Mills managed the day-to-day operations of NGC.

12.     NGC is registered in Colorado as a foreign entity. The Statement of Foreign Entity Authority stated that JUSA-M was the manager of NGC and "R. Mills" was the member or authorized representative of a member.

13.     NGC recorded several annual registrations, which identified Russell Mills as being the authorized representative to act on behalf of NGC, either directly or as the authorized representative of JUSA-M.

14.     NGC's principal street address at all relevant times (which was publicly filed with the Florida and Colorado secretaries of state) was 2404 North Rio Grande Avenue, Orlando, Florida.

15.     NGC's Operating Agreement (the "Operating Agreement"),[3] set forth certain

"Management Powers of the Manager." As relevant here, section 7.1(A), states:

> (A) Except as otherwise expressly provided in this Agreement with respect to any matter requiring the consent or approval of a Majority in Interest or the Unanimous Consent of the Members, the management, operation and control of the Company, its business and the Project (including but not limited to its day-to-day business and affairs) shall vest solely in the Manager and such Manager shall have authority to take any and all such actions on behalf of the Company as may lawfully be delegated to a 'manager' under the Act, including without limitation, responsibility and authority to perform the following: …
>
> > (5) Protecting and preserving the title and interests of the Company in its properties and assets ….

16.     Section 7.1(B) states:

> (B)  Unless such action requires the Unanimous Consent of the Members or consent or approval of a greater number of Members, any action required by this Agreement to be 'approved' by the Members or which requires the 'approval' or 'consent' of the Members shall require the approval of a Majority in Interest of the Members. Notwithstanding the provisions of Section 7.1A hereof, the Manager may undertake on behalf of the Company or cause the Company to undertake the following actions *only* upon the approval of a Majority in Interest of the Members (each a 'Major Decision'): …
>
> > (5) sell, lease, encumber or otherwise dispose of any Company properties or assets except in accordance with any approved Plan and Budget ….

17.     Section 7.13 states:

> **Section 7.13   Reliance by Third Parties.**  Notwithstanding anything to the contrary in this Agreement, any Person dealing with the Company shall be entitled to assume that the Manager has full power and authority, without the consent or approval of any other Member or Person, to encumber, sell, or otherwise use in any manner any and all assets of the Company and to enter into any contracts on behalf of the Company, and take any and all actions on behalf of the Company, and such Person shall

---

[3] The Operating Agreement was erroneously titled "NG Development."  I am persuaded that this was simply a typographical error and the Operating Agreement is the operative document defining the legal rights of NGC's members and manager.

be entitled to deal with the Manager as if it were the Company's sole party in interest, both legally and beneficially. In no event shall any Person dealing with the Manager or its representatives be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expediency of any act or action of the Manager or its representatives. Each and every certificate, document or other instrument executed on behalf of the Company by the Manager or its representatives shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i) at the time and the execution and delivery of such certificate, document, or instrument, this Agreement was in full force and effect, (ii) the Person executing and delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Company and (iii) such certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Company.

18.     Section 15.12 states:

Section 15.12  **No Third Party Beneficiaries**  This Agreement is solely for the benefit of the Members.  No person not a Member of the Company shall have any rights or privileges under this Agreement, either as a third-party beneficiary or otherwise (provided, however, that the foregoing shall not deemed to limit the obligation of the Company to indemnify certain third parties as expressly contemplated by **Section 7.7** hereof).

19.     The Operating Agreement became effective as of June 11, 2010.  The above

provisions of the Operating Agreement were in effect at all relevant times, including, 2018 and

2019.

20.     Prior to this lawsuit, Mr. Gondert never reviewed the Operating Agreement, as he

testified, "[t]hat's what attorneys were for."

21.     Although Mr. Gondert never reviewed the Operating Agreement, his signature

appears on page 38 of the Operating Agreement across from the signature of Avid Hunter's

representative.

22.     Mr. Mills signed the Operating Agreement on behalf of JUSA-M as manager. Mr. Mills also signed the Operating Agreement as the manager of JUSA Development, LLC, a member of NGC.

23.     The Operating Agreement was never publicly recorded or publicly available in Florida or Colorado.

24.     NGC did not observe corporate formalities such as holding member meetings or keeping formal minutes of decisions.

25.     Because Mr. Gondert does not speak or read English, Mr. Gondert's practice was that when he received information such as emails in English, he would have someone translate them for him. Originally, Reinhard Krafft translated while in later years it was primarily Mr. Gondert's daughter Steffi Neises.

26.     Mr. Mills frequently signed documents for NGC, including the closing documents for NGC's initial purchase of the Property and publicly recorded documents.

27.     Mr. Mills was not always consistent in the way he signed documents for NGC. At times, he would sign as manager of JUSA-M, as manager for NGC.  Other times he would sign as Russell Mills, manager of NGC.  This happened both with transactions that NGC approved and the transactions NGC challenges in this lawsuit.[4]

28.     Mr. Gondert testified that Mr. Mills signed documents as NGC's manager under his orders.

29.     Employees of NGC, including accountants for NGC, were directed by Mr. Mills.

---

[4] Examples of instances where Mr. Mills signed as manager of NGC include exhibit 19 (a proposed sale contract for the Property in 2014), exhibit 27 (a sales contract for water rights for another property owned by NGC), and exhibit 74 (a 2018 release agreement concerning an easement on the Property).  Examples of instances where Mr. Mills signed as the manager of JUSA-M, as manager of NGC include exhibit 73 (a May 2017  right of way grant letter for a right of way on the Property), exhibit 15 (the 2010 closing documents on NGC's acquisition of the Property) and exhibit 115 ( a 2017 contract to sell the Property).

**C.      NGC's Colorado Counsel**

30.      The law firm Seter & Vander Wall, PC, including attorney Kim Seter, Esq., represented NGC and was its counsel in Colorado from 2010 to December 2019.

31.      Mr. Mills was Mr. Seter's primary contact at NGC, and Mr. Seter understood Mr. Mills was NGC's manager.

32.      Mr. Gondert relied on Mr. Seter to represent NGC in Colorado and was aware that he was NGC's counsel in Colorado.

33.      Mr. Mills and the Seter law firm were NGC's representatives and agents in Colorado.

34.      Mr. Seter testified that it did not make a difference to him whether Mr. Mills signed documents directly as NGC's manager or as the manager of NGC's manager, and he was aware of documents that Mr. Mills signed as NGC's manager.

**D.      NGC's Acquisition of the Property**

35.      In November 2010, NGC acquired the Property as part of a combined purchase of multiple properties and water rights in Adams and Weld Counties, for which it paid a combined price of $11.5 million.

36.      Mr. Seter's representation of NGC included NGC's purchase and ownership of the Property and the adjoining shopping center.  Mr. Seter's firm prepared the closing package for the purchase.

37.      Mr. Mills signed the closing documents on NGC's behalf.

**E.      NGC's Attempts to Sell the Property**

38.      For several years, NGC was actively marketing the Property in Colorado. Dan Robison was NGC's broker and was responsible for dealing with potential buyers.

11

39.     Mr. Mills represented NGC in negotiations to sell the Property, and Mr. Gondert and his daughter relied on Mr. Mills to negotiate sales.

40.     Although Mr. Mills agreed he needed unanimous consent to sell the Property, Mr. Mills did not expect third parties to deal with NGC's members, including Avid Hunter or Klaus Gondert, directly regarding approvals.  Neither did Mr. Seter who never informed prospective purchasers of the Property that they should be contacting Mr. Gondert or anyone other than Mr. Mills.

41.     Russell Mills was responsible for obtaining internal approvals from NGC's members for various transactions, which Ms. Neises agreed with.

42.     Mr. Mills sought approval from Mr. Gondert through emails or phone calls.  Mr. Gondert approved transactions over the phone.

43.     Third parties not affiliated with NGC did not contact Mr. Gondert or his daughter directly.

44.     Mr. Seter was aware that Mr. Mills was in contact with others involved in NGC, but Mr. Mills was the manager that he was directed to deal with.

45.     Mr. Gondert did not reach out to third parties, including WSN principals Mr. Eisenstein or Mr. LeRossignol, informing them that Mr. Gondert needed to approve any sale of the Property.

46.     Over the years, NGC entered into several contracts to sell the Property, none of which closed until the conveyance to Marbella at issue in this case.

47.     In 2017, Curt LeRossignol and Michael Eisenstein (who later became managers of WSN) became aware of the opportunity to purchase the Property along with the 12.5-acre

parcel immediately to the south.  They were provided sales information by NGC's broker, Mr. Robison.

48.     Mr. LeRossignol and Mr. Eisenstein were introduced to Mr. Mills by Mr. Robison, and Mr. LeRossignol identified documents in Adams County public records that identified Mr. Mills as manager of NGC, including the 2016 Statement of Authority (discussed below).

49.     Mr. LeRossignol and Mr. Eisenstein submitted offers on the Property (as well as the southern parcel) which were not accepted by NGC.

50.     Mr. LeRossignol and Mr. Eisenstein learned that there was a German investor involved in the Property; however, they were never directed to contact him directly.

51.     In June and July 2018, Mr. LeRossignol and Mr. Eisenstein exchanged emails with Mr. Mills and Mr. Robison which identified Mr. Gondert as the German investor and that his approval in some form was needed before NGC could agree to the sale.

52.     Mr. LeRossignol and Mr. Eisenstein communicated with and relied on Mr. Mills as NGC's manager and Mr. Robison as NGC's broker with respect to a potential purchase of the Property.

**F.     NGC's Sale of Water Rights and the 2016 Statement of Authority**

53.     In 2016 and early 2017, NGC sold certain water rights that it owned on the Big Thompson River in connection with a property NGC owned known as Pinnacle Farms.

54.     NGC's attorney Kim Seter represented NGC with respect to the sale of the water rights.  Mr. Gondert knew that Mr. Mills and NGC's attorney Kim Seter handled the contracts on NGC's side for the sale of the water rights.

55.     In connection with that transaction, the purchaser requested that NGC prepare a statement of authority confirming authority to sell those water rights.

56.     A Statement of Authority dated September 19, 2016 was recorded in the public record with the Adams County Clerk and Recorder on September 20, 2016 at Reception No. 2016000078234.

57.     The September 2016 Statement of Authority identified "Russell L. Mills, as the Manager of NGC Development, LLC" as a person authorized to execute instruments conveying title to real property on behalf of NGC. It further noted that Mr. Mills' "[a]uthority is not limited." The Statement of Authority did not refer to authority for any specific or particular transaction.

58.     NGC's attorneys at the Seter Law Firm prepared and recorded the Statement of Authority.

59.     Mr. Mills signed that Statement of Authority as manager or representative of NGC.

60.     Although Mr. Gondert testified that he never saw the Statement of Authority prior to his deposition in this lawsuit, Mr. Mills testified that he would not have signed the Statement of Authority without Mr. Gondert's approval.

61.     Whether or not Mr. Gondert was aware of the Statement of Authority, there is no dispute that Mr. Gondert was aware of and approved the sale of NGC's water rights.

62.     Mr. Mills signed the sale and purchase agreement for the water rights as manager of NGC; the agreement was not signed Russell Mills, manager of JUSA-M, as manager of NGC.

63.     The sale of water rights closed in two closings. The proceeds from the first closing of water shares were deposited into NGC's account on November 22, 2016. The

proceeds from the second closing of water shares were deposited into NGC's account on January 6, 2017.

**G.     Mr. Gondert and Mr. Mills' Relationship Deteriorates**

64.     As time went on, Mr. Gondert began to lose confidence in Mr. Mills.  According to Mr. Gondert, Mr. Mills improperly transferred money from NGC to other entities in which Mr. Mills had an ownership interest.  NGC argues that Mr. Mills was embezzling NGC funds. Mr. Mills generally denies that he improperly transferred NGC funds to other entities or that he did so without Mr. Gondert's knowledge.

65.     In any event, the relationship between Mr. Mills and Mr. Gondert deteriorated significantly in 2018.

66.     Mr. Gondert lost trust in Mr. Mills as a result of the perceived irregularities in NGC fund transfers and other issues Mr. Gondert noticed, including that Mr. Mills told him he wanted to resign as manager.

67.     Mr. Hoffmeister, who is a consultant for NGC, began losing faith in Mr. Mills' work as manager in 2018 as well. He communicated his concerns to Mr. Gondert by email.

68.     As of July 2018, Mr. Hoffmeister and Mr. Gondert had discussed "clear[ing] the decks" of Mr. Mills as manager.

69.     In October 2018, Mr. Hoffmeister reported to Mr. Gondert that he believed it was irresponsible to leave Mr. Mills managing Mr. Gondert's companies, including NGC and Founders Ridge Development.

70.     Mr. Gondert and Mr. Mills' relationship deteriorated further and in September or October 2018, Mr. Gondert testified that he retained an attorney.

71.     As of November 2018, Mr. Mills believed that Mr. Gondert and his daughter Ms. Neises were not acting in accordance with the Operating Agreement.

72.     By November 2018, Mr. Mills and Mr. Gondert were not communicating with one another.

73.     Despite Mr. Gondert's concerns about Mr. Mills, NGC did not replace Mr. Mills as the individual responsible for managing NGC or file any public document in Colorado limiting Mr. Mills' authority until September 3, 2019, when NGC filed a statement of authority revoking Mr. Mills' authority to act for NGC.[5]

**H.     NGC's Failure to Pay Property Taxes**

74.     Beginning in 2012 or 2013, NGC failed to pay its real estate taxes for the Property to Adams County.

75.     A third-party, INA Group, LLC, purchased a tax lien on the Property in November 2013.

76.     By 2013, NGC's attorneys were investigating issues related to the real estate taxes for the Property. This went on for several years as Mr. Seter's office continued to investigate the Real Estate tax issue and dispute procedures.

77.     Mr. Seter reported to NGC that a treasurer's deed for the Property could issue if the taxes were not paid.

78.     On June 5, 2018, INA Group, LLC filed an application for treasurer's deed with Adams County.

---

[5] In May 2019, Mr. Gondert and Avid Hunter filed a lawsuit in Florida against Mr. Mills.  In addition, NGC filed lawsuits against its former attorney Kim Seter and the law firm Seter & Vander Wall as well as against NGC's former property-manager Perry Radic and Drake Asset Management, alleging that the actions of these individuals and entities caused NGC to lose title to the Property.  I take judicial notice of these lawsuits but nothing in this order is intended to or should be construed as this court expressing any findings or opinions on the merits of those lawsuits.  Those lawsuits involve different parties, different issues, and different claims.

79. The Seter Law firm informed NGC that a tax deed had been applied for in 2018.

80. On June 20, 2018, the Adams County Treasurer's Office sent NGC an "Urgent Notice" that stated "**YOU ARE IN DANGER OF LOSING THIS PROPERTY BECAUSE OF UNPAID PROPERTY TAXES.**"

81. The Adams County Treasurer published notice of the application for Treasurer's Deed in the Northglenn-Thornton Sentinel, a weekly newspaper, printed and published for Adams, County, Colorado. These notices were published on August 2, 2018, August 9, 2018, and August 16, 2018.

82. On August 23, 2018, the Adams County Treasurer's Office sent NGC a "Final Notice" by certified mail that stated "If the property taxes are not paid by **NOVEMBER 29, 2018 at 2:00 p.m.,** a Treasurer's Deed will be issued which will change ownership of the property to the owner of the tax lien certificate." That same Final Notice was sent to the Property address that day.

83. The Adams County Treasurer's Office sent the notices to NGC's registered address in Florida (2404 North Rio Grande Avenue, Orlando, Florida, 32804) as well as to the Property address in Colorado.

84. The Seter Law firm, NGC's attorneys, were aware of the notices issued by Adams County and were directly contacted by the county treasurer.

85. Mr. Mills knew that if the outstanding property taxes were not paid off by the afternoon of November 29, 2018, a treasurer's deed would issue.

86. Mr. Mills understood that if the treasurer's deed had actually issued, title to the Property would be transferred from NGC to a third-party, and that NGC would not have had the

opportunity to reacquire the property.  Mr. Seter was aware that once a treasurer's deed was issued, the owner of real property loses title to that property without any recourse.

87.     Mr. Mills testified that he was responsible for making sure that NGC's real estate taxes were paid, however, the members of NGC were responsible for providing the funding for those taxes.

88.     NGC's counsel frequently advised NGC of the pending deadlines for the real estate taxes.

89.     The Adams County Treasurer's Office maintained a checklist to make sure the required process for issuing a treasurer's deed was followed, including for the treasurer's deed application at issue here.

90.     The Adams County Treasurer's Office did not send any notice directly addressed to Mr. Gondert because there was no indication in the public record that he had an interest in the Property.

91.     Leading up to November 29, 2018, NGC did not have sufficient funds available for NGC to pay the outstanding real estate taxes.

92.     NGC knew that in order to pay off the real estate taxes, a wire was not sufficient, and someone had to deliver good funds in person to the treasurer's office.

93.     Mr. Gondert did not understand the tax lien process.  Mr. Gondert testified that he did not know that a third-party had applied for a tax deed on the Property.

94.     Mr. Gondert confirmed that he was relying on NGC's manager and Colorado attorneys to deal with the taxes.

95.     The parties dispute when the last time Mr. Gondert received notice that the property taxes had not been paid.  The evidence shows that in 2016 and into early 2017, Mr.

Mills sent emails to Mr. Gondert indicating that the taxes were still due.  Mr. Gondert maintains that he was not aware that the taxes were still due in 2018.

96.     The parties also dispute how the taxes were to be paid.  There are emails from Mr. Mills at the time of the sale of the Pinnacle Farms water rights that the taxes needed to be paid and could be paid from proceeds upon "closing."  There is conflicting evidence as to what "closing" is referred to in the email.  The email is not clear whether the reference is to the sale of water rights closing or an anticipated closing on a pending sales contract for the Property (which ultimately did not happen).

97.     What is clear is that the property taxes were never paid by NGC whether or not it had the funds to pay them in 2016, 2017 or 2018.

98.     It is equally clear that Mr. Gondert never followed up with Mr. Mills or took any other action to confirm that the property taxes had been paid from the proceeds of the water shares sale or otherwise.[6]

**I.     Events on November 29, 2018**

99.     On the evening of November 28, 2018, Mr. Robison, NGC's real estate broker, reached out by email to Mike Eisenstein and Curt LeRossignol informing them of the delinquent tax situation and offering a first mortgage and the chance to purchase the Property in the future if they would be willing to fund the $603,371 to pay the taxes the next day.

100.     Mr. Eisenstein and Mr. LeRossignol did not have over $600,000 available on such short notice and were unable to assist NGC.

---

[6] I need not resolve the dispute as to why the property taxes were not paid (i.e., whether there were sufficient funds from the sale of water rights to pay the taxes and Mr. Mills did not do so or whether there were never sufficient funds left over from any water rights closings because Mr. Gondert directed the funds be used for other matters). The precise reason for the failure to pay the property taxes is not germane to the outcome of this case.  What is important is the undisputed fact that NGC did not pay the property taxes.

101.    The next morning, Mr. Eisenstein forwarded Mr. Robison's email to Charles Santaularia informing him of the situation and the potential offer.

102.    Before November 29, 2018, Mr. Santaularia had never been introduced to or previously done business with Mr. Mills or NGC.  Mr. Santaularia has been a real estate investor for five to seven years, including investing by purchasing certificates in tax lien auctions.  He has experience applying for treasurer's deeds, and the process for redeeming taxes for properties in order to avoid issuance of a treasurer's deed.  As testified by Mr. Santaularia, purchasers of tax lien certificates have the opportunity to obtain title to property at a very small fraction of the property's market value.

103.    The morning of November 29, 2018, the county treasurer again contacted NGC's attorneys about the issuance of the treasurer's deed, and NGC's attorneys communicated that to NGC.

104.    Mr. Santaularia did not see the email immediately after Mr. Eisenstein emailed it, however, he did receive the email that morning at around 11:00 a.m.  After reviewing the email, Mr. Santaularia called Mr. Eisenstein, who in turn told him to contact NGC's manager and broker, specifically Mr. Mills and Mr. Robison.

105.    In his conversation with Mr. Eisenstein, Mr. Eisenstein did not mention anything about NGC having an owner in Germany.

106.    After speaking with Mr. Eisenstein, Mr. Santaularia talked to Mr. Mills and Mr. Robison.  They confirmed to Mr. Santaularia that NGC knew it was going to lose title to the Property unless the taxes were redeemed by 2:00 p.m. that day.  When Mr. Santaularia asked why they had not paid the taxes, Mills informed him it was because the company's funding had not come through.

107.     Mr. Santaularia next called Eric Fagerstrom at Homestead Title and asked him to look up the title information concerning the Property.  Mr. Fagerstrom invited Mr. Santaularia to come to his office.

108.     At Mr. Fagerstrom's office, Mr. Fagerstrom pulled an Ownership & Encumbrance report in front of Santaularia which showed NGC was the record owner of the Property, and that there were no liens on the Property.  Mr. Fagerstrom also searched the records of the Adams County Clerk and Recorder, and found a Statement of Authority for NGC that was signed by Russell Mills dated September 19, 2016 (the "2016 Statement of Authority").  Mr. Santaularia was present and reviewed the O&E Report.[7]

109.     Mr. Santaularia became aware of the 2016 Statement of Authority at some point on November 29, 2018 prior to him paying off NGC's property tax debt.[8]

110.     Based upon Mr. Robison identifying Mr. Mills as the manager of NGC and Mr. Mills confirming he was manager, and the certification in the 2016 Statement of Authority, Mr. Santaularia believed that Mr. Mills had authority to negotiate and act for NGC.

111.     Mr. Santaularia spoke with Mr. Mills and Mr. Robison by phone.  Mr. Santaularia told Mr. Mills that he was unwilling to provide the funds as a loan and was not interested in a mortgage on the Property. Instead, Mr. Santaularia was only willing to provide the funds in exchange for a transfer of ownership for the Property, but he would also agree to a separate repurchase option whereby NGC could buy the Property back after ninety days for $1.5 million.

---

[7] Mr. Santaularia's trial testimony and deposition testimony conflicted at times as to whether he met with Mr.Fagerstrom in person on November 29th, or if he only had telephone conversations with Mr. Fagerstrom.  Mr. Fagerstrom testified they met in his office.  I find it more likely than not that Mr. Santaularia visited Mr. Fagerstrom's office.

[8] Mr. Santaularia's trial testimony and deposition testimony conflicted at times as to when Mr. Santaularia actual saw the 2016 Statement of Authority.  I find it more likely than not that at the very least Mr. Santaularia was aware of the 2016 Statement of Authority and its contents on November 29, 2018, even if he did not review it with his own eyes that day.

112.     Mr. Santaularia and Mr. Mills agreed that Mr. Santaularia would pay off the taxes for NGC in exchange for a quit claim deed to the Property, and NGC would receive a ninety-day repurchase option for $1.5 million.  Mr. Santaularia and Mr. Mills executed purchase and sale contracts confirming that agreement.

113.     Mr. Eisenstein and Mr. LeRossignol were not involved in the negotiations between Mr. Santaularia and NGC.

114.     Mr. Mills never told Mr. Santaularia that he needed to get any other approvals for the transaction.

115.     Mr. Santaularia never asked Mr. Mills if he was authorized to sell the Property or if Mr. Mills needed approval from anyone else.  Mr. Santaularia did not request the NGC Operating Agreement at that time.

116.     Mr. Santaularia also contacted the Adams County Treasurer's office to confirm the status of the taxes and amount owed. He confirmed that the taxes needed to be paid by 2:00 p.m. that day, but was able to reach an agreement that if he arrived by 3:00 p.m. the treasurer's office would still accept payment.

117.     Mr. Santaularia did not pay the outstanding taxes until he received the fully signed and executed purchase contract from NGC.  Mr. Santaularia credibly testified that, under the circumstances, he did not have time to obtain title insurance.  He also testified he would not have had time to review NGC's Operating Agreement and get the taxes redeemed, even if he had received it.

118.     Mr. Santaularia paid off all of NGC's outstanding taxes on the Property on November 29, 2018, which prevented the issuance of the treasurer's deed. Mr. Santaularia, on

behalf of Marbella executed an Affidavit for Redemption on November 29, 2018, confirming that he had paid off the outstanding real estate taxes on the Property.

119.    NGC and Marbella (through Mr. Mills and Mr. Santaularia respectively) fully executed the contract to buy and sell real estate whereby NGC agreed to convey the Property to Marbella.

120.    Mr. Mills knew that if NGC did not exercise its buyback option, title would remain with Mr. Santaularia's entities.

121.    A Quit Claim Deed dated November 29, 2018 conveying the Property from NGC Development, LLC to Marbella Ventures, LLC was recorded in the public record with the Adams County Clerk and Recorder on December 4, 2018 at Reception No. 2018000097608.

122.    Mr. Mills executed the November 29, 2018 Quitclaim deed on behalf of NGC and handwrote his name on the deed.

123.    NGC's intention, as expressed by Mr. Mills, was to convey title of the property to Marbella.

124.    Mr. Mills, also signed the buy-back agreement from Marbella Ventures on behalf of NGC.

125.    If the Property taxes had not been paid by Marbella on November 29, 2018, a treasurer's deed to the Property would have issued.

126.    It was Mr. Mills' intent to save the Property from being struck off to the holder of the tax lien certificate by a treasurer's deed, and to preserve the right for NGC to re-acquire title to the Property.  Although Mr. Mills would have preferred a loan transaction with Mr. Santaularia, Mr. Mills fully understood that he needed to get something done on November 29, 2018 or else NGC would lose the Property.

127.    The court does not find that it was Mr. Mills' intent to defraud NGC or Mr. Gondert by entering into the sales contract with Mr. Santaularia.  Whatever else Mr. Mills was doing with respect to NGC, the transactions with Mr. Santaularia were not done to cover up any embezzlement or other unlawful conduct Mr. Mills may have engaged in prior to November 29, 2018.

128.    Until this litigation was filed, Mr. Santaularia did not know that Mr. Gondert was involved with NGC and had not specifically authorized the transfer of the Property to Marbella.

**J.      Events After November 29, 2018 and the Conveyance to WSN**

129.    Pursuant to the contract with Marbella, NGC had a right to repurchase the Property within a ninety-day period.

130.    However, NGC failed to exercise its repurchase option despite Mr. Mills and Mr. Santaularia agreeing to several extensions.

131.    While NGC had the ability to repurchase the Property from Marbella, Mr. Eisenstein and Mr. LeRossignol kept updated on the status of that repurchase.

132.    Mr. LeRossignol even reached out to another lender, Bob Amter of Montegra, in an attempt to assist NGC in procuring funding to repurchase the Property from Marbella so that the Property would not be lost to a third party.

133.    In preparation for NGC's repurchase of the Property, Homestead Title (who was to conduct the closing) requested that NGC execute an updated Statement of Authority.

134.    A Statement of Authority dated February 20, 2019 was recorded in the public record with the Adams County Clerk and Recorder on March 19, 2019 at Reception No. 2019000019540.

135.    Mr. Mills signed the February 2019 Statement of Authority on behalf of NGC, which again confirmed that he was manager of NGC and had unlimited authority to convey Property on behalf of NGC.

136.    A Quitclaim Deed dated February 20, 2019 was executed and recorded to "correct the legal description and notary acknowledgement in the deed recorded at Reception No. 2018000097608." The deed was recorded in the public record with the Adams County Clerk and Recorder on February 22, 2019 at Reception No. 2019000013110.

137.    Mr. Mills executed the February 20, 2019 Quitclaim Deed on behalf of NGC.

138.    In March 2019, Mr. LeRossignol and Mr. Eisenstein came into contact with Hugo Weinberger, who later became part of WSN's management group, in order to help bring in additional investors to potentially finance a purchase of the Property and the 12.5-acre adjacent parcel.

139.    Mr. LeRossignol was in contact with Mr. Seter in November 2018 regarding the Property's Metro District.  Mr. Seter never directed Mr. LeRossignol to contact Mr. Gondert.

140.    Mr. Mills never provided the Operating Agreement to Mr. Eisenstein or Mr. LeRossignol.

141.    WSN conducted extensive due diligence before purchasing the Property from Mr. Santaularia's companies.

142.    WSN utilized counsel to assist in due diligence and closing on the Property.

143.    WSN closed on the Property with a title company and obtained title insurance.

144.    A Quit Claim Deed dated June 17, 2019 conveying the Property from Marbella Ventures, LLC to MarQuest, LLC was recorded in the public record with the Adams County Clerk and Recorder on June 19, 2019 at Reception No. 2019000047503.

145.     A Special Warranty Deed dated June 17, 2019 conveying the Property from MarQuest, LLC to Westminster Station Northgate, LLC was recorded in the public record with the Adams County Clerk and Recorder on June 19, 2019 at Reception No. 2019000047504.

146.     WSN paid $3,250,000 for the Property.

147.     WSN also purchased and obtained title to the adjacent southern 12.5 acre property.

148.     In undertaking the transaction with WSN, Mr. Santaularia's intent was not to make it impossible for NGC to buy the property back; instead he would have transferred title back to NGC had it kept its side of what it had promised.

149.     Mr. Gondert did not become aware of the sale of the Property to Marbella or the subsequent conveyance to WSN until after they occurred.

**K.     What Could Have Happened Had Mr. Gondert Been Advised of November 29, 2018 Deadline**

150.     Mr. Gondert testified that had he known in November 2018 that the property taxes had not been paid, he had the funds available and would have paid the property taxes.

151.      However, Mr. Gondert also testified that had Mr. Mills called him on November 29th, he would not have wired Mr. Mills the money directly to pay the taxes and instead would have had to investigate to confirm the amount due and determine where to send a wire transfer.

152.     The court finds that whether or not Mr. Gondert had the funds to pay the property taxes is beside the point because the relationship between Mr. Gondert and Mr. Mills had deteriorated to a point in November 2018 that they were not communicating, and even if Mr. Santaularia passed on the deal, Mr. Mills would not have contacted Mr. Gondert to ask for funds to pay the property taxes.

153.    The court further finds that based on the testimony of Gina Moldonado that had the property taxes not been paid by the deadline on November 29, 2018, the treasurer's deed would have issued as soon as the Treasurer was able to sign it.

154.    The court finds that had Mr. Santaularia not paid the property taxes by 3:00 p.m. on November 29, 2018, NGC would have lost the Property by issuance of a treasurer's deed.

## III.    BURDEN OF PROOF

This is a civil case so I apply the preponderance of evidence standard in evaluating the parties' claims and any affirmative defenses.  Colo. Rev. Stat. § 13-25-127; *Silver Core Min. Co. v. DeBell*, 595 P.2d 269, 271 (Colo. Ct. App. 1979) (applying preponderance of the evidence standard in action to quiet title to unpatented mining claims).  Proof by a preponderance of the evidence means that the evidence must outweigh evidence to the contrary.  *See, e.g.* CJI-Civil 3:1 ("To prove something by a 'preponderance of the evidence' means to prove that it is more probably true than not.").

A plaintiff in a quiet title action must rely on the strength of its own title rather than on an alleged weakness or lack of title in the defendants. *See Silver Core Min. Co.*, 595 P.2d at 271; C.R.C.P. 105(a).  When it appears that the plaintiff's property rights have been lost or terminated, "he is in no position to question the legality of the title claimed by others."  *Sch. Dist. No. Six v. Russell*, 156 Colo. 75, 396 P.2d 929, 932 (1964); *see also Osborne v. Holford*, 40 Colo. App. 365, 368, 575 P.2d 866, 868 (1978) (noting that when a plaintiff fails to establish its own title he has no basis on which to force defendants to establish their title); *Bock v. Bd. of Cty. Comm'rs*, 520 P.2d 149, 151 (Colo. App. 1974) ("In regard to plaintiff's challenge to the validity of defendants' title, it is axiomatic that where plaintiff in an action to quiet title to land fails to make a prima facie showing of his title, he is in no position to question the legality of the tile

claimed by other parties to the suit."); *see also Meyer v. Haskett*, 251 P.3d 1287, 1292-93 (Colo. App. 2010) (noting party to a quiet title suit cannot question the title of another party unless he can show title in himself).

## IV.    CONCLUSIONS OF LAW

### A.    Quit Title Claim

NGC's primary claim for relief seeks to equitably quiet title in the Property to NGC by invalidating the transaction between NGC and Marbella and later Marquest to WSN.  Plaintiff's main contention is that Mr. Mills did not have authority to sell the Property under the Operating Agreement.  NGC maintains that without the requisite authority, the transaction with Marbella is either void because the deed was forged or voidable because Mr. Mills was engaged in fraud when he signed the deed conveying the Property to Marbella.  For the reasons that follow, I conclude that NGC has failed to prove its quite title claim.

#### 1.    Applicable Law

##### a.    Colorado's Recording Act and Property Statutes

Colorado's recording and conveyance statutes are meant to encourage the security and marketability of real estate.  *See* Colo. Rev. Stat. § 38-34-101; *see also Strekal v. Espe*, 114 P.3d 67, 73 (Colo. Ct. App. 2004) ("the security and marketability of real estate titles is an essential state interest." (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544).)  "This interest is best served by a bright line rule that enables potential buyers to determine the validity of a title and its potential encumbrances."  *Id*. (citing *Lobato v. Taylor*, 71 P.3d 938, 964 (Colo. 2002).)

The Colorado legislature has expressly stated its intent that the Colorado real property statutory scheme must be liberally construed to make title secure and marketable and to render recorded instruments enforceable and free from defects.  *See* Colo. Rev. Stat. § 38-34-101 (The

laws concerning real property and interests therein "shall be liberally construed with the end in view of rendering such titles absolute and free from technical defects.")

Colorado is a race-notice recording jurisdiction whereby the legislature has provided specific mechanisms for publicly recording documents and putting the public and potential purchasers on notice as to who has authority to act for limited liability companies.  The "race-notice system 'is the linchpin of Colorado real estate law.'"  *Joondeph v. Hicks*, 235 P.3d 303, 306 (Colo. 2010) (quoting *Premier Bank v. Bd. of County Comm'rs*, 214 P.3d 574, 579 (Colo. Ct. App. 2009).)  "Its purpose is to enable a buyer or mortgagee, by analysis of the chain of title, to determine exactly what it is acquiring."  *Premier Bank*, 214 P.3d at 579 (citing cases).

To effectuate notice, documents regarding real property may be recorded in the county clerk and recorder of the county where the real property is located, and unrecorded documents are not valid against any person with rights in the real property unless that person has prior notice.  *See* Colo. Rev. Stat. § 38-35-109(1).  The recording statutes are designed to protect purchasers of real property against non-recorded events and permit a purchaser "to rely on the condition of title as it appears of record."  *Thomas v. Lynx United Grp., LLC*, 159 P.3d 789, 793-94 (Colo. Ct. App. 2006) (internal quotations omitted).  Recorded documents provide notice "to all persons or classes of persons claiming any interest in said property."  Colo. Rev. Stat. § 38-35-106(1). By contrast, non-recorded documents do not provide notice to third-party purchasers or the world. *See Thomas*, 159 P.3d at 794; *see generally Lakewood v. Mavromatis*, 817 P.2d 90 (Colo. 1991) (discussing Colorado's recording act and holding that documents not recorded with the proper county clerk and recorder do not provide notice).

Colorado's recording act "protect[s] bona fide purchasers without notice[.]" *Guaranty Bank and Trust Co. v. LaSalle Nat. Bank Ass'n*, 111 P.3d 521, 523 (Colo. Ct. App. 2004).

Recording is a requirement for showing statutory authority and amending or superseding a statement of authority.

   **b.  Statements of Authority under Colo. Rev. Stat. § 38-30-172**

   Colorado law provides that an entity, such as an LLC, may record a statement of authority evidencing that a person has authority to convey, encumber, or otherwise affect title to real property.  *See* Colo. Rev. Stat. § 38-30-172(4)(c).  A statement of authority is *prima facie* evidence of such authority.  *Id.*  The statute recognizes that the absence of any limitation on an individual's authority in a recorded document is *prima facie* evidence that no such limitations exist.  Colo. Rev. Stat. § 38-30-172(6).[9]

   The Colorado General Assembly also foresaw the possibility that members, managers, or other once-authorized individuals may lose their authority, and created a mechanism by which an entity could revoke previously recorded statements of authority, and thereby, revoke (or impose limitations upon) the authority of a previously authorized representative of the entity.  The statute recognizes that a statement of authority may be amended or superseded by the recording of a subsequent statement of authority that contains a limitation upon the authority of the person named in the prior statement.  Colo. Rev. Stat. §§ 38-30-172(5), (6).  However, an entity's failure to do so in a subsequent statement of authority is *prima facie* evidence that no such limitations exist.  *See* Colo. Rev. Stat. § 38-30-172(6).  Non-recorded documents (such as the Operating Agreement) cannot override or limit a statement of authority recorded in the public record — recordation is a requirement for showing statutory authority and amending or

---

[9] Florida's LLC laws also provide for Statements of Authority, which may be recorded and state that a person has authority or limitations on authority to execute instruments, enter into transactions, or otherwise bind the LLC. *See* Fla. Stat. Ann. § 605.0302. Under Florida law, if a record that is publicly filed conflicts with an LLC's operating agreement, the publicly recorded record "prevails as to other persons to the extent the other persons reasonably rely on the record." Fla. Stat. Ann. § 605.0107(4)(b).

superseding a statement of authority. *See* Colo. Rev. Stat. §§ 38-30-172(4), (5), (6) (recognizing that certain *recorded* instruments provide evidence of authority to convey, encumber, or otherwise affect title to real estate);  Colo. Rev. Stat. § 38-30-172(2)(c) (defining "recorded" to mean recorded with the county clerk and recorder).

**c.      Authority — Actual and Apparent**

"The authority and powers of corporate officers and agents are governed by the ordinary rules of agency." *Kuehn v. Kuehn*, 642 P.2d 524, 526 (Colo. Ct. App. 1981).  "Whether an agent has been given authority to act on behalf of a principal is an issue of fact."  *Citywide Banks v. Armijo,* 313 P.3d 647, 653 (Colo. Ct. App. 2011).

Agency law provides that one person's actions may bind another under three circumstances: (1) when the agent has actual authority; (2) when the agent has apparent authority; and (3) under the concept of *respondeat superior*.  *See State Farm Mut. Auto Ins. Co. v. Johnson*, 2017 CO 68, ¶ 19, 396 P.3d 651, 655 (2017) (citing Restatement (Third) of Agency ch. 2 Introductory Note).

Actual authority includes the concepts of "express and implied authority."  *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994).  "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Id.* (citing cases).  "Implied authority, on the other hand, embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.* (internal quotations omitted).

Apparent authority exists when "the third party reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal."  *Id.* (citations omitted).  "An agent can make his principal responsible for his actions if he is acting

pursuant to either actual or apparent authority, regardless of whether the principal has knowledge of the agent's conduct." *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994).

> ### 2.  Mr. Mills Had at Least Apparent Authority to Act for NGC

The parties presented lots of testimony and exhibits on the question of Mr. Mills' authority to convey the Property.  Having considered the testimony and the exhibits, I am persuaded that Mr. Mills had, at the very least, apparent authority to transfer the Property from NGC to Marbella.  The best evidence of the Mr. Mills' authority vis-à-vis a third party such as Marbella is section 7.13 of the Operating Agreement.

As a Florida LLC, NGC is bound by its Operating Agreement.  *See* Fla Stat. Ann. § 605.0106(1) ("[a] limited liability company is bound by and may enforce the operating agreement, regardless of whether the company has itself manifested assent to the operating agreement.").[10]  Thus, NGC is bound by Section 7.13 of the NG Operating Agreement which states (with emphasis added):

> **Reliance by Third Parties**. ***Notwithstanding anything to the contrary in this Agreement***, ***any Person dealing with the Company shall be entitled to assume that the Manager has full power and authority***, ***without the consent or approval of any other Member*** or Person, ***to*** encumber, ***sell*** or otherwise use in any manner any and all ***assets of the Company and to enter into any contracts on behalf of the Company, and take any and all actions on behalf of the Company***, and such Person shall be entitled to deal with the Manager as if it were the Company's sole party in interest, both legally and beneficially. ***In no event shall any Person dealing with the Manager or its representative be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expediency of any act or action of the Manager or its representatives***. Each and ***every*** certificate, ***document or other instrument executed on behalf of the Company by the Manager or its representative shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that*** (i) at the time of the execution and delivery of such certificate, document or instrument, this Agreement was in full force and effect, ***(ii) the Person executing and***

---

[10] Section 15.9 of the Operating Agreement states that "[t]his Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Florida, without regard to the principles of conflicts of law."  Thus, I apply Florida law to my analysis of the interpretation of the Operating Agreement and the authority it confers on NGC's manager when dealing with a third party.

*delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Company and (ii) such certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Company.*

By this provision, the members of NGC clearly contemplated the legal concepts of actual authority and apparent authority of the manager to act on behalf of the NGC, and contractually agreed that third persons were entitled to rely, at the very least, on the apparent authority of the Manager.[11]  The language of section 7.13 is clear that for any third party dealing with NGC the third party shall be entitled to assume that the manager (here Mr. Mills) has "the full power and authority, without the consent or approval of any other Member or Person" to sell NGC property. NGC's members, which included Avid Hunter, further agreed that where a third party is concerned, the third party has *no* obligation to determine if the manager has, in fact, complied with the terms of the Operating Agreement.  Rather, the members agreed that as between NGC and a third party, any document or other instrument signed by the manager is ***conclusive*** evidence in favor of the third party that the person signing the document (here Mr. Mills) was "duly authorized and empowered to do so for and on behalf of [NGC]" and that such document or instrument "is binding upon [NGC]."

NGC's arguments as to why section 7.13 did not vest Mr. Mills with sufficient authority vis-a-vis Mr. Santaularia are unavailing.  While section 7.13 may at first blush conflict with section 7.1(B) which requires unanimous member approval to sell NGC property, there is no actual conflict because each provision covers a different situation.  Section 7.1(B) deals with the relationship between the manager and the members.  Section 7.13, on the other hand, deals with the relationship between the third parties and the manager.  In other words, in section 7.1(B) the

---

[11] The parties at various times discuss section 7.13 in terms of implied actual authority and apparent authority. Section 7.13 does not necessarily fit neatly within a particular category of authority but the consideration of whether it is some form of actual verses apparently authority is less important than what the provision says.

members clearly agreed that, as it relates to actual authority and the internal relationship between the members and the manager, the manager was required to obtain the consent of the other members before selling property.  However, the members also agreed in section 7.13 that, as it relates to outside third persons (such as Mr. Santaularia or Marbella), those third persons were entitled to assume the manager was properly authorized to act on behalf of NGC and that Mr. Santaularia did not have to inquire into whether Mr. Mills had member approval to sell the Property.

For similar reasons, section 15.12, the "no third party beneficiaries" clause, does not override section 7.13.  To begin with, Section 7.13 is not a benefit to Defendants, but rather a limitation on NGC as to the actions performed by its manager that can be challenged.

Further, section 7.13 is the more specific clause.  Under Florida law, "'a specific clause takes precedence over a general clause." *Ibis Lakes Homeowners Ass'n, Inc. v. Ibis Isle Homeowners Ass'n, Inc.*, 102 So. 3d. 722, 728 (Fla. Dist. Ct. App. 2012) (quoting *Raines v. Palm Beach Leisureville Comty. Ass'n,* 317 So. 2d 814, 817 (Fla. 4th DCA 1975).  The title of the section is "Reliance by Third Parties" and specifically addresses how third-parties deal with NGC.  That section cannot be trumped by a general provision to not create third-party beneficiaries.

Section 7.13 begins with the phrase, "Notwithstanding anything to the contrary in this Agreement," provides additional support for an interpretation that section 7.13 is the controlling section when it comes to the subject matter of section 7.13.  That is true whether looking at section 7.1(B) or 15.12.  NGC's reliance of *Land O' Sun Realty Ltd. V. REWJB Gas Invs.*, 685 So. 2d 870, 871-72 (Fla. Dist. Ct. App. 1996) is misplaced as that case is distinguishable.  While the majority in that case recognized the use of the term "notwithstanding anything to contrary"

did not resolve an otherwise irreconcilable conflict, the issue there was whether the trial court properly allowed the introduction of parole evidence to resolve the conflict.  Here, by contrast, there is not an irreconcilable conflict between section 7.13 and either section 7.1(B) or section 15.12.  Each provision addresses a different issue.  As noted above, section 7.13 is a limitation on NGC as to the actions performed by its manager that can be challenged which is something different than a third party beneficiary.  Likewise, section 7.1(B) deals with NGC's internal authority and approval process between the members and the manager, whereas section 7.13 is an agreement amongst the members that a third party is entitled to assume that the manager has full authority to act for NGC and any document executed by the manager is conclusive against NGC.  In other words, construing the provisions in this manner (i.e., that they address different issues) effect can be given to each provision.  *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000) ("Finally, we rely upon the rule of construction requiring courts to read provisions of a contract harmoniously in order to give effect to all portions thereof.").[12]

I am not persuaded by NGC's argument that the phrase "on behalf of the Company" found in Section 7.13 means that this provision only applies to "authorized acts."  NGC cites no law to support this interpretation.  "The phrase 'on behalf of' means 'in the interest of; as the representative of; for the benefit of.'" *Kyle W. Larson Enters. v. Allstate Ins. Co.*, 2012 COA 160M, ¶ 18, 305 P.3d 409, 412 (quoting *Webster's Third New International Dictionary* 198 (2002).)  Here, Mr. Mills was acting as NGC's manager or representative and executed the relevant contracts and deeds for the benefit of NGC.  Nothing about the phrase "on behalf of the

---

[12] Stated another way, in the event that the manager acts without required member approval, the members agreed that, as between NGC and a third party, NGC would bear the risk of loss for the manager's unauthorized conduct. NGC's members, however, may still have a remedy against the manager for any loss caused by the manager's violation of section 7.1(B), but section 7.13 protects the third party.

Company" implies that it only applies to explicitly authorized acts for NGC and such a reading would render Section 7.13 superfluous.[13]

In sum, I conclude that section 7.13 binds NGC and means that it cannot challenge a third-party's assumption that "the Manager has full power and authority, without the consent or approval of any other Member or Person, to  . . . sell  . . . all assets of the Company and to enter into any contracts on behalf of the Company . . . ."  Further, NGC cannot complain that a third-party (such as Mr. Santaularia or Marbella) did not verify that the terms of the Operating Agreement had been complied with.  The provision also makes clear that the documents or instruments executed by Mr. Mills (as manager or as representative of the manager) are "conclusive evidence in favor of any and every Person relying thereon."  Therefore, NGC's own operating agreement precludes NGC's argument that Mr. Mills lacked authority to enter into the transactions at issue.  NGC is bound by the acts of its manager. [14]

Further support for the conclusion that Mr. Mills had at least apparent authority comes from the 2016 Statement of Authority.  There was a battle of the experts presenting conflicting testimony as to whether the 2016 Statement of Authority was sufficient to allow a third party to rely on it.  Their divergent views aside, the evidence supports the finding that the 2016 Statement of Authority complied with the statutory requirements of Colo. Rev. Stat. § 38-30-172(2)(d)(I)-(IV).  The Statement of Authority contained all the information required by the statute.  Importantly, the Statement of Authority did not contain any limitations on Mr. Mills' authority to

---

[13] Defendants also argue that section 7.1(A)(5) provided actual authority to Mr. Mills to sell the Property in order to preserve the title to the Property. I do not find this argument convincing as a stand-alone basis to find that Mr. Mills had authority to convey the Property to Marbella, even though that Mr. Mills' intent was when he conveyed the Property to Marbella.  Mr. Mills' authority comes from section 7.13 and the members agreement that third parties are entitled to assume that the manager has full authority to sell NGC property.

[14] Mr. Gondert testified that he was not aware of section 7.13 until this lawsuit.  Even if that is true, a representative of Avid Hunter signed the Operating Agreement and Mr. Gondert's signature also appears on the Operating Agreement's signature page.  Under Florida law, "[i]t is well established the failure to review a contract prior to its execution is not a defense against its application."  *Santana v. Miller*, 314 So. 3d 346, 349 (Fla. Dist. Ct. App. 2020).

act for NGC.  It was prepared by NGC's attorneys and publicly filed (albeit in the incorrect

county).  In short, the 2016 Statement of Authority constituted *prima facie* evidence of Mr.

Mills' authority to act for NGC.

NGC's primary argument is that the Statement of Authority did not create authority

because Mr. Gondert did not authorize the filing of the Statement of Authority.  Because Mr.

Mills signed the Statement of Authority, NGC argues that Mr. Mills could not grant himself

authority that he did not have.  NGC's arguments misses the mark.  Assuming for the sake of

argument that there was not express authority given by NGC's members for the preparation and

recording of the 2016 Statement of Authority, it is undisputed that the 2016 sales of NGC water

shares were authorized transactions approved of by NGC's members, including Mr. Gondert.

This was not a situation where Mr. Mills was engaging in a sham transaction.  Nor do I find that

just because Mr. Mills signed the Statement of Authority that a third party reviewing the public

record would have reason to believe that Mr. Mills did not have such authority or that his

authority to act for NGC was not limited.  As noted, the Statement of Authority complied with

the statutory requirements of Colo. Rev. Stat. § 38-30-172(2)(d)(I)-(IV).[15]

### 3.    The Deeds to Marbella Were Not Forged and Not the Product of Fraud

NGC argues that the deeds to Marbella are void because they were forged deeds or

voidable because they were fraudulently executed.  I conclude that NGC has not proven either

claim.

---

[15] NGC's argument implies that a third party could not rely of the Statement of Authority unless someone other than Mr. Mills signed the Statement, such as NGC's members.  I fail to see how this adds much to the analysis from the perspective of a third party.  A third party reviewing the public records would not be in any better position to ascertain whether the members signing the Statement of Authority were in fact the members of NGC or whether there was sufficient member consent to authorize the filing of the Statement of Authority.

### a.  Forgery

"It is well-established that a forged deed is void and conveys no title." *Svanidze v. Kirkendall*, 169 P.3d 262, 266 (Colo. Ct. App. 2002) (citing *Upson v. Goodland Bank & Trust Co.*, 823 P.2d 704, 705 (Colo. 1992)).  In the context of a forged deed analysis, the parties all rely on Colo. Rev. Stat. § 18-5-102.  Under that statute, "A person commits forgery, if, *with intent to defraud*, such person falsely makes, completes, alters, or utters a written instrument which is or purports to be, or which is calculated to become or to represent if completed: . . . a deed . . . or . . . a public record or an instrument filed or required by law to be filed or legally fileable in or with a public office or public servant." *Id.* (emphasis added).  "[A] person falsely completes an instrument . . . when he or she (1) adds or inserts *materially false information or a materially false statement* (2) to any instrument, genuine or non-genuine, (3) thereby purporting to complete the instrument so as to render it legally operative." *People v. Kovacs*, 284 P.3d 186, 187 (Colo. Ct. App. 2012).  "A materially false statement is a false assertion that affects the action, conduct, or decision of the person who receives or is intended to receive the asserted information in a manner that directly or indirectly benefits the person making the assertion." *Id.* at 189 (*citing* Colo. Rev. Stat. § 18-5-101(3)(a)).

NGC's forged deed argument rests on the proposition that Mr. Mills had no authority to act for NGC when he conveyed the Property to Marbella.  Given my conclusion that Mr. Mills had at least apparent authority, no materially false information was inserted into the Marbella deeds and NGC's forgery claim necessarily fails.  Mr. Mills, moreover, confirmed that he signed those deeds and he intended to convey the Property from NGC to Marbella.

Nor am I persuaded that any defects in the November 29, 2018 deed to Marbella render the deed a forgery or fraudulent deed.  The parties signed the real estate purchase and sale

contract and intended to convey title to Marbella in the first Marbella deed. *Sleeping Indian Ranch, Inc. v. W. Ridge Grp.*, 119 P.3d 1062, 1069 (Colo. 2005) ("It is in fact established in this jurisdiction that the execution of a contract to purchase land causes an equitable conversion of the purchaser's contractual interest into an equitable interest in the realty itself.") (citing *First Nat'l Bank of Wray v. McGinnis*, 819 P.2d 1080, 1083 (Colo. App. 1991) and *Dwyer v. District Court*, 523 P.2d 725 (1975).) As WSN's expert Mr. Notarianni testified, the first Marbella deed may have been insufficient for third parties reviewing the public to confirm a transfer of title, however, as between NGC and Marbella, title to the Property transferred by virtue of the first Marbella deed.

Nor does the fact that Mr. Mills signed the Marbella deeds as "manager" for NGC and not as manager for JUSA-M, as manager for NGC render the deeds a forgery or fraud. Although NGC contends that Mr. Mills was never the manager of NGC, it is undisputed that Mr. Mills was the manager of JUSA-M, which was NGC's manager. Therefore, Mr. Mills would have been the proper individual to sign documents on NGC's behalf, even if he did not execute them in the proper representative format as the manager of NGC's manager. *See* Colo. Rev. Stat. § 38-34-102 ("Where, from the body of an instrument, it is apparent that a person is conveying or is acting in some official or representative capacity and the signature to the instrument omits the statement of the official or representative capacity, it shall be presumed that the official or representative capacity is a part of the signature.")

Concerning the notarization of the November 29 deed, NGC is correct that the notary did not indicate the identity of the person who actually signed the deed before her on November 30, 2018. However, Colorado law does not require real estate deeds to be notarized at all in order to be valid, it only suggests that deeds which are notarized have an evidentiary presumption of

being properly executed, whereas unnotarized deeds do not.  Colo. Rev. Stat. § 38-30-113(2)

(deed "*may* be acknowledged" (emphasis added)); § 38-35-101(2)-(4) (notary acknowledgement

shall be "prima facie evidence" of proper execution of deed, authority of individual signing, and

delivery of deed);  *Am. Nat'l Bank v. Silverthorn*, 87 Colo. 345, 348, 287 P. 641 (1930) ("In

Colorado, as generally in the states of the Union, unless there is an express statutory provision to

the contrary, a deed of real estate to be effective as a conveyance or transfer of real estate, as

between grantor and grantee, need not be acknowledged at all.").  The missing information in the

notarial acknowledgement does not render the deed invalid.

### b.   Fraud

"It is well-established that deeds obtained through fraudulent acts are generally voidable,

but not void."  *Perfect Place v. Semler*, 426 P.3d 325, 334 (Colo. 2018).  NGC claims that Mr.

Mills executed the deeds to Marbella as part of his ongoing fraudulent scheme to embezzle funds

from NGC.  The gist of NGC's fraud claim is that Mr. Mills was stealing from NGC and that the

Marbella transaction was done to keep Mr. Gondert in the dark.  I am not persuaded by a

preponderance of the evidence.

Even if NGC is correct in its claim Mr. Mills was embezzling funds from NGC, (and I

am not finding that NGC is correct), it does not necessarily follow that the transaction with

Marbella was part of that scheme or otherwise the product of an effort by Mr. Mills to defraud

NGC.  The transaction with Marbella does not bear any of the hallmarks that are generally

associated with a fraudulent sale by an unauthorized representative.  This was not a situation

where Mr. Mills sold the Property and kept the sales proceeds.  To the contrary, the sales

proceeds were used for NGC's benefit to pay the property taxes and keep NGC from losing the

Property through the issuance of the treasurer's deed.  Mr. Mills did not receive anything of

value from the Marbella sale, which one would expect if Mr. Mills engineered a fraudulent sale. Moreover, Mr. Mills negotiated a repurchase agreement to allow NGC to buy back the Property within ninety days.

I am persuaded that, as a factual matter, Mr. Mills engaged in the Marbella transaction not out of an intent to defraud NGC but rather an effort to protect the Property and allow NGC the ability to reacquire the Property, which would not have been possible once the treasurer's deed issued.  Mr. Mills was fully aware that if the taxes were not paid by 2:00 p.m. on November 29, 2018, NGC would lose the Property.  Mr. Mills ultimately may be held liable in the Florida lawsuit for not obtaining member approval for the Marbella sale (or other conduct related to NGC not paying the taxes on the Property, such as not informing Mr. Gondert or another member in November about the impending treasurer's deed), but the Marbella transaction was not done to cover Mr. Mills' tracks for any other fraudulent conduct he may have engaged in with respect to NGC.[16]

The irregularities and/or defects in the first Marbella deed are not evidence of an intent to defraud NGC.  Rather, I find that they were the result of sloppy drafting largely due to the time constraints (around three or four hours) to get the transaction completed before the 2:00 p.m. deadline (extended to 3:00 p.m.) to pay the property taxes or else NGC would lose the Property. The sloppy drafting of the documents for the Marbella transaction is consistent with the prior practice of Mr. Mills sometimes signing documents as NGC's manager when the correct way would have been to have his sign as the manager of JUSA-M as manager for NGC.[17]

---

[16] To be clear, this court is not making a finding one way or the other whether Mr. Mills was embezzling funds from NGC.  Resolution of that question is not necessary in this case because I find that Mr. Mills did not sell the Property to cover up any embezzlement.  Whether Mr. Mills was embezzling funds from NGC is a question more properly directed to the lawsuit between NGC and Mr. Mills in Florida.

[17] The sloppy drafting errors in the November 29, 2018 deed were the reason for the second Marbella deed on February 20, 2019.

### 4.     Bona Fide Purchaser Status

The next issue I address is the Santaularia Defendants and WSN's contention that the chain of conveyances to Marbella and ultimately to WSN are valid because Marbella and WSN are bona fide purchasers which protects the conveyances even if one or more of the deeds is voidable.  I address each contention in turn.[18]

### a.     Applicable Law

Under Colorado law, although a court may generally consider invalidating a deed that is voidable, it may not invalidate a transaction where property was transferred to a bona fide purchaser.  *Svanidze v. Kirkendall*, 169 P.3d 262, 263-64 (Colo. App. 2007).  A party is entitled to bona fide purchaser status when it:  (i) gave value for the property; (ii) acted in good faith; and (iii) lacked notice of any alleged title defect.  *Martinez v. Affordable Housing Network, Inc.*, 123 P.3d 1201, 1205-06 (Colo. 2005).

"Whether a party is a good faith purchaser [i.e., bona fide purchaser] is a question of fact."  *Strekal v. Espe*, 114 P.3d 67, 74 (Colo. Ct. App. 2004).

### b.     Santaularia Defendants

### i.     Value Analysis

I conclude that Marbella gave sufficient value to be deemed a bona fide purchaser.  Although Mr. Gondert testified that NGC itself did not receive payment of any money directly from Marbella, the legal concept of "giving value" is not limited to only monetary compensation paid to the seller directly.  *See Cedar Lane Investments, LLC v. Am. Roofing Supply of Colo.*

---

[18] Having concluded that Mr. Mills had sufficient authority to convey the Property to Marbella and that the deeds to Marbella are not void as forgeries or voidable for fraud, it would seem that is sufficient to quiet title in WSN. Nevertheless, because the parties devote a substantial portion of their briefing to the issue of whether Defendants are bona fide purchasers, I will address that issue.

*Springs, Inc.*, 919 P.2d 879, 883 (Colo. App. 1996)(accepting obligations of installment land contract sufficient "value" to make party a bona fide purchaser).  It is undisputed that Marbella paid $603,522, to the Adams County Treasurer to satisfy the overdue property tax obligations that were otherwise owed by NGC.  Likewise, it is undisputed that, at the time of its acquisition, Marbella also entered into a separate contractual agreement with NGC to sell the Property back to NGC within ninety days if NGC complied with the terms of the repurchase contract — something that was not available to NGC if the treasurer's deed issued.

ii.      **Good Faith Analysis**

As to whether Marbella (or Mr. Santaularia) acted in good faith when it purchased the Property, I conclude that it did.  Marbella was under no legal requirement to enter into a transaction, yet recognized NGC's stated interest in saving the Property from being struck off to the tax lien certificate holder and losing the Property forever.  NGC, likewise, could have declined to enter into the transaction with Marbella.

Mr. Santaularia testified that he always intended and was willing to transfer the Property back to NGC upon payment of the repurchase price.  Even though the repurchase amount is more than double the amount of the taxes, the number was negotiated at arms' length between sophisticated individuals.  An intention to make a profit from the transaction does not evidence a lack of good faith.  That NGC was between a large rock and a very hard place, and would have lost title to the Property had it not come to agreement with Marbella, does not mean that Marbella had any duty to negotiate softly or take pity on NGC.

To the extent NGC contends that Mr. Mills embezzlement scheme precludes a finding of good faith by Mr. Santaularia, I reject such contention.  Aside from my conclusion above that

Mr. Mills was not trying to defraud NGC with the sale to Marbella, there is no evidence that Mr. Santaularia was aware or any fraudulent conduct by Mr. Mills.

Similarly, the evidence does not support a finding that Mr. Santaularia and the principals of WSN conspired to deprive NGC of the Property.  Even if Mr. Eisenstein pressed Mr. Santaularia to sell the Property to WSN, Mr. Santaularia did do so until *after* the repurchase contract with NGC expired.  Whatever overtures WSN made to Mr. Santaularia were secondary to NGC's contractual right to repurchase the Property.  Had NGC performed its obligations under the repurchase agreement, Mr. Santaularia would have sold the Property back to NGC — and NGC would have had a contractual right to force Mr. Santaularia to sell the Property to back to NGC.  Also, the fact that Mr. Eisenstein and Mr. Santaularia may have discussed Mr. Eisenstein receiving a commission or finder's fee if NGC repurchased the Property is not evidence of a conspiracy between WSN and the Santaularia Defendants.  In short, the evidence does not support a finding that Mr. Santaularia bought the Property on November 29, 2018 so that he could flip it WSN for a higher price.[19]

### iii.    Notice Analysis

The final inquiry is whether the Santaularia Defendants had notice of any alleged title defect (i.e., Mr. Mills not obtaining member approval to sell the Property).  Colorado law recognizes "three forms of notice:  actual notice, constructive notice, and inquiry notice." *Martinez*, 123 P.3d at 1206.

---

[19] The evidence did establish that Mr. Santaularia was acting in his own self-interest once the contractual deadline for NGC to repurchase expired.  Mr. Santaularia was playing different parties off one another to generate the highest sale price.  Maximizing profit is not evidence of bad faith, especially when Mr. Santaularia afforded NGC the opportunity to repurchase the Property under the terms of their contract.  Nor is the fact that Mr. Santaularia's father may be an investor in WSN support the conclusion that Mr. Santaularia and WSN were in cahoots to deprive NGC of the Property.

"Actual notice occurs when a party has actual knowledge of a title defect." *Id.*  I find that Mr. Santaularia and Marbella did not have actual notice of any defect in Mr. Mills' authority to convey the Property to Marbella on behalf of NGC.  There was no evidence that Mr. Santaularia actually knew of any issues or limitations on Mr. Mills' authority.  I further find that no one, including Mr. Mills, informed Mr. Santaularia that member approval (specifically Mr. Gondert's approval) was required.  Mr. Santaularia was informed by Mr. Robison (NGC's broker) and Mr. Mills that Mr. Mills was NGC's manager.  This was consistent with the information in the public record, including the 2016 Statement of Authority.

I do not find credible any assertion that Mr. Mills may have told Mr. Santaularia that Mr. Mills needed additional approvals before he could convey the Property prior to the actual conveyance on November 29, 2018.  Mr. Mills initially wanted to structure the transaction with Mr. Santaularia as a loan.  When Mr. Santaularia rejected a loan in favor of a sale with a repurchase agreement, Mr. Mills was the person best situated to explain that further approval would be needed for a conveyance and, in my view, he did not make that disclosure to Mr. Santaularia.  Had Mr. Mills made such a disclosure, I highly doubt that Mr. Santaularia would have put up $600, 000 to pay off NGC's tax debt until he received confirmation that Mr. Mills had obtained Mr. Gondert's approval on behalf of the NGC members.

I also find the Mr. Santaularia did not have constructive notice of any lack in Mr. Mills' authority to sell the Property.  "Constructive notice arises when a search of the title records would have revealed a defect." *Martinez*, 123 P.3d at 1206.  Here, a search of the title records would not have revealed any limitation of Mr. Mills' authority.  The Operating Agreement was not recorded.  Mr. Fagerstrom performed a title search on the Property for Mr. Santaularia. Noting in the title search revealed any limitation on Mr. Mills' authority.  Rather, just the

opposite.  The 2016 Statement of Authority informed the public that Mr. Mills had no limitations on his authority as manger for NGC.  Even if I were to discount the weight Mr. Santaularia should have given to the 2016 Statement of Authority based on the testimony of NGC's expert, there is still nothing in the 2016 Statement of Authority that would have revealed a limitation on Mr. Mills' authority.  As discussed above, the 2016 Statement of Authority met the statutory requirements.

Likewise, there is no evidence from any of the Colorado Secretary of State or Florida Secretary of State filings prior to November 29, 2018, that stated Mr. Mills had limited authority to act for NGC.  Accordingly, Mr. Santaularia cannot be charged with constructive notice based on the public record.

Finally, there is the question of whether Mr. Santaularia was on inquire notice.  "Inquiry notice arises when a party becomes aware or should have become aware of certain facts which, if investigated, would reveal the claim of another."[20]  *Martinez*, 123 P.3d at 1206.  The duty to inquire does not arise in all circumstances, however, because "[i]nquiry notice requires sufficient facts to attract the attention of interested persons and prompt a reasonable person to inquire further" concerning those facts.  *Monaghan Farms, Inc., v. Denver*, 807 P.2d 9, 15 (Colo. 1991).  The duty to inquire is not triggered until there are circumstances that would have made an ordinary purchaser sufficiently curious or suspicious about a fact as to need to conduct further investigation of that fact.  *Littlefield v. Bamberger*, 32 P.3d 615, 618-19 (Colo. Ct. App. 2001).  Conveyance by quitclaim deeds is not enough on its own to put a potential purchaser on notice of a defect in title.  *Martinez*, 123 P.3d at 1207-08.

---

[20] While constructive notice and inquiry notice are similar in that they both "operate to impute knowledge to a party under certain specific circumstances," they are treated as separate inquires.  *Martinez*, 123 P.3d at 1206.

Here, NGC argues that Mr. Santaularia was on inquiry notice that Mr. Mills did not have sufficient authority to transfer the Property by himself, because Mr. Santaularia did not ask for or review the Operating Agreement prior to the transaction or conduct what NGC describes as "standard" due diligence.  I am not persuaded.

First, NGC does not point to any particular facts Mr. Santaularia learned in the short period of time he had on November 29, 2018 to evaluate the proposed transaction that would have "attract[ed] the attention of interested persons" or "prompt[ed] a reasonable person to inquire further."  NGC does not identify any facts or documents that called into question, or would have tended to call into question, the recorded documents in the real property records and public records concerning NGC and Mr. Mills' authority.  On the contrary, all of the documents at issue in this action, save one (the Operating Agreement), would not have alerted a reasonable person to question whether Mr. Mills could enter into the transaction.  Mr. Mills had repeatedly signed contracts, deeds, leases, and documents on behalf of NGC.

NGC relies heavily on *Martinez v. Affordable House Network, Inc.*, 123 P.3d at 1201, to support its argument that Mr. Santaularia had sufficient information to trigger a duty to investigate. The facts in *Martinez*, however, are not similar to this case in any material respect.  In *Martinez*, the Colorado Supreme Court was specific to articulate that its analysis there was based upon it "look[ing] closely at the factual circumstances of [that] case[.]"  *Id.* at 1205.  All three courts in that case — the trial court, the Court of Appeals, and the Supreme Court — determined that further investigation would have revealed the underlying option agreement, and that review of that contract would have given notice to the buyer Troco that its seller AHN might not have properly acquired good title from Martinez.  *Id.* at 1206-07.  The court ultimately determined that a duty to inquire was triggered based upon information of-record not being in line with other information

learned by the buyer, namely that Troco knew Martinez was living in the home, that the seller AHN had obtained title through two then-unrecorded quitclaim deeds, and there remained unsatisfied mortgages on the property for which Martinez was obligated. *Id.* at 1207-08.

No such discrepancy between recorded and unrecorded information known to Marbella exists here, and therefore *Martinez* is distinguishable. Rather, the recorded information here (NGC's acquisition deed and the 2016 Statement of Authority) aligned with all of the information known to or learned by Marbella. The party possessing the property (NGC) was the same as the party listed as having record title; the person acting on behalf of the owner (Mr. Mills) was the same person listed in all of the recorded documents and publicly filed documents as having authority to act on behalf of the owner. Unlike *Martinez*, all of the facts revealed to Marbella prior to the transaction were in agreement with those recorded documents. Because there was no discrepancy, there was no duty to inquire triggered because there was nothing "curious" or "suspicious" learned by Mr. Santaularia.

It is true that Mr. Santaularia did not specifically ask Mr. Mills about his authority to bind NGC in a sale of the Property and Mr. Santaularia certainly could have asked Mr. Mills for a copy of the Operating Agreement. Yet when weighed against the evidence Mr. Santaularia had in front of him, I am not persuaded that Mr. Santaularia had a duty to do so.[21] It is clear that Mr. Mills was acting as the individual charged with NGC's management duties and that was known to Mr. Santaularia. The publicly filed 2016 Statement of Authority confirmed that Mr. Mills was the person authorized to act for NGC without limitation. Further, even if Mr. Santaularia had asked for the Operating Agreement, it is not clear that Operating Agreement would have fully

---

[21] I am also not persuaded that had the questioned been raised, Mr. Mills would have told Mr. Santaularia that he needed further approvals given that the deadline to save the Property from being struck off to a lienholder was mere hours aways.

answered the question of Mr. Mills' authority.  Unlike the situation in *Martinez*, this is not a circumstance where review of the Operating Agreement would have unquestionably given notice to Marbella that Mr. Mills did not have authority.  While section 7.1(B)(5) requires member approval before transferring property, section 7.13 not only allows a third party like Mr. Santaularia to assume that Mr. Mills had the full power to act without any additional member approval but it specifically states that a third party has no obligation to inquire as to whether the manager has complied with the terms of the Operating Agreement and that a third party shall be entitled to deal with the manager as NGC's sole party in interest.

I am not persuaded by NGC's suggestion that there is a "standard" due diligence that must be conducted in every commercial real estate transaction in order to avoid being held to be on inquiry notice, especially where there are a mere four to five hours in order to consummate a transaction.  Commercial real estate transactions are not all the same, and are not subject to the same types, levels, or depth of due diligence.  NGC's expert witness was qualified as an expert in commercial real estate transactions generally, where the property is being purchased from a seller with no intent or expectation of ever selling it back to that seller in the future, and for the buyer's future commercial development and exploitation of the property.  The transactions upon which he based his testimony involved multiple entities and individuals (including attorneys, title companies, principals of the parties to the transaction, appraisers, and others), and eventual development of the property into a mixed-use development.

However, the types of transactions with which NGC's expert had experience was not the type of transaction contemplated, negotiated, and consummated with Marbella.  NGC's expert testified that he was not familiar with tax lien purchases and foreclosures.  NGC's expert had

never been in a circumstance where a property needed to be purchased or sold within a particular deadline or else all of the parties involved would lose any right to the property forever.

I do not find the fact that NGC was unable to pay its tax bills somehow triggered a duty to inquire into the authority of the manager of the company, because these are unrelated issues. NGC's expert conceded in testimony that the intent of the transactions between NGC and Marbella were to try and save the Property from being struck off to a lienholder via a treasurer's deed. Given the circumstances and intent of the parties to the transaction between NGC and Marbella, the due diligence practices enumerated by NGC's expert simply were inapplicable and unreasonable for this transaction. Stated another way, had the Mr. Santaularia/Marbella followed the due diligence practice suggested by NGC's expert, the Property would have been lost forever through the treasurer's deed because that level of due diligence could not have been completed in just a few hours.

In that respect, when looking at whether Mr. Santaularia conducted sufficient due diligence, the transaction cannot be looked at in a vacuum. *Martinez* instructs that courts must "look closely at the factual circumstances of the case," 123 P.3d at 1205, to determine whether inquiry notice should be imputed to a prospective purchaser. Here, the circumstances were such that NGC faced the imminent loss of the Property within a few hours of Mr. Santaularia learning of the situation. Under this compressed time frame, Mr. Santaularia spoke with NGC's manager, as well as NGC's real estate agent, both of whom affirmed that Mr. Mills could enter into the transaction. Mr. Santaularia also conducted an independent ownership and encumbrance search of recorded public records for the Property through a licensed title insurance company, which confirmed that (a) NGC owned the Property, (b) Mr. Mills had transacted business before on behalf of NGC, and (c) there was a Statement of Authority recorded in the real property records

50

confirming Mr. Mills had authority to act for NGC.  Nothing in this investigation disclosed a lack of authority by Mr. Mills to act for NGC or that further member approval was needed before Mr. Mills could convey the Property to Marbella on NGC's behalf.  Under all of these circumstances, especially with time being of the essence, I find that Mr. Santaularia acted reasonably.[22]

Lastly, I do not accept any suggestion that because Mr. Eisenstein initially introduced Marbella to NGC, that Mr. Eisenstein's prior knowledge of facts and issues should be attributed to Marbella to create notice to Marbella.  There is no legal or factual support for this suggestion.

NGC does not cite to any law which imputes the knowledge of an unrelated third person to a party to a transaction.  Unlike the knowledge of an agent, which may be attributed to a principal, Mr. Eisenstein, Mr. LeRossignol, and Mr. Santaularia all testified without challenge that Mr. Eisenstein and Mr. LeRossignol were not related to, members in, or agents of Marbella, and had no relationship to that entity.  Thus, whatever knowledge they had concerning the need for Mr. Gondert to approve transactions cannot be imputed to Mr. Santaularia and Marbella.[23]

### b. WSN

Because I find that the Marbella transaction qualifies as a bona fide purchaser transaction, I need not separately evaluate whether WSN was a bona fide purchaser because WSN's title is protected under the Shelter Rule.

---

[22] The fact that Mr. Santaularia used a quitclaim deed for the transaction does not raise any inquiry concerns for me. Papering the transaction was a rush job and it appears that Mr. Santaularia grabbed a form quit claim deed from Mr. Fagerstrom when he was at his office.  It does not appear to me that Mr. Santaularia gave any thought to what form of deed (quitclaim verses warranty) to use for the transaction.  Further, with the intent being that NGC would repurchase the Property within ninety days, the use of a quitclaim deed is not outside the bounds of reason and does not suggest anything untoward about the transaction.  The same is true of the purchase price and repurchase price. Mr. Santaularia had all the leverage in the deal and he paid no more than he had to under the circumstances.

[23] My conclusion is not altered by the fact that Mr. Eisenstein and Mr. Santaularia discussed a finder's fees upon NGC's repurchase of the Property.

"The 'Shelter Rule' provides that one who is not a bona fide purchaser, but who takes an interest in property from a bona fide purchaser, may be sheltered in the latter's protective status." *Strekal v. Espe*, 114 P.3d 67, 74 (Colo. App. 2004) (*quoting Sun Valley Land & Minerals v. Burt*, 853 P.2d 607, 613 (Idaho Ct. App. 1993)).  This rule has long-standing roots in Colorado law.  *See Strekal*, 114 P.3d 74 (*citing Moore v. Allen*, 26 Colo. 197, 200-01, 57 P. 698, 699 (1899); *Reed v. Munn*, 148 F. 737, 753 (8th Cir. 1906) (applying Colorado law)).  The purpose of the rule is to protect the marketability of title.  *Strekal*, 114 P.3d 74.

There are two exceptions to the Shelter Rule: (1) "when a good faith purchaser obtains the property from a grantor who had notice of an outstanding interest in the property, the shelter rule does not apply if the property is reconveyed to the grantor;" or (2) "if the property is reconveyed from a good faith purchaser to a person who is guilty of violating a trust or duty with respect to the property." *Id.* at 74.  Neither exception applies here, because (1) Mr. Eisenstein and Mr. LeRossignol were not direct or indirect parties to Marbella's purchase of the Property, and (2) they had no legal duty to NGC.

Thus, I need not decide whether WSN was a bona fide purchaser also, because the determination that Marbella was a bona fide purchaser protects all those purchasers subsequently taking title through Marbella, including WSN.[24]

### 5.    Equitable Defenses

Defendants assert equitable defenses of equitable estoppel and unclean hands.  Given my findings above, I need not address these defenses.  However, to the extent the equities of this case have any bearing on the issues decided above, I add the following to my findings.  The

---

[24] The same analysis applies to the transfer from Marbella to Marquest, which was simply a transfer between entities owned by Mr. Santaularia.  Even if NGC could show that the Shelter Rule did not apply, at best it would return title to Marbella for the reasons stated above.

evidence proved that NGC did not pay its property taxes.  Whether that was the result of malfeasance by Mr. Mills or Mr. Gondert's desire to use available NGC funds for other purposes, the net result was that without Mr. Santaularia coming into the picture late on November 29, 2018, NGC would have lost the Property by a treasurer's deed.  Despite NGC's claim that Mr. Gondert was ready, willing and able to pay off the taxes had he known they were still due and owing, the evidence amply demonstrated that Mr. Gondert's relationship with Mr. Mills had deteriorated to such a low point in November 2018 that they were not communicating. There is no evidence to suggest that had Mr. Santaularia passed on the deal that Mr. Mills would have contacted Mr. Gondert.  Mr. Santaularia was NGC's only opportunity to save the Property by at least getting an opportunity to repurchase the Property within ninety days.

## B.        Unjust Enrichment Claim

As an alternative to its quiet title claim, NGC alleges that, in the event that title is not quieted in NGC, the Santaularia Defendants were unjustly enriched when they acquired the Property from NGC at a substantial discount from its fair market value.  I conclude that NGC has not proven its unjust enrichment by a preponderance of the evidence.

### 1.        Applicable Law

In order to prove a claim for unjust enrichment, a plaintiff must prove: (1) at plaintiff's expense, (2) the defendant received a benefit, (3) under circumstances that would make it unjust for defendant to retain the benefit without paying.  *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 119-20 (Colo. 1998).  A claim for unjust enrichment is an equitable, "judicially created remedy designed to avoid benefit to one to the unfair detriment of another."  *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000); *see also Ninth Dist. Credit Ass'n v. Ed Duggan,*

*Inc.*, 821 P.2d 788, 795 (Colo 1991)("concept of unjust enrichment centers attention on the prevention of injustice").

### 2.      Analysis

NGC has not established that the circumstances of the transfer of the Property to Marbella make it unjust for Marbella, Marquest or Mr. Santaularia to retain (and later convey the property to WSN) without paying NGC additional compensation for at least two reasons.

First, NGC has not established any misconduct or malfeasance by the Santaularia Defendants that would make the sale to Marbella unjust.  Based upon the evidence presented at trial, all parties entered into the sale from NGC to Marbella in order to prevent the Property from being lost to an unknown tax lienholder.[25]  Similarly, the uncontested evidence establishes that NGC knowingly and intentionally transferred the Property to Marbella — it was not a mistake, or the product of coercion.  To the extent NGC attempts to tie the Santaularia Defendants to Mr. Mills' supposed embezzlement of NGC funds, such attempt fails because there is no evidence that the Santaularia Defendants had any knowledge of Mr. Mills' scheme.  Moreover, as discussed above, I find that whatever else Mr. Mills may have been doing with respect to NGC, the sale of the Property to Marbella was not part of a scheme by Mr. Mills to cover up his embezzlement of NGC funds.

Second, the fact that Marbella's purchase price was only $603,371.22 does not mean that the circumstances were "unjust" or require additional payment to NGC.  NGC had failed to pay

---

[25] As the Santaularia Defendants point out, Colorado case law suggests that in certain circumstances, such as the claims between arms-length, unrelated parties, it is necessary for the plaintiff to establish some form of misconduct or malfeasance by the defendant (such as fraud, coercion, or a clear act of bad faith) before the claimant can recover for unjust enrichment.  *See, e.g., DCB Constr. Co. v. Central City Dev. Co.,* 965 P.2d 115, 122 (Colo. 1998)(for a landlord's retention of improvements to property to be unjust, there must be "some type of improper, deceitful, or misleading conduct by the landlord").  Whether that is a legal requirement here is a question I need not decide because even assuming it is not, the lack of malfeasance, misconduct or bad faith by the Santaularia Defendants remains a relevant consideration of the whether they received a benefit under unjust circumstances.

its property taxes for several years.  NGC was imminently facing the loss of title to the Property to the tax lien certificate holder, who had purchased the tax lien certificate for only $40,495.30 (less than one-tenth the amount paid by Marbella).  NGC was between a rock and a very hard place:  either sell the Property to the Santaularia Defendants with at least the opportunity to repurchase the Property or lose the Property forever through the treasurer's deed.  Just because Mr. Santaularia drove a hard bargain, (including rejecting the idea of making a loan rather an outright purchase), does not make the circumstances of the sale unjust.  Mr. Santaularia paid no more than he absolutely had to acquire the Property but that does mean he was unjustly enriched.

Further, even after Marbella's purchase, NGC had the right to regain the Property for a repurchase price of $1.5 million, a profit of only approximately $900,000 to Marbella (not a $6+ million gain as alleged by NGC).  It is prescribed by Colorado statute, and accepted as a settled matter of public policy, that opportunistic investors such as Marbella may legally obtain title to real estate for a fraction of whatever the fair market value of the property might be due to a landowner's non-payment of taxes.[26]

Accordingly, the Santaularia Defendants are entitled to judgment in their favor on NGC's unjust enrichment claim.[27]

## V.      ORDER OF JUDGMENT

Based on the foregoing, it is therefore, ORDERED as follows:

1.      Title to the Property is quieted in favor of WSN and against all others claiming an interest in the Property.

---

[26] Under the circumstances of this case, Mr. Santaularia is in no real different position than the tax lien holder or someone who buys property at a foreclosure sale for nothing more than the outstanding debt on the property.  These types of transactions happen all the time and do not amount to unjust enrichment.  The same is true here.

[27] Given this disposition, I need not address the Santaularia Defendants' other arguments and equitable defenses to NGC's unjust enrichment claim.

2.      Judgment enters in favors of Defendants WSN, Charles Santaularia, Marbella and Marquest and against NGC on NGC's first cause of action to quiet title under C.R.C.P. 105.

3.      Judgment enters in favors of Defendants Charles Santaularia, Marbella and Marquest and against NGC on NGC's second cause of action for unjust enrichment.

4.      The Clerk of Court shall issue a certificate releasing the Lis Pendens filed by NGC and recorded in the Adam's County Recording Office at Reception # 2020000001540 pursuant to C.R.S. § 38-35-110(3)(a).

4.      Defendants WSN, Charles Santaularia, Marbella and Marquest are entitled to an award of costs under C.R.C.P. 54(d).  Bill of costs must be filed within 21 days of the date of this order and the parties must comply with C.R.C.P. 121 §1-22(1).

5.      Any party requesting an award of attorney fees shall make such a request by filing a motion within 21 days of the date of this order that complies with C.R.C.P. 121 §1-22(2). [28]

Dated this 20th day of September, 2022.

BY THE COURT:

_____

Jeffrey A. Smith
District Court Judge

---

[28] The court expects that before any motion for attorney fees is filed, the parties will engage in meaningful conferral about both the right to fees and the amount of fees.