```
 1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF COLORADO
 2

 3   NGC DEVELOPMENT, LLC,          .  Case No.  21-cv-01746-RM-STV
                                    .
 4             Plaintiff,           .
                                    .
 5   vs.                            .
                                    .  Alfred A. Arraj Courthouse
 6   KIM SETER, a Colorado citizen,.  901 19th Street
     SETER & VANDER WALL, P.C.,     .  Denver, CO  80294
 7                                  .
                                    .
 8             Defendants.          .
                                    .  September 15, 2022
 9   . . . . . . . . . . . . . . . .  11:29 a.m.

10       TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
           SCOTT V. VARHOLAK, UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:            Keating Wagner Polidori &
13                                    Free, P.C.
                                   By:  Ross Whiting Pulkrabek
14                                 1290 Broadway
                                   Suite 600
15                                 Denver, CO  80203
                                   (303) 534-0401
16
     For the Defendants:           Gordon Rees Scully
17                                   Mansukhani, LLP
                                   By:   John M. Palmeri
18                                 BY:  Melissa Ann Wiese
                                   BY:  Rose Elizabeth Zetzman
19                                 555 17th Street
                                   Suite 3400
20                                 Denver, CO  80202
                                   (303) 534-5145
21
     Court Recorder:               Clerk's Office
22                                 U.S. District Court
                                   1929 Stout Street
23                                 Denver, CO  80294

24

25
```

1
   Appearances Continued:
2

3    Transcription Service:          AB Litigation Services
                                     216 16th Street, Suite 600
4                                    Denver, CO  80202
                                     (303) 296-0017
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1

2           (Time noted:  11:29 a.m.)

3           THE COURT CLERK:  All rise.  Court is in session.

            THE COURT:  Please be seated.

4           This is 21-cv-1746.  Can I have entries of

5    appearance?

6           MR. PULKRABEK:  Yes.  Good morning, Your Honor.

7    Ross Pulkrabek for the plaintiff, NGC Development, LLC.

8           THE COURT:  Good morning.

9           MR. PALMERI:  Good morning, Your Honor.  John

10   Palmeri, Melissa Wiese, and Rose Zetzman appearing for

11   defendants.

12          THE COURT:  And good morning.

13          So we're here today on a number of discovery

14   disputes.  Why don't we just take them one at a time.  Let's

15   begin with request for production number one.  I'll hear

16   further argument.  Let's begin with Plaintiff, and then we'll

17   go to Defendant on each one.

18          MR. PULKRABEK:  Sure, Your Honor.

19          We objected to request for production number one

20   because it just doesn't describe the documents they're asking

21   for with reasonable particularity.  That's the primary reason

22   for it.

23          This is a request for any and all documents

24   relating to or arising out of, and then it kind of goes on to

25   say, four separate lawsuits that have been filed.  And

 1  honestly, I'm not quite sure where that begins and ends.

 2          We've tried to confer about it and, you know, what

 3  I've asked for is can you give me a more definitive list so

 4  that we know that once we've produced those documents,

 5  assuming we would agree to produce them, once we produce

 6  them, we can kind of put the stake through the heart of this

 7  request and call it dead.  And the response that I've heard

 8  has basically been, well, no, we don't know what more we

 9  might want then.

10          And the topic has ranged from, you know, we want

11  copies of expert reports.  We give them the expert reports,

12  now they want the expert files.  They want all sorts of

13  materials from the Florida case.  They've asked for emails

14  between counsel in different litigations, and I just don't

15  know where it ends.

16          And I think what it is, is it's sort of a request

17  for give me every document that could have anything to do

18  with anything in any of these four cases.  I think that

19  that's not really within the spirit of the rule.  I also

20  think that it's not within the spirit of putting limits on

21  discovery because it's just sort of an omnibus request that I

22  find impossible to answer.

23          And then the final point that we've raised is, I

24  don't know if this is intended to scoop up attorney-client

25  communications in these various litigations, but I will say

1    this, just talking with lawyers at the other firms that would

2    be impacted by this, we'd be looking at, you know, kind of an

3    insurmountable job, frankly, in trying to parse through all

4    of the attorney-client communications that have occurred,

5    because we're talking about the client title case, which

6    actually went all the way through trial, we're talking about

7    the Drake (phonetic) case which Faegre Drinker is handling,

8    which is set to go to trial in November.  Of course there is

9    this legal malpractice case, and I don't know if they're

10   actually asking for my communications with my clients.

11   There's, you know, the Florida litigation, which involves a

12   Florida law firm.

13           We're talking about hundreds of hours that would

14   be involved to kind of cull through all of the communications

15   that have occurred, prepare a privilege log.  It would be an

16   expensive, you know, in excess of $100,000 to do that kind of

17   work, and I'm not really quite sure what the point is.

18           We've given them more than 250,000 pages of

19   documents already.  They basically have the entire record

20   from the quiet title case, which is most closely at issue in

21   this case.  And if they -- if there are things that they want

22   in addition to that what we are suggesting is send us a

23   request that is describing what you want with reasonable

24   particularity within the language of the rule, and then we

25   can consider that on its merits.

1           But kind of asking us to produce any documents in

2    any of the four litigations that could conceivably be

3    discoverable or have anything to do with any of four separate

4    lawsuits is really not something that we even know where to

5    begin.

6           THE COURT:   Okay.   Thank you.

7           Response?   And if I allow this request to stand,

8    why wouldn't we just be at a point where all any party ever

9    needs to issue is one request for production, which is give

10   me everything relevant?   Because that's essentially what this

11   request is, except it's even broader because it covers four

12   lawsuits, not just one.   But if I allow this all anybody ever

13   needs to issue was one request for production saying, give me

14   everything related to this lawsuit.

15           MR. PALMERI:   I disagree, Your Honor.   And let's

16   parse this and let's hear what Mr. Pulkrabek said.   What Mr.

17   Pulkrabek said was, you have to tell us what you want and

18   we'll give you that as long as you don't ever ask for

19   anything else.   And that's just not -- that's not palatable.

20           THE COURT:   Well, but --

21           MR. PALMERI:   We're happy to work through this --

22           THE COURT:   This is the request for production.

23           "Any and all documents arising out of or relating

24   to this litigation."

25           MR. PALMERI:   Well, and to the Florida action.

1          THE COURT:  Well, no.  It says to this litigation,

2    the Florida action, the quiet title action, and the Drake

3    asset action.

4          So if I allow this to stand all anybody ever has

5    to issue is in, you know, Case Number 22-cv-1, please give me

6    any and all documents arising out of or relating to 22-cv-1.

7    That's not what the Rules of Civil Procedure provide for.

8          MR. PALMERI:  Well, I disagree.  Let's take, for

9    example, the Florida case.  Why are we not entitled to --

10   it's only NGC's documents.  Why are we not entitled to NGC's

11   documents in that case?  I don't know what that case

12   involves.

13         THE COURT:  What documents?

14         MR. PALMERI:  Anything having to do with that

15   case.  If it has to do with correspondence in that case, I

16   think I'm entitled to it.  If it has to do with discovery in

17   that case, I think I'm entitled to it.  If it has to do with

18   depositions they were taken in that case, I'm entitled to it.

19         THE COURT:  So you're entitled to every request

20   for production in that case?

21         MR. PALMERI:  Sure.

22         THE COURT:  Every request for admission, every

23   interrogatory request.

24         MR. PALMERI:  Sure.  Why not?  The lawsuit --

25         THE COURT:  What's the relevance of --

1          MR. PALMERI:  This is --

2          THE COURT:  Settlement negotiations, attorney-

3 client communications.

4          MR. PALMERI:  Yes.  Well, if it's privileged, it's

5 privileged.  Let's break this down, Your Honor.  We are so

6 far afield from where the issues in this case should be.  The

7 issues in this case are that Mr. Mills went rogue and that

8 somehow the lawyers should be responsible for Mr. Mills going

9 rogue.  NGC's principle, Avid Hunter, has sued Mr. Mills in

10 Florida.  We want to know what evidence they've generated in

11 that lawsuit in Florida, in their lawsuit against Mr. Mills,

12 so that we could evaluate what they're basing on how he went

13 rogue, et etcetera.

14          So that's the -- not just is it relevant, it is

15 fundamental to this case.  They have to prove the same

16 elements that they have to prove in the Mills case in order

17 to recover from Mr. Seter.  If Mr. Mills did not go rogue,

18 then there's no liability on behalf of NGC.

19           Now, in any event --

20          THE COURT:  But let me ask my question again.  How

21 is this any different than -- you're turning the burden on

22 them to determine what is relevant.  How is this any

23 different than me permitting in any single -- in every single

24 case that ever goes in, a single request for production

25 saying, give me everything?

1              MR. PALMERI:  Well, in terms of proving relevance,

2    it is not my burden to -- I do not know what they have, Your

3    Honor.  It is not my burden to determine what relevant

4    evidence they have.

5              Now, to go back to your point, I'm happy and we

6    have attempted to confer on this.  So back to your point, why

7    is this any different?  Frankly, it isn't necessarily

8    different.  The way the rules of discovery work is if you

9    have a concern with a response, then you work through it.

10   You don't refuse to produce any single document.  I mean,

11   they have produced zero.

12             And let's take for example the experts.  We

13   brought up, well, we need to have the expert reports.  They

14   give the expert reports, we don't have the expert files.  Now

15   they're saying, we're refusing to give you the expert files

16   because you asked for the expert reports, and we're only

17   going to give you what you asked for and you're never going

18   to be able to ask for anything else, or you're never going to

19   be able to say that you need more.  That certainly is not

20   within the spirit.

21             So in terms of the conversations that I've had

22   with Mr. Pulkrabek, we've laid all this out, Your Honor, and

23   we have conferred numerous times, but they have not produced

24   a single document.  So in fact, if they want to produce what

25   they deem -- it is not my burden to determine relevance --

1              THE COURT:  They say they produced 250,000

2   documents.

3              MR. PALMERI:  Not relating to Florida.  They've

4   produced nothing with respect to Florida.

5              The 250,000 pages that they produced, Your Honor,

6   have to do with the quiet title case.  And again, they're

7   suing us for $9 million, we want to get the information

8   having to do with Mr. Mills.  They do not claim that the

9   250,000 pages is the universe.  What they're saying, for

10  example -- and we'll get to it with the financial records.

11  What they're saying is, we're not going to give you anything

12  because unless you tell us exactly what you want and you

13  limit it to that, we're not going to give you anything.

14             The way the rules of -- the way the rules should

15  work is they should produce what they deem to be the relevant

16  documents in those.

17             THE COURT:  Well, no, that's not how they work.

18  How they work is if you make a request that is patently over

19  broad, they're entitled to object to it, and then you need to

20  explain what it is you want.  This request is over broad.

21  I'm sorry, to say any and all documents arising out of or

22  relating to this litigation puts the burden on them to --

23  well, what's related to this litigation?  This litigation,

24  the Florida action, the quiet title action, and the Drake

25  asset.  You're asking for all the -- for four cases you're

1  asking them to determine what might be related to that

2  litigation.  That's an over broad request.  It just, it is.

3            Now, certainly you can ask questions that are more

4  limited.  You know, if you feel you need it, give me all

5  pleadings in this case.  Now their response may be, I don't

6  have all pleadings, or why can't you pull the pleadings

7  yourself using -- I don't know if that was a federal case or

8  a state case, but if it's federal using CMECF, just pull the

9  -- pull the pleadings yourself.

10            But you're placing the burden on them to determine

11  what is relevant and that's not how the rules work.

12            MR. PALMERI:  With all due respect, they do.  They

13  have to determine --

14            THE COURT:  They don't.

15            MR. PALMERI:  -- what's relevant.

16            My position on what's relevant, Your Honor, is --

17            THE COURT:  That is --

18            MR. PALMERI:  -- anything having to do with that.

19            THE COURT:  In state court, I would agree with

20  you.  Not in federal court.

21            MR. PALMERI:  Well, I --

22            THE COURT:  In state court you're right, you have

23  as part of your initial disclosures to disclose, but that's

24  not how federal court works.

25            MR. PALMERI:  I'm not asking -- I'm not moving on

1    the initial disclosures, Your Honor.  I'm well aware of the

2    distinction between state court and federal court.  We're

3    talking about a request for production of documents.  The

4    disclosures require them to determine what they intend to

5    rely on to assert a claim or defense.

6              THE COURT:  Correct.  And now --

7              MR. PALMERI:  I'm not -- I'm not disputing that.

8              But in any event, Your Honor, I think we just need

9    to address this now.  We have gone back and forth for months.

10   We haven't received a single document.

11             For example, if -- and we have conferred on this.

12   The only issues -- I've told Mr. Pulkrabek what we're looking

13   for and --

14             THE COURT:  Then request it.  What are you looking

15   for?

16             MR. PALMERI:  Well --

17             THE COURT:  Because all you've said is, I want

18   everything.

19             MR. PALMERI:  So for example, with Mills, I want

20   the correspondence in that matter, Your Honor.  If they're

21   communicating with Mills and counsel, opposing counsel for

22   Mills, I think I'm entitled to that.  I have told them we

23   want any of the pleadings in that case.  I've told them we

24   want discovery in that case.  I told them we want any

25   financial records that were produced in that case.  We've run

1    through it.

2            The only dispute that I have that he had raised,

3    and I said we're happy to carve it, is any potentially

4    privileged, attorney-client privilege communications, and I

5    told them let's hold off on that for now.  We're not moving

6    on that.  That if Faegre and the other lawyers are claiming

7    privilege, then let's carve it for now.

8            But the idea that they are not producing a single

9    document, I guess I could use -- I'm limited in my numbers of

10   requests, Your Honor.

11           THE COURT:  I get that, and that's -- there's a

12   reason for that, and you're trying to get around it by

13   saying, give me everything, and that the rules don't permit.

14   They just don't.  Otherwise, in every single case we'd have

15   one request for production; give me everything --

16           MR. PALMERI:  Well, we're here --

17           THE COURT:  -- and that's not what the rules do.

18           MR. PALMERI:  Well, we're here following the

19   conferral, so let's just define it right now, Your Honor.

20           THE COURT:  Yeah.

21           MR. PALMERI:  I'm more than happy to do that.

22   I've done this with Mr. Pulkrabek.

23           THE COURT:  No, you have to -- that's not how this

24   works.  It's not my job to narrow down an overly broad

25   request, nor is it that we walk into court and, you know, we

1  have a conferral here.

2          You submit a request for production.  If you want

3  to submit a request for production that says, produce all

4  discovery that is in your possession in this case, fine.  If

5  it's please produce all pleadings, again I don't know why you

6  can't -- they're public records, I don't know why you can't

7  pull the pleadings yourself, but it --

8          MR. PALMERI:  They're not public records, Your

9  Honor.  They're in Florida.  It is not an equal burden.  It's

10 Florida State Court, and in terms of what we have access to

11 versus what they have access to is not the same, Your Honor.

12         THE COURT:  Then submit a request --

13         MR. PALMERI:  So this idea that we have to go do

14 it --

15         THE COURT:  -- for production that says produce

16 this.  That's not what this does.  This says give me

17 everything related to -- it's overly broad.  I'm sorry, it

18 just is.

19         MR. PALMERI:  Well, then we'll move on, Your

20 Honor.

21         THE COURT:  You can disagree with me, and, you

22 know, that's fine.  And you know, you can submit an objection

23 to Judge Moore and see what he says, but this is a patently

24 over broad request.

25         MR. PALMERI:  Your Honor, I want to --

```
 1              THE COURT:  It just is.
 2              MR. PALMERI:  I want to move on.
 3              THE COURT:  Okay.
 4              MR. PALMERI:  We've gotten zero documents in terms
 5   of the responses to our requests for production, and whatever
 6   we need to do to facilitate that --
 7              THE COURT:  Okay.
 8              MR. PALMERI:  -- I will do.
 9              THE COURT:  Okay.  Then with respect to --
10              MR. PALMERI:  So let's move on to the second one.
11              THE COURT:  -- request for production number one,
12   I'm going to quash request for production number one.
13   Obviously you can submit a more specific request to them and
14   then we can take it up at that point.
15              With respect --
16              MR. PALMERI:  The second point is --
17              THE COURT:  Go ahead.
18              MR. PALMERI:  -- the financial records, Your
19   Honor.
20              THE COURT:  Go ahead.  You can argue that.
21              MR. PALMERI:  We've received zero.  We have asked
22   them for financial records.  We have asked them -- we have
23   described for them what we are looking for.  They've refused
24   to produce any of their financial records.  They said we
25   don't know, we'll run reports.  So what we then did is we
```

1  asked, what type of software do you have?  They have a

2  Timberline Sage based software.  And what we said was, if you

3  don't know about the reports or what have you, you could

4  produce this in native file or you could segregate this,

5  produce it, and we'll run whatever reports we need to.  But

6  we need to get the financial records of NGC.

7         Again the response is, we're not going to give you

8  anything unless you limit your request and agree that

9  whatever we give you is it and it's the end of the road.

10         So what we need here, and we've already described

11  this for them, we need the financial statements, we need the

12  profit and loss, we need -- and there are any number of

13  reports that could be run.

14         The only thing that we have heard is that there's

15  a woman named Donna Wiener (phonetic), she's an independent

16  contractor, she now has that.  There's no dispute, Your

17  Honor, that they have -- it's within their possession,

18  custody, or control.  It is the NGC financial records.  So we

19  ask that they be required to produce the financial records in

20  any number of ways, either -- and the request we have is

21  produce it in data format.  We're not asking for access to

22  their software as a user or anything else, but what we are

23  asking for is that if we could get access to that our

24  forensic accountant can run whatever reports he wants.

25         To the extent that they want to produce the hard

1    documents, then they need to produce the hard documents that

2    would be available, that would be including their year-end,

3    their general ledger --

4              If I can just take a look at an item, Your Honor?

5              And again, we've run through this with Mr.

6    Pulkrabek that we're looking for it would be their general

7    ledger, their income statements, their profit and loss

8    reports, et cetera.  That's what we're looking for.  They're

9    suing for in excess of $9 million in damages, at the heart of

10   this has to do with the financial structure of NGC and

11   whether they were operating the property, whether they had

12   money to pay the taxes, et cetera.  Directly at issue, and

13   we'd ask that there'd be an order to compel production of the

14   financial records.

15             THE COURT:  Let me hear from Plaintiff.  If I were

16   to strike, because again this request suffers from the same

17   problem as request number one, because it contains -- after

18   saying any and all of NGC's and FRD's books, records,

19   financial statements, annual reports, which is more limited,

20   it then says, and any other documents arising out of or

21   related to this litigation.

22             So the tail end of this suffers from the same

23   exact problem.  But if I were to strike the, "and any other

24   documents arising out of or related to this litigation, the

25   Florida action and quite title and/or the Drake asset

1   action," what's your response to that?

2          So if I ordered you to produce the financial

3   records of NGC, because they're right, we do need to know did

4   you have the ability to pay these back taxes or did you not

5   have the ability.  Because if you didn't have the ability to

6   pay the back taxes, there's no damages here.

7          MR. PALMERI:  Well, and there are other reasons

8   for it as well.  Again, having to do with are there financial

9   information that would've provided evidence regarding Mills

10  going rouge?

11         In terms of the, if you strike that, as long as

12  we're not prejudiced from going back, again. Mr. Pulkrabek's

13  position has been, I'm not going to give you anything unless

14  you agree that you're never going to ask for anything else.

15  If you strike that, and then if we have some other documents

16  and we need to follow up, I don't have a problem with that.

17         THE COURT:  Yeah.  You can submit whatever request

18  for production you want.  But if I strike the rest of this,

19  is that -- so if I strike from annual -- after annual

20  reports, if I strike the rest of it, is that sufficient for

21  you to produce the information that's necessary?

22      (No audible response)

23         THE COURT:  I'm asking Plaintiff.

24         MR. PULKRABEK:  Oh, are you asking me --

25         THE COURT:  Yeah.

1          MR. PULKRABEK:  -- at this point?

2          THE COURT:  If I strike after annual reports on,

3    is that sufficient for you to respond to that?

4          MR. PULKRABEK:  I don't know that it is.  So you

5    would -- the request would still be, produce any and all NGC

6    and FRD's books, records, financial statements, and annual

7    reports, period.

8          THE COURT:  Correct.

9          MR. PULKRABEK:  All right.  Well, let me address

10   that.  I think you understand why we have objected to it as

11   it's written.

12         There are a couple different things I want to

13   point out.  And first, I have to disagree with Mr. Palmeri

14   that we haven't produced any documents, and we've even in

15   response to this stuff, we've produced, you know, hundreds of

16   pages at minimum.

17         But with respect to the 250,000 pages that were

18   produced, let me just kind of describe briefly what that is.

19   When my client, Avid Hunter/Klaus Goddard got control of NGC

20   and FRD, from Russell Mills and Juica M (phonetic) which were

21   the management companies, they got a server.  The server had

22   a bunch of emails on it, and a lot of the emails are emails

23   between Russell Mills and his staff and this bookkeeper, Dyna

24   or - Wiener.  Okay?  And those things attach, ad nauseam,

25   financial inform.

1       There's exactly the kind of stuff that Mr. Palmeri

2  is talking about.  He wants, you know, financial statements.

3  There's lots of them, lots and lots of them.  General

4  ledgers, there are hundreds of pages of general ledgers that

5  show all the charges that the companies are incurring and so

6  forth.  There's tax returns.

7       I'm not quite sure what the fact is that Mr.

8  Palmeri's interested in, you know, what was Mr. Goddard's

9  capital contribution to the company.  Probably a fair fact.

10  I think that's totally ascertainable from what they have.

11  What was his percentage interest?  I want to see what Russ

12  Mills was spending money on, where the money was.

13       I think they have all that, they're bank records

14  in the 250,000 pages.  So I think they already have what they

15  want, and I'm not really sure that there's more of a universe

16  that's relevant to this case than what we've already

17  produced.  So that's kind of point number one.

18       Point number two is the way that Russell Mills,

19  when he was managing this company through Juice M, a separate

20  company, was he had -- he was using this Timberline

21  accounting software and he had multiple entities all set up

22  on that software.  And the reason for it as I understand from

23  Ms. Wiener, is that he was using -- he was kind of, like,

24  keeping one bank account, or a couple bank accounts, for all

25  of these different entities that were under manage, and so

1  that's why everything's sort of consolidated.

2          It's possible to run a report that breaks out just

3  show me the stuff for NGC.  That's possible for Ms. Wiener to

4  do.  But what she says is, look, I'm not willing to give

5  access to anybody else because there are all of these

6  different companies that are folded up within a single file,

7  and if I give access then I'm giving access to the complete

8  file. There's no way to just carve NGC, or for that matter,

9  this other company FRD, out.

10          THE COURT:  Well, but I thought you said she could

11 produce reports for NGC.

12          MR. PULKRABEK:  Yes, she can.  And so that's what

13 we've kind of talked about is, look, if there are specific

14 reports that you would like me to ask Ms. Wiener to run then

15 tell me what reports those are and then we will consider them

16 and run them.

17          For the most part, I would imagine we won't have

18 an objection to it.  There might be a few that would get

19 into, you know, what are -- what legal fees and costs are

20 they paying to my firm for this case?  Or, you know, or

21 paying to some other firm for the Florida case or something.

22 There may be some things that we would object to, but those

23 things would then necessarily postdate, any liability that

24 Mr. Seter would have.  So I'm not sure why it would be

25 necessarily relevant either.

1          So I think that that's the way to approach this.

2    Tell us what they want.  Again, I think they've already got

3    all the stuff in the record.  I mean the financial statements

4    are certainly there.  I can swear up and down to that,

5    because I've seen them.  You know, there are tax returns in

6    there.

7          But tell if they want them to be rerun because

8    they don't want to search the file themselves for them, you

9    know, I think we would be willing to give them the financial

10   statements on an annual basis.  You know, year-end financial

11   statements, sure, we could probably do that.

12         And this is a conversation we've had in conferral.

13   I've kind of suggested, hey, if that's what you want, how

14   about I give you that?  And the response I get is, well, we

15   take that, but we don't want to foreclose that we're going to

16   also then want to say we want the broad Timberline data.  And

17   you know, we go through that conversation.

18         So in response to your original question, if you

19   strike it, it narrows it certainly, but it doesn't completely

20   eliminate the issue.

21         Then the final point is, quite frankly, FRD is a

22   third party company.  You know, I believe it's substantially

23   under Klaus Goddard's control, so I don't think it's an issue

24   of we couldn't produce it, but there may be some other

25   interested parties in that one and I'm not sure what they

1   would have to say about it.  And Mr. Seter never provided any

2   legal services to FRD, so I'm not quite sure why FRD, which

3   is just in Florida, would even be relevant.

4           So if we're going to -- if we're talking about

5   narrowing the language, I would also suggest we take out FRD

6   and just really focus on NGC.

7           THE COURT:  Let me ask briefly, what's the

8   relevance of FRD?

9           MR. PALMERI:  Your Honor, I don't know.  We didn't

10  ask for the FRD records.  It sounds like they commingled --

11          THE COURT:  Well, you did.  It says, any and all

12  of NGC's and FRD's books, records, financial statements,

13  manual reports.  It's in the request.

14          MR. PALMERI:  May I have a moment, Your Honor?

15          THE COURT:  Sure.

16      (Pause)

17          MR. PALMERI:  The point is that they're

18  commingled.  But in any event, it's relevant again having to

19  do with Goddard Mills.  The idea and the theory is that it

20  has to do with whether Mills went rogue, et cetera.  I think

21  it goes to that, Your Honor. In any event --

22          THE COURT:  Well, but how?

23          MR. PALMERI:  Well, if they're commingling the

24  money --

25          THE COURT:  I mean, you didn't even realize you

1   requested it until moments ago, so how is it -- what's the

2   relevance of it?

3          MR. PALMERI:  Well, again, it has to do with the

4   financial dealings between Mills and Goddard.  The idea

5   having to do with the approach here is that Mills is the one

6   actively involved in everything, that Goddard's the money

7   guy, and that it's relevant, are there money?  Is there money

8   changing hands?  Where were they?

9          To the extent they need to carve FRD or having to

10  deal with that, we can deal with that, Your Honor.  But to go

11  back let me just address what their approach is.

12         THE COURT:  Here's what I'm going to do, because

13  we're going to be here all day if we're taking 20 minutes on

14  each of these, I am going to permit request for production

15  number four to the extent it ask for any and all of NGC's

16  books, records, financial statements, and annual reports.  I

17  think that's sufficiently narrow.  That, one, it's

18  understandable, and two it's sufficiently narrow that it's

19  not overly burdensome.  I think everybody can understand what

20  documents are being requested with that, and if they need to

21  be -- if this third-party accountant needs to print them out

22  in a hard copy she could do so, but I think that's

23  efficiently understandable.

24         MR. PALMERI:  Again, Your Honor, just one

25  clarification.  If we feel we need additional, I trust we're

1   not prejudiced by further requests.

2          THE COURT:  As long as you're written number of

3   requests for production, you're free to submit additional

4   requests for production.

5          MR. PALMERI:  Thank you.

6          MR. PULKRABEK:  And Your Honor, just so I

7   understand, when we're talking about records, which could be

8   a broad term, we're talking about the financial records.

9          THE COURT:  Yes.

10         MR. PULKRABEK:  Right?

11         THE COURT:  Yes.

12         MR. PULKRABEK:  Okay.

13         THE COURT:  With respect to request for production

14  Number 5, what's the issue here?  Because the representation

15  is they've all been produced.

16         MR. PALMERI:  The representation they've all been

17  produced relating to Colorado.  I want all of the email

18  communications between Mills and Goddard, not limited to

19  Colorado.

20         THE COURT:  Let me ask, are you limited -- have

21  you limited it to Colorado, or has everything been produced?

22         MR. PULKRABEK:  As far as I know, everything's

23  been produced.

24         THE COURT:  All right.

25         MR. PULKRABEK:  I've personally looked through it

1   and it's ad nauseam communications about everything.

2        THE COURT:  Then I'm going to order it to be

3   produced, if it hasn't been already.  But it sounds like it

4   already has been.

5        With respect to issue number four, which is the in

6   camera review of redacted documents.  Let me -- and number --

7   why don't we take up four and five together?  Let me hear

8   argument on this.  In order for me to do an in camera review

9   I think there needs to be some showing that something's been

10  improperly withheld.  I don't think the mere fact that we

11  have redactions in some documents necessarily implies that

12  something had been improperly withheld.  It's my

13  understanding that Mr. Mills' representation covered many

14  topics, and the fact that some things are redacted and some

15  things aren't tends to suggest to me that counsel went

16  through the appropriate steps in order to determine, does

17  this relate to something that is, you know, was an NGC

18  communication as opposed to a Mr. Mills' personal

19  communication.  Because obviously the NGC communication, the

20  privilege was held by NGC and should be turned over.

21       But if he's communicating about, you know, let's

22  take an example.  Do I have personal criminal liability for

23  anything here?  That's a personal communication.  So I don't

24  know that a showing's been made here that requires in camera

25  review, and I'm not inclined to just do an in camera review

```
 1   in every case without some sort of showing that there's
 2   something that's been improperly withheld.  Otherwise, I'm
 3   going to be spending my entire time conducting in camera
 4   reviews in every case.
 5            So let me hear argument.
 6            MR. PULKRABEK:  Sure.  So, Your Honor, I think we
 7   laid out the story, and it's a little bit different from what
 8   Mr. Palmeri is suggesting, just Mr. Mills going rogue.
 9            What happened here is Mr. Mills and Mr. Seter were
10   working on getting this kind of crazy wire transfer of 80 to
11   a $100 million out of Nairobi or Kenya.  Now, frankly, I
12   think this was a Nigeria 419 scam that was going on.  It's
13   got all the hallmarks of that.  But the idea was Mr. Mills
14   wants this money, some of it he's going to use for Friesland
15   Trust (phonetic), which he's doing with Mr. Seter, other
16   money he's going to use to finally pay off these taxes.
17   Okay?  And so they're kind of working on this fake wire
18   transfer issue from Kenya.  That's what this case really kind
19   of boils down to.
20            And so what you can see from the exhibits that we
21   submitted, in Exhibit B, this has some really good examples,
22   there are communications where they're frantically talking
23   about this wire transfer issue, and they -- and what appears
24   to be going on is they'll concede up to a point that, okay,
25   well some of this has to do with when Mr. Mills is wearing
```

1    his NGC hat and Mr. Seter is wearing his NGC hat, but then in

2    the next sentence they want to say, okay, but other talk,

3    other communication about the wire transfer somehow doesn't

4    have to concern NGC.  And now they're -- it's just switching

5    on a different hat, sort of mid paragraph, as they talk about

6    things.

7             So that's why I suggest, would you do an in camera

8    review?  It's extraordinarily weird, in my opinion.  And I

9    understand that it's fairly commonplace that we'll get

10   documents that are produced and then maybe there will be

11   something that's been redacted out of attorney-client

12   privilege because that's legal advice.  What's unusual about

13   this thing is we've got two fiduciaries speaking to each

14   other about NGC business in an email.  Mr. Seter's a

15   fiduciary, Mr. Mills is a fiduciary, and they're clearly

16   talking about NGC interests.  But then they just go back and

17   forth and they want to say, okay, well this sentence was only

18   about NGC, but then this other sentence must be about Mills'

19   personal interests.

20            The world doesn't work that way, and people don't

21   get to kind of retrospectively look at an email and say,

22   well, let's figure out what hat somebody was wearing when

23   they made this particular statement versus that particular

24   statement.  I would submit to you that when you've got two

25   fiduciaries who owe duties to NGC talking about something

1  that clearly NGC has an interest in, which is getting these

2  taxes paid, and they're talking about the wire transfer

3  that's going to pay them off, they don't get to pick and

4  choose between which sentences they disclose.  There's been a

5  waiver as to the whole, that's my position.  I think they've

6  waived it.

7            And surely, you know, Mr. Mills --

8            THE COURT:  Well, how so?  I mean, if --

9            MR. PULKRABEK:  Sure.

10            THE COURT:  Obviously he can communicate with

11  counsel on behalf of NGC, and that's one privileged

12  communication.  That privilege is held by NGC.

13            MR. PULKRABEK:  Yes.

14            THE COURT:  But if he's having a separate -- I

15  mean, are you requiring him to hit "send" on that email and

16  then compose a second one that says, and by the way, I've got

17  a question about my personal --

18            MR. PULKRABEK:  Or --

19            THE COURT:  That doesn't -- I mean, I don't know

20  of any case, nor have you pointed me to one, that says that

21  by including conversations both personally and on behalf of

22  the company in the same email that you somehow waive your

23  privilege.

24            MR. PULKRABEK:  I'll tell you what I would expect

25  to see.  I don't think there's any case that would support

1   doing this.  I've just never seen anything like this before,

2   frankly.  What I would expect to see --

3            THE COURT:  Well, that doesn't surprise me at all.

4   It doesn't surprise me at all if you are representing the

5   principle of a company who has separate, you know, has a

6   relationship with a law firm and they have -- you know, let's

7   say they have a principle of eight companies, it doesn't

8   surprise me at all that they may ask questions about each

9   company in a single email to the law firm, or ask questions

10  about, you know, personal issues in the in email to a law

11  firm that's representing on multiple matters.  That doesn't

12  shock me at all.

13           MR. PULKRABEK:  Well, I think, you know, in that

14  situation, and I've never seen anything quite like that, but

15  the closest analogous thing that I've seen are, you know,

16  bank reports, things like that where they delineate, okay,

17  there's a paragraph here about the non-privileged issue.

18  Then there might be a separate paragraph about the privileged

19  issue, or there might be a heading or something to set it

20  off.

21           But all we have here is we have an email that's

22  clearly about this wire transfer, and that's the subject.

23  There's no question that's what this is about.  And we see

24  that they're willing to show some of it, and then they get to

25  a sentence and they want to redact that.

1              I will also just say, Your Honor, that this is

2    probably the most aggressive assertion of attorney-client

3    privilege that I've ever seen in any case by a lawyer and a

4    defendant.  And what we've seen, I mean, we've been in here

5    now, I think this is the third or fourth time, on privilege

6    issues.  We've gotten a lot of the documents that they were

7    saying were privileged and they weren't privileged, and this

8    is exactly the kind of stuff that we're finding out.  And

9    this is at the heart of the case.

10             What we have is we've got a lawyer who owed duties

11   to NGC, and Mills who owed duties to NGC, and they're trying

12   to figure out how they're going to get 80 to $100 million

13   into Seter's wire transfer account.  This was a fraud that

14   they got looped into out of Kenya.  It was one of those

15   Nigerian prince scams.  But they're working on that.  They're

16   talking to each other, they're talking to bankers, they're

17   talking to Mr. Roberts and other people in Kenya.  The one

18   person they're not talking to is Klaus Goddard who has money

19   and he could send it over to pay the taxes.  That's what this

20   case is really about.

21             So we'd like to see, and at least, you know, at a

22   minimum, have assurance that the additional things that have

23   been redacted don't also relate to our case.  I think that,

24   honestly, I don't know how we could make any more of a

25   showing than is made here that you should look at this

1   redacted material.  I can't -- how would we possibly do that?

2          THE COURT:  How many documents are we talking

3   about?

4          MR. PULKRABEK:  I think I've limited it to about

5   four or five.  I mean, we're talking about 10 pages, maybe.

6          THE COURT:  Okay.

7          MR. PULKRABEK:  For the stuff that they've

8   redacted.  And then there are some additional documents that

9   they withheld saying, well, this stuff concerned a different

10  company, Decono (phonetic).  Well, we heard the same argument

11  when they said these communications concerned the Friesland

12  Trust.  It's the exact same argument.  We got the documents

13  and clearly they pertain to this wire transfer that affects

14  NGC.  And they're in the same time period that they're

15  talking about this stuff.  That's why I would ask you to look

16  at, you know, maybe the 10 pages with the redactions, and the

17  10 pages that they claim the deal with Decono.

18          If you conclude that it's totally unrelated, then

19  at least I have, and my client has, peace of mind that, you

20  know, we're not facing an overly aggressive assertion of the

21  attorney-client privilege.

22          THE COURT:  All right.

23          MR. PALMERI:  Your Honor, I'm not going to repeat

24  our -- we have been here several times, as you know, and I'm

25  not going to repeat our prior arguments.  We don't control

1   the privilege.  So whether it's an overly aggressive

2   assertion or not, what we've attempted to do is to protect

3   that privilege, which I think we're required to do.

4             THE COURT:  Okay.  Here's what I'll do.  I'll

5   conduct it in camera review of it and then make a ruling.

6             How quickly can these documents be provided to my

7   chambers?

8             MR. PULKRABEK:  Within, probably by Monday.

9             THE COURT:  Okay.  Let me set this then -- we

10  still have one issue that I'll take up today, but let me set

11  this for -- are you all available next Thursday at 11:45 for

12  just my ruling on the issue?

13            MR. PALMERI:  In person?

14            THE COURT:  Oh, actually, that's not going to

15  work.  How about next Friday at 11:30?  You don't need to be

16  here in person.  You can be on the phone for that.

17            MR. PULKRABEK:  That works for me.

18            THE COURT:  Okay.

19            MR. PALMERI:  That would work for me.

20            THE COURT:  Okay.

21            MR. PALMERI:  May I make one note, Your Honor?

22  There are two separate client matters, one has to do with

23  Decono, and then the other has to do with the Friesland

24  Trust.

25            THE COURT:  Okay.

1          MR. PALMERI:  I think there are separate issues

2    having to do with Decono.  There's, I think the Court needs

3    to look at these separately, and if we'd be allowed I'd like

4    to submit the documents with a cover sheet that would say

5    these have to do with Friesland Trust --

6          THE COURT:  Sure.

7          MR. PALMERI:  -- and then a separate cover sheet

8    saying these have to do with the Decono, just so you're

9    aware.

10         THE COURT:  Sure.  That's fine.

11         MR. PULKRABEK:  Because the Decono has nothing to

12   do with anything.

13         THE COURT:  Sure.  That's fine.  And I'll even

14   permit you, I want the documents by Monday at 5:00, but I'll

15   even permit you, if you want to, include an explanation for

16   why you believe it's separate and irrelevant and not related

17   to NGC privilege.  I'll prevent you to do that.

18         That brings us into then to the final issue which

19   is the text messages.  Let me ask, it's unclear to me from

20   the position statement of defendants -- the position

21   statement says both they don't exist, and then if they do,

22   they're privileged.  That can't be both.  Either text

23   messages don't exist, or they exist and they're privileged,

24   but it can't be both.  So, which is it?

25         MR. PALMERI:  Your Honor, as I understand it, we

1   have not gone to -- what we would have to do, we'd have to go

2   to AT&T to see if they exist or not.

3          THE COURT:  Because none of them were kept?

4          MR. PALMERI:  Your Honor, I don't want to make

5   representations to the Court.  I'm not exactly sure whether

6   any had been saved or not.  My understanding is, to the

7   extent we're going to attempt to capture them, we'd have to

8   get them through AT&T.  I don't -- I don't know if they're --

9   I mean, they certainly aren't screenshotted.

10         MR. PULKRABEK:  Well, the issue here, Your Honor,

11  is we were told earlier that they just didn't communicate by

12  text messages, then we get these additional emails that show

13  that they clearly did communicate.  We sent document

14  preservation to Mr. Seter two years ago or so, hopefully he

15  preserved the documents, including any communications with

16  Mills by text.

17         I think from my standpoint, step number one is

18  they ask Mr. Seter, look at your phone and see if you got

19  text messages with Mills, and if so, got them off the phone.

20  And then step two would be, review them for privilege and

21  list any privilege on a privilege log.

22         But as you can see, I think, they're definitely

23  talking by text about this wire transfer, exchanging

24  passwords for encrypted communications they're having about

25  the wire transfer, and having other communications about it.

1   It's all very relevant to our theory of the case.

2            THE COURT:  I am going to order if there's any on

3   the phone to review them.  If they're privileged, you can

4   submit it -- you can, you know, assert a privilege on it.

5   But at least see if there's any on the phone or not.  And

6   then, like I said, if there are, they should be produced, or

7   alternatively, a privilege log produced for it.

8            MR. PALMERI:  We'll look on his phone.

9            THE COURT:  Okay.

10           MR. PALMERI:  Again, we're talking about text

11  messages from over four years ago, Your Honor.

12           THE COURT:  Yeah.  I don't know.  I mean, I tend

13  to delete my text messages.  I know other people, my wife, I

14  think, keeps every text message she has.  I don't know the

15  answer to this or not, but let's get to the bottom of it.

16           All right.  Thanks, everyone.  We'll be in recess.

17           MR. PULKRABEK:  All right.  Thank you, Your Honor.

18           THE COURT CLERK:  All rise.

19                    (Time noted:  11:24 a.m.)

20                      *  *  *  *  *

21

22

23

24

25

1                          CERTIFICATE

2        I, RANDEL RAISON, certify that the foregoing is a

3  correct transcript from the official electronic sound

4  recording of the proceedings in the above-entitled matter, to

5  the best of my ability.

6

7

8  _____          October 10, 2022

9  Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25